No. 23-_____

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

IN RE: MARRIOTT INTERNATIONAL, INC.
CUSTOMER DATA SECURITY BREACH LITIGATION

_____

On Petition For Permission To Appeal
from the United States District Court for the District of Maryland,
MDL No. 19-md-2879 (Bailey, J.)

_____

## PETITION OF DEFENDANT ACCENTURE LLP FOR PERMISSION TO APPEAL UNDER RULE 23(f)

_____

DEVIN S. ANDERSON
CRAIG S. PRIMIS, P.C.
EMILY M. LONG
JOSEPH C. SCHROEDER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
devin.anderson@kirkland.com

*Counsel for Defendant-Petitioner
Accenture LLP*

December 13, 2023

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____        Caption: In re: MARRIOTT INTERNATIONAL, INC.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Accenture LLP
(name of party/amicus)


who is _____petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Accenture plc, Accenture Inc., Accenture LLC, Accenture Sub LLC, Accenture Sub II Inc.,
      Accenture Sub III Inc., and Accenture Sub IV Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                ☑ YES ☐ NO
      If yes, identify all such owners:

      Accenture plc, Accenture Inc., Accenture LLC, and Accenture Sub LLC

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s Devin S. Anderson                    Date:    12/13/2023

Counsel for: Accenture LLP

Print to PDF for Filing

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS ................................................................. 3

QUESTIONS PRESENTED ............................................................... 6

STANDARD OF REVIEW ................................................................ 7

ARGUMENT ...................................................................................... 7

I.    The District Court Erred By Certifying Classes That It Admitted
      Lack Any Class-wide Injury Subject To Common Proof. ............................ 8

II.   The Questions Presented Are Important And Resolving Them Now
      Will Simplify or Dispose of This Litigation. ................................................. 19

CONCLUSION .................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019)................................................20

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................17

*Bank of Louisiana v. Marriott Int'l, Inc.*,
438 F. Supp. 3d 433 (D. Md. 2020)................................................16

*California v. Texas*,
141 S. Ct. 2104 (2021)............................................................18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).....................................................8, 9, 10, 11, 13

*Ealy v. Pinkerton Gov't Servs., Inc.*,
514 F. App'x 299 (4th Cir. 2013) .................................................9

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) .....................................................7

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
254 F.R.D. 68 (E.D.N.C. 2008) ...................................................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)...............................................................17

*Gunnells v. Healthplan Services, Inc.*,
348 F.3d 417 (4th Cir. 2003) ................................10, 11, 12, 13, 20

*Harris v. Medical Transp. Mgmt., Inc.*,
77 F.4th 746 (D.C. Cir. 2023)....................................................12

*Lienhart v. Dryvit Sys., Inc.*,
255 F.3d 138 (4th Cir. 2001) ...............................................7, 19, 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..............................................................18

*In re Marriott Int'l, Inc.*,
    78 F.4th 677 (4th Cir. 2023) ........................ 1, 2, 3, 5, 6, 9, 11, 13, 14, 15, 19, 20

*Moss v. United Airlines, Inc.*,
    20 F.4th 375 (7th Cir. 2021) ................................................................20

*Naparala v. Pella Corp.*,
    2016 WL 3125473 (D.S.C. June 3, 2016) ...........................................20

*Parker v. Asbestos Processing, LLC*,
    2015 WL 127930 (D.S.C. Jan. 8, 2015) ..............................................14

*In re Rail Freight Fuel Surcharge Antitrust Litig.- MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) ............................................................12

*Romig v. Pella Corp.*,
    2016 WL 3125472 (D.S.C. June 3, 2016) ...........................................14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)............................................................................18

*Stillmock v. Weis Markets, Inc.*,
    385 F. App'x 267 (4th Cir. 2010) ......................................................17

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) .............................................................13

*Tillman v. Highland Indus., Inc.*,
    2021 WL 4483035 (D.S.C. Sept. 30, 2021) .................................11, 20

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)........................................9, 10, 13, 17, 18, 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..........................................................7, 8, 9, 10, 13

*Windham v. Am.Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977) ...............................................................12

**Rules**

Federal Rule of Evidence 702....................................................................1, 18

Rule 23 ................................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17, 19, 20

**Other Authorities**

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1779 (3d ed.) .............................17

## INTRODUCTION

This Court previously found that class certification in this sprawling data-breach litigation warranted Rule 23(f) review, and the same serious, unresolved, and recurring questions persist following remand back to the district court.  *See In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023).[1]  That is because the district court (now Judge John M. Bailey, following Judge Paul W. Grimm's retirement) proceeded to recertify the class as to Accenture in a single sentence that did not address *any* of the Rule 23 or Article III concerns that were the subject of extensive briefing, argument, and analysis in this Court.  That leaves this case with the same glaring procedural and constitutional deficiencies that this Court believed were deserving of Rule 23(f) review previously.  If anything, the district court's failure to address issues highlighted in this Court's opinion heightens the need for intervention.

To recap: this case arises out of the 2018 Marriott data breach.  As plaintiffs made their way through discovery, they had just one theory of common, class-wide injury for their negligence claims against Accenture, which was an IT-services contractor for Marriott.  Plaintiffs claimed they had somehow lost revenue from hypothetical sales of their data because of the breach.  The district court rejected that theory on the facts, the law, and under Federal Rule of Evidence 702.  The district

---

[1] For brevity, all internal quotations have been omitted and all emphasis has been added, unless otherwise noted.

court then concluded that plaintiffs' damages class against Accenture failed Rule 23, because injury, causation, and damages were not common issues and predominated. But the district court adopted a novel strategy of using Rule 23(c)(4)'s provision for "issue" classes to certify classes only on the elements of duty and breach. Whether viewed through the lens of Rule 23 commonality, predominance, or superiority, or Article III, there is nothing to recommend a class action where there is admittedly no class-wide injury. As the district court acknowledged, millions of follow-on, individual trials on important elements of *liability* like injury and causation would still be required before any individual plaintiff could prove a claim.

This Court vacated these unusual issue classes and thoughtfully highlighted significant problems that the district court should consider in the first instance. For one, the Court recognized that it is an open question in this Circuit whether it is even permissible to "certify certain elements of a cause of action as to which common issues predominate" for class treatment, where "individual issues predominate as to other elements." *In re Marriott Int'l*, 78 F.4th at 688. The Court also acknowledged Accenture's concern that where "injury and causation elements have been carved out of class proceedings," the "result is inconsistent with Article III standing requirements because there is no assurance at the certification stage that all class members have suffered the necessary injury in fact at the hands of the defendant." *Id.* at 689 n.7. And the Court emphasized that Rule 23(b)(3)'s "superiority" criterion

"takes on special importance" when using Rule 23(c)(4), especially where "cleav[ing] off" elements of a cause of action means that the class litigation will not actually resolve liability for any class member. *Id.* at 689. But this Court ruled narrowly. It declined to resolve these important questions because once the Court "vacated certification of the Rule 23(b)(3) damages classes against Marriott …, nothing remains to support the district court's superiority finding as to the issue classes against Accenture." *Id.* at 690.

Unfortunately, the same critical Rule 23 and Article III problems endure, because the district court ignored this Court's opinion and reinstated the classes against Accenture with no analysis on remand. This Court should grant review again, and reverse. The same divide concerning the appropriate use of the issue-class mechanism remains in the district courts of this Circuit. The same constitutional concerns remain with the district court's proposed advisory class trials. And the district court has not shown that it will engage with these important issues, which will remain unresolved because the unusual decision to certify individual elements of a single claim will likely preclude a further opportunity for review in this Court.

## STATEMENT OF FACTS

On November 30, 2018, Marriott announced that its legacy Starwood guest-reservation database had experienced a cyberattack. Forensic investigation

determined that a threat actor may have gained access to personal information of Starwood guests—including names, addresses, email addresses, phone numbers, and birthdates, as well as some passport and payment-card numbers, the vast majority of which were encrypted. ECF.598-1.at.5-7. Following Marriott's announcement, numerous lawsuits were filed against Marriott and ultimately consolidated in a multi-district litigation in the District of Maryland. ECF.1.

Accenture was an IT contractor for Starwood during the relevant period. ECF.1019-18.at.46:10-17. Given its role as a behind-the-scenes third-party service provider, Accenture never interacted directly with Marriott customers. Nevertheless, plaintiffs added Accenture as a named defendant. ECF.537. While plaintiffs alleged statutory, contractual, and negligence claims against Marriott, they asserted only negligence claims against Accenture.

Following fact and expert discovery, plaintiffs moved to certify Rule 23(b)(3) damages classes based on two theories of alleged harm. First, as to their contract claims against Marriott, plaintiffs put forward a model asserting that they were overcharged for staying in Marriott hotels. Second, as to their negligence claims, plaintiffs offered one damages theory: that their personally identifiable information (or "PII"), had some common "market value" that plaintiffs "lost…when hackers gained access to, and/or exported, PII from the NDS database." ECF.1014.at.32 (Ex. A). The court rejected this latter theory in full. ECF.1012.at.24-38 (Ex. B). In

denying certification of a damages class on plaintiffs' negligence claims, the district court found that "the loss of market value theory cannot support class certification … even as to liability," as "too many open questions remain as to individualization"—including "fact of injury, injury causation, etc"—"to satisfy the predominance requirement" of Rule 23(b)(3).  ECF.1014.at.33.

The district court nevertheless certified a Rule 23(c)(4) issue class—not to resolve any claims, but to resolve only "the duty and breach issues." ECF.1014.at.66.  In so doing, the district court admitted that it was relying on a "broad view" of Rule 23(c)(4) that has not been endorsed or adopted by this Court. ECF.1014.at.61&n.60.  And the district court acknowledged that individual trials would still be required on injury, causation, and damages.  ECF.1014.at.66.  But it posited that this approach would produce "efficiency gains," since it had already certified a separate damages class against Marriott.  ECF.1014.at.66,67.

Accenture successfully petitioned for an interlocutory appeal of that initial class certification order under Rule 23(f), and this Court vacated and remanded.  The Court recognized that the district court's order raised questions regarding issue classes that were "not … free from doubt."  *In re Marriott Int'l*, 78 F.4th at 689.  The Court also noted Accenture's argument that because even the fact of injury was not a common issue, the classes raised questions of Article III standing.  *Id.* at 689 n.7. But the Court determined that it could vacate the classes on superiority grounds,

because the district court's superiority finding was based solely on the fact that it had also certified classes against Marriott, and the Court was reversing the Marriott certification. *Id.* at 689. The Court said that the district court, on remand, could reconsider its findings as to Accenture. *Id.* at 689–690.

Without further evaluating these important issues, the district court *sua sponte* reinstated the classes against Accenture. It asked for briefing on the separate issue of "the effect of [a] class waiver provision contained in the Starwood Preferred Guest Program 'Terms and Conditions' on the potential certification of a class," but did not ask for briefing on the issue classes or otherwise indicate that it was ready to fully resolve other class certification issues. *See* ECF.1135. After receiving briefing on the class waiver and holding that Marriott could not invoke it, the district court proceeded to reinstate the issue classes as well, without further analysis:

> This Court also finds that inasmuch as this Court will re-certify the classes with respect to Marriott in this case, the class certification with regard to Accenture will be reinstated again.

ECF.1155.at.20 (Ex. C).[2]

## QUESTIONS PRESENTED

1. Whether a court can certify a class under Rule 23 or Article III without a viable theory of class-wide injury susceptible to common proof.

---

[2] Marriott's separate Rule 23(f) petition discusses significant issues relating to the district court's decision on the class waiver. Because Accenture believes that these issues also support review, Accenture joins in Marriott's petition in full.

2.  Whether a court can use Rule 23(c)(4) to hold class trials on individual elements of a single claim.

## STANDARD OF REVIEW

This Court has "unfettered discretion" to allow an appeal from an order granting class certification based on "any consideration that [it] finds persuasive." Fed. R. Civ. P. 23(f), Adv.Comm.Note.  When conducting a Rule 23(f) inquiry, this Court considers "whether the certification ruling is likely dispositive," whether it "contains a substantial weakness," whether "appeal will permit the resolution of an unsettled legal question of general importance," "the nature and status of the litigation," and "the likelihood that future events will make appellate review more or less appropriate." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 144 (4th Cir. 2001).

The "substantial weakness" factor "operates on a sliding scale to determine the strength of the necessary showing regarding the other … factors." *Id.* at 145–46.  The weaker the order, the less important the other factors become. *Id.*  "The court should grant the petition, notwithstanding the other factors, where a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

## ARGUMENT

The decision below checks every box that matters to Rule 23(f) review.  It raises important legal issues that divide district courts and remain undecided. *In re*

*Marriott Int'l*, 78 F.4th at 688–89.  It commits manifest errors and did not address this Court's guidance in the prior appeal.  And "the nature and status of the litigation" also supports review, where the district court's unusual class proceeding will resolve liability for not even a single plaintiff as to Accenture and will needlessly duplicate these proceedings.  This Court should grant review.

## I.    The District Court Erred By Certifying Classes That It Admitted Lack Any Class-wide Injury Subject To Common Proof.

1.  Although the district court's order warrants reversal on multiple grounds, each stems from the fateful decision to certify a class despite finding there was no common injury uniting the class against Accenture.[3]  The Supreme Court has cautioned that the "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Plaintiffs seeking class-action treatment of their claims "must affirmatively demonstrate [their] compliance with Rule 23."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(a) "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart*, 564 U.S. at 349-50; *see also id.* at 348–49 (plaintiffs who seek to represent a class must "possess the same interest and suffer the same injury as the

---

[3] Because the district court on remand (Bailey, J.) simply reinstated the issues classes without analysis, the references to "district court" going forward in this submission are referring to the original opinions of the district court (Grimm, J.), unless otherwise specified.

class members"); *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 304 (4th Cir. 2013) (class must have "a shared injury"). When plaintiffs seek damages on behalf of an entire class, Rule 23(b)(3) predominance requires that plaintiffs be able to measure the impact of the injury across the class. *Comcast*, 569 U.S. at 35 (plaintiffs must "provide a method to measure and quantify damages on a classwide basis"). The Supreme Court in recent years therefore has not hesitated to reject class actions lacking viable theories of class-wide liability and injury. *See Wal-Mart*, 564 U.S. at 349-50; *Comcast*, 569 U.S. at 38; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

The district court manifestly erred by certifying classes with no common injury here. The district court examined plaintiffs' only purportedly *common* evidence of injury, causation, and damages—the market-value model offered by their expert—and found it unscientific, unreliable, and a poor fit for the facts of the case. ECF.1012.at.24–38. Thus, and as this Court noted when vacating and remanding the district court's order previously, all "theories of injury" pressed by the plaintiffs against Accenture "were concededly individualized … individualized issues predominated as to whether they [class members] had suffered actual injury" at all. *In re Marriott Int'l*, 78 F.4th at 684. That should have been the end of the matter. If the question of whether class members have been injured cannot be answered the same, up or down, "in one stroke" for everyone in the class, there can

9

be no class action. *Wal-Mart*, <u>564 U.S. at 350</u>. This through line in *Wal-Mart*, *Comcast*, and *TransUnion* should have made certification of any class against Accenture a non-starter.

2. The district court nonetheless certified a class under Rule 23(c)(4)'s provision for "issue" classes—not to resolve an individual cause of action or even liability—but to resolve only a subset of the essential elements of liability, namely, the "duty and breach issues." ECF.1014.at.66. The first class-certification order (and the only order with any analysis of the issue) purported to rely on this Court's decision discussing issue classes in *Gunnells v. Healthplan Services, Inc.*, <u>348 F.3d</u> <u>417</u> (4th Cir. 2003). But that 20-year-old decision (predating *Wal-Mart*, *Comcast*, and *Transunion*) does not override the Supreme Court's command that injury be a common question. *Gunnells* held that a Rule 23(c)(4) issue class may be certified only if "all other necessary requirements of subsections (a) and (b) of Rule 23 are met." <u>348 F.3d at 441</u>. Here, plaintiffs lacked a common injury, and so neither Rule 23(a) nor (b) were met.

The district court acknowledged that "the Fourth Circuit has not explicitly adopted," the admittedly "broad view" of Rule 23(c)(4) on which the district court's decision rested, ECF.1014.at.61&n.60 (citing *Gunnells*, <u>348 F.3d at 441</u>), but it seemed to think that *Gunnells* supported its effort to whittle down plaintiffs' proposed class to just two elements after they failed to demonstrate that liability was

a common issue.  In *Gunnells*, this Court held that "if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4)."  348 F.3d at 441.  Thus, issue certification was appropriate so long as "*a cause of action, as a whole* … satisf[ied] rule 23(b)(3)'s predominance requirement," which was decidedly not the case here.  *Id.* at 441, 444. *Gunnells* thus permitted issue class certification as a case-management tool for limited purposes, such as to certify an entire claim (but not other claims) for class treatment.  *Id.* at 444.

The more sparing approach of *Gunnells* avoids predominance problems that arise when Rule 23(c)(4) is used to carve out one or two elements of a claim for class treatment.  Predominance is even "more demanding" than commonality, *Comcast*, 569 U.S. at 33-34, and requires that "questions of law or fact common to class members predominate over any questions affecting only individual class members," Fed. R. Civ. P. 23(b)(3).  Yet as this Court recognized (without deciding the matter), the district court's use of "issue" classes in this case could render predominance a dead letter.  "[O]nce the issues to be certified are narrowed down to make them sufficiently common, it is virtually axiomatic that common issues will predominate." *In re Marriott Int'l*, 78 F.4th at 689.  This approach enables an "end-run around Rule 23(b)(3)," *Tillman v. Highland Indus., Inc.*, 2021 WL 4483035, at *18 (D.S.C. Sept.

30, 2021), and removes all meaning from the pronouncement in *Gunnells* that issue classes, like all other classes, must satisfy Rule 23's "subsection (b)," 348 F.3d at 452. *See also Harris v. Medical Transp. Mgmt., Inc.*, 77 F.4th 746, 762 (D.C. Cir. 2023) (vacating issue class certification, and cautioning that "[n]or can predominance become a tautological inquiry … [a]n issue class cannot consist of a single common question that predominates [only] as to itself.").

The district court's approach to issue class certification renders predominance "tautological" in this case. The quintessential predominance hurdle is lack of common injury. "[P]redominance … demands … that all class members were in fact injured," *In re Rail Freight Fuel Surcharge Antitrust Litig.- MDL No. 1869,* 725 F.3d 244, 252 (D.C. Cir. 2013), and that individualized injuries not require "separate mini-trial(s) of an overwhelming large number of individual claims," *Windham v. Am.Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977). But that is exactly the problem here. The only reason the district court even considered splitting off elements of plaintiffs' negligence claims for issue class treatment was that common issues did *not* predominate as to the negligence cause of action as a whole: there were "too many open questions remain[ing] as to individualization to satisfy the predominance requirement," including "fact of injury, injury causation, etc." ECF.1014.at.33. Class certification should have been *denied*, not granted.

*Gunnells* expressly declined to "enter th[e] fray" of whether Rule 23(c)(4) could be used to certify one or more elements of a single cause of action. *Gunnells,* 348 F. 3d at 444. And in the prior appeal, this Court recognized that whether an element-by-element issue class could ever be permissible was thus still an open question. *See In re Marriott Int'l*, 78 F.4th at 688. It also bears noting that *Gunnells* predates the Supreme Court's more-recent pronouncements in *Wal-Mart*, *Comcast*, and *TransUnion*. Even before *Wal-Mart*, this Court recognized that aspects of *Gunnells* may reflect an out-of-date permissiveness towards class actions: to "the extent the vision of liberality and flexibility set forth by the court in *Gunnells* conflicts with the Supreme Court's admonitions that we should pay 'careful attention' to Rule 23 by giving it a 'rigorous analysis,' we are, of course, bound to follow the Supreme Court." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 n.8 (4th Cir. 2006).[4] As the district court's decisions show, the time to decide that question is now. The Court should hold that issue class certification is not appropriate in the absence of a common harm uniting the class. *See Wal-Mart*, 564 U.S. at 349-50 *Gunnells*, 348 F.3d at 441.

3. The issue classes also make a hash of Rule 23(b)(3)'s command that "a class action [be] superior to other available methods for fairly and efficiently

---

[4] *Gunnells* also approved a 23(c)(4) class in the context of conditional certification, 348 F.3d at 433, which is no longer permitted by Rule 23. *See* Adv.Comm.Note.

adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). This superiority guardrail "takes on special importance" when district courts certify issue classes. *In re Marriott Int'l*, 78 F.4th at 689. When district courts use issue classes to engage in a "narrowing process" and "cleave[] off individualized questions … for separate individual trials," they by the same token also "diminish[] the efficiency gains of the class proceedings." *Id.* at 689. The result is that "the superiority component of Rule 23(b)(3) frequently comes into play to defeat issue certification," especially "where the remaining individualized issues will … require significant resources." *Id.* (quoting *Romig v. Pella Corp.*, 2016 WL 3125472, at *15 (D.S.C. June 3, 2016) and *Parker v. Asbestos Processing, LLC*, 2015 WL 127930, at *15 (D.S.C. Jan. 8, 2015)).

The potential for complex follow-on individual trials underpinned the Court's prior decision to vacate class certification against Accenture. The Court expressly advised that the district court could "reconsider [its] determination" as to superiority "[o]n remand." *Id.* at 690. That did not happen. The new judge on remand failed to "consider [this] determination," and so committed yet another manifest error. It bears repeating: despite this Court recognizing that this case threatens significant superiority problems, the district court on remand recertified issue classes against Accenture in a single sentence, without briefing, and without even mentioning the superiority requirement. ECF.1155.at.20.

14

To be sure, this Court had acknowledged that the district court's superiority decision could "tak[e] into account" whether it would also certify "classes against Marriott," Accenture's co-defendant. *In re Marriott Int'l*, 78 F.4th at 690. But the district court on remand simply took it for granted that if it found Marriott's class waiver unavailable and recertified the class action against Marriott, then a class action necessarily must be certified against Accenture, too, without further briefing and analysis. But that is not at all what this Court said, nor would such automatic re-certification make sense. The claims against Marriott include "contract and consumer-protection claims" against Marriott alone. *Id.* at 683. The only claims pressed against Accenture are negligence claims—the very ones for which the district court acknowledged that injury and causation were individualized. *Id.* at 684. Certification of different causes of action against a different defendant (Marriott) could hardly dispose of whether classes should be certified on only some elements of separate claims brought against Accenture. At a minimum, on remand, the district court should have considered this Court's opinion, and addressed whether follow-on trials on injury and causation issues "w[ould] also require significant resources," "defeat[ing] issue certification." *Id.* at 689.

That inquiry could have had only one answer. The superiority problems in this case are overwhelming: the district court's certification order envisions a class-wide proceeding purporting to determine only negligence's duty and breach

15

elements, without determining even *liability* (much less damages) for any single class member. Literally millions of individuals would then, to recover, need to pursue trials on causation and damages after that.[5] These millions of individual trials would each have to consider whether the individual (a) suffered an injury (b) caused by defendants' purported breach of the duty of care, and (c) giving rise to damages, and in what amount. None of those questions would be simple—the district court admitted that "discovery taken to date … has demonstrated [that] a large number of class members' PII may have been exposed in data breaches other than the Starwood breach or exposed in another manner." ECF.1014.at.63. One named plaintiff, for example, revealed that she suffered identity theft not on account of the data breach, but rather because she lost her physical credit card on vacation. *See* ECF.1019-26 at 42:13–44:20. The result is that each of these millions of follow-on proceedings would be "[t]he functional equivalent of a full-blown trial on damages causation," ECF.1014.at.63, each requiring enormous expense.

There is little reason to believe that superiority's ultimate aim can be met in this case. Superiority tests whether "the objectives of the class-action procedure

---

[5] Nor is it clear that even the duty and breach elements of a negligence claim could here be resolved in a single class-wide proceeding. Negligence claims are typically governed by the law of the state of a plaintiff's injury, *see Bank of Louisiana v. Marriott Int'l, Inc.*, 438 F. Supp. 3d 433, 443 n. 8 (D. Md. 2020) (discussing the *lex loci delicti* choice-of-law rule), with the result that different state negligence laws will likely apply to different class members. Resolving duty and breach may require separate proceedings considering variations in those negligence laws.

really will be achieved," *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010), meaning whether "Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action," Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1779 (3d ed.).  But even if the district court ends up issuing a purportedly binding ruling as to breach and duty, few if any plaintiffs here will ever seek to prove individual injuries or causation.  As plaintiffs themselves admitted to this Court in the prior go-round, "only a lunatic or a fanatic sues for a small amount."  *See In re Marriott Int'l*, No. 22-1744, Dkt.42 at 87 (filed Nov. 15, 2022).  The only thing to be added by issue class certification is extra litigation, with little prospect of resolving or even helping in resolving a single individual claim.

4.  Finally, certifying class actions without common injuries raises serious Article III concerns.  "Rule 23's requirements must be interpreted in keeping with Article III constraints."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997).  Plaintiffs must establish standing for "[e]very class member," "each claim that they press," and "each form of relief that they seek."  *TransUnion,* 141 S. Ct. at 2208; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).[6]  This class proceeding, however, will not and cannot determine whether

---

[6] For example, to the extent plaintiffs seek a declaratory judgment about whether Accenture had a duty or breached a duty to class members, standing would be required for that declaratory judgment: "just like suits for every other type of remedy,

the class members suffered "an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 141 S. Ct. at 2203; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs' only theory of common, class-wide harm was excluded under Rule 702 and *Daubert*; plaintiffs have not appealed that determination, and plaintiffs expressly admit that the existence and extent of any other harm (identity theft or mitigation) would vary from class member to class member. No proceeding will determine whether the class has been injured. By definition, a proceeding directed only to duty and breach will not and cannot determine, up or down, whether "[e]very class member … ha[s] Article III standing" for their claims against Accenture. *TransUnion*, 141 S. Ct. at 2208.

Thus, even though federal courts do not "adjudicate hypothetical or abstract disputes" or "issue advisory opinions," *id.* at 2203, an impermissible advisory opinion is all that could result from the district court's procedure here. This Court acknowledged Accenture's points on this issue last time. Although it did not "ha[ve] occasion to address" the standing issue, it noted Accenture's argument that "carv[ing]" the "injury and causation elements … out of class proceedings" was "inconsistent with Article III standing requirements, because there [wa]s no

---

declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021).

assurance at the certification stage that all class members have suffered the necessary injury in fact at the hands of the defendant." *In re Marriott Int'l*, <u>78 F.4th at 689</u> & n.7.  Absent that injury in fact, there is no standing to award judgment in one stroke to the entire class on even the duty or breach elements of the class members' claims.  Nor is there subject-matter jurisdiction to bind class members to such a class-wide ruling—the ruling would instead be advisory, precisely the sort of "roving commission" that *TransUnion* and other cases have prohibited.  *TransUnion*, <u>141 S. Ct. at 2203</u>.

The district court's failure to address the constitutional problems created by its issue classes was manifest error.  At a minimum, Rule 23(c)(4) must include injury as one of the "issues" to be tried in common.  Otherwise, there is no jurisdiction to adjudicate the claims for the issue class in the first place.  This constitutional issue, too, cries out for this Court's review.

## II.    The Questions Presented Are Important And Resolving Them Now Will Simplify or Dispose of This Litigation.

Even apart from manifest error, additional factors also support granting this petition.  *First*, review "will permit the resolution of [u]nsettled legal question[s] of general importance" requiring this Court's needed guidance.  *Lienhart*, <u>255 F.3d at 144</u>.  The exact same questions that this Court previously found worthy of 23(f) review remain unanswered.  The case for review has only strengthened given that

the district court made the same errors certifying the same classes, and refused to engage with the questions that this Court had directed it to consider on remand.

To start, district courts in this Circuit have divided over whether *Gunnells* permits element-by-element issue certification. *Compare Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 77 (E.D.N.C. 2008) ("the *Gunnells* court appeared to hold that a district court may certify individual causes of action, not individual issues, for class treatment"); *with Naparala v. Pella Corp.*, 2016 WL 3125473, at *13-14 (D.S.C. June 3, 2016) (discussing a "more permissive approach" to issue classes). This "[C]ourt has yet to rule directly on this issue," and so which side of the split is correct is "not … free from doubt." *In re Marriott Int'l*, 78 F.4th at 689. The district court's decision adopts the permissive side of the split without any analysis, rendering it more entrenched.

The district court's decision also diverges from those in other data-breach cases, which have rejected exactly the same sorts of "[d]uty and breach" issue classes that the district court certified here as incompatible with Rule 23(b)(3) predominance and superiority. *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 697 (N.D. Cal. 2019); *Tillman*, 2021 WL 4483035, at *19 (similar). And it raises constitutional problems, as this Court has already recognized. *See In re Marriot Int'l*, 78 F.4th at 689 n.7; *see also Moss v. United Airlines, Inc.*, 20 F.4th 375, 379 (7th Cir. 2021). These questions support review, too.

*Second*, the "nature and status of the litigation" also favors granting the petition, especially where reversal would be "likely dispositive" as to Accenture. *Lienhart*, 255 F.3d at 144. This Court holds that "review is appropriate … to avoid the judicial diseconomy entailed in allowing a class certification which is clearly infirm to be litigated to final judgment only to face vacatur on appeal." *Id.* at 146. That judicial-economy concern is well-founded in this case. If the Court does not review the district court's order, then Accenture will be required to engage in a likely unconstitutional issue-class proceeding without resolving liability for any class member. The Court may never have a chance to review this proceeding, as it is unclear whether any class member would ever actually prove the remaining causation and injury elements of their claims (and so whether there would ever be a final judgment that could be appealed from). As even plaintiffs acknowledge, "only a lunatic" would pursue individual trials even under the district court's issue-class order. *See In re Marriott Int'l*, No. 22-1744, Dkt. 36 at 87. The possibility that the class could "escape effective review" alone supports granting the petition. *Lienhart*, 255 F.3d at 144.

Yet if the class is ever actually appealed, then economy concerns support review as well. The class would (due to its constitutional infirmities) almost certainly "face vacatur on appeal," *id.* at 146, leaving all negligence elements of plaintiffs' claims still unresolved after years of protracted proceedings. Manifest

error, failure to address this Court's prior guidance, and basic efficiency concerns all favor granting the petition and deciding the important questions presented here.

## CONCLUSION

For these reasons, this Court should grant the petition.

Respectfully submitted,

/s/ *Devin S. Anderson*
DEVIN S. ANDERSON
CRAIG S. PRIMIS, P.C.
EMILY M. LONG
JOSEPH C. SCHROEDER
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
devin.anderson@kirkland.com
*Counsel for Defendant-Petitioner Accenture LLP*

December 13, 2023

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 5(c)(1) because this brief contains 5,175 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.


December 13, 2023

s/*Devin S. Anderson*
Devin S. Anderson

# CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system pursuant to Local Rule 25(a)(1)(A)(i). I further certify that copies were sent to the following via electronic mail:

Amy E. Keller
DICELLO LEVITT GUTZLER LLC
Ten North Dearborn Street, 6th Floor
Chicago, IL 60602
akeller@dicellolevitt.com

James J. Pizzirusso
HAUSFELD LLP
888 15th St. NW, Ste 300
Washington, DC 20006
jpizzirusso@hausfeld.com

Megan Jones
HAUSFELD LLP
600 Montgomery Street, Ste 3200
San Francisco, CA 94111
mjones@hausfeld.com

Andrew N. Friedman
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, NW, Ste 500
Washington, DC 20005
afriedman@cohenmilstein.com

Norman E. Siegel
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Ste 200
Kansas City, MO 64112
siegel@stuevesiegel.com

MaryBeth V. Gibson
THE FINLEY FIRM, P.C.
3535 Piedmont Rd, Bldg. 14, Ste 230
Atlanta, GA 30305
mgibson@thefinleyfirm.com

Ariana J. Tadler
TADLER LAW LLP
One Penn Plaza, 36th Floor
New York, NY 10119
atadler@tadlerlaw.com

Jason Lichtman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
jlichtman@lchb.com

Daniel Robinson
ROBINSON CALCAGNIE, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660
drobinson@robinsonfirm.com

Timothy Maloney
Veronica Nannis
JOSEPH GREENWALK & LAAKE,
P.A.
6404 Ivy Lane, Ste 400
Greenbelt, MD 20770
tmaloney@jgllaw.com
vnannis@gjllaw.com

Gary F. Lynch
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
glynch@carlsonlynch.com

James Ulwick
KRAMON & GRAHAM PA
1 South Street, Ste 2600
Baltimore, MD 21202
julwick@kg-law.com

Daniel R. Warren
Lisa M. Ghannoum
Dante A. Marinucci
BAKER & HOSTETLER LLP
127 Public Square, Ste 200
Cleveland, OH 44114
dwarren@bakerlaw.com

Gilbert S. Keteltas
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Ste 200
Washington, DC 20036
gketeltas@bakerlaw.com

Matthew S. Hellman
Lindsay C. Harrison
Zachary C. Schauf
Kevin J. Kennedy
Elizabeth B. Deutsch
JENNER & BLOCK LLP
1099 New York Avenue, NW, Ste 900
Washington, DC 20001
mhellman@jenner.com
lharrison@jenner.com
edeutsch@jenner.com

s/*Devin S. Anderson*
Devin S. Anderson

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | * |
| | *     MDL No. 19-md-2879 |
| *CONSUMER ACTIONS* | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

This case involves consolidated class action claims filed by consumers against Marriott and Accenture related to a data breach of the Marriott-owned Starwood Hotels and Resorts, Inc.[1] It is part of the Multidistrict Litigation ("MDL") pending before me concerning the data breach. Consumer Plaintiffs ("Plaintiffs") and Marriott and Accenture ("Defendants") selected ten "bellwether" claims to test the sufficiency of the pleadings, which include tort, contract, and statutory claims under the laws of various states.[2] Following the resolution of Defendants' motions to dismiss, nine bellwether claims remain. Plaintiffs now move to certify classes for monetary damages, liability issues, and injunctive relief under Federal Rules of Civil Procedure 23(b)(3),

---

[1] Plaintiffs named as defendants Marriott International, Inc., Starwood Hotels and Resorts Worldwide, LLC, and Accenture LLP. Second Amended Consolidated Complaint ("Compl."), ECF Nos. 413 (sealed), 537 (redacted) at ¶¶ 12–14. In this memorandum, I will refer to Marriott and Starwood as one entity and use the brand names interchangeably as Marriott acquired Starwood in 2016. *Marriott buys Starwood, becoming world's largest hotel chain*, CNBC (Sept. 23, 2016), https://www.cnbc.com/2016/09/23/marriott-buys-starwood-becoming-worlds-largest-hotel-chain.html. Marriott and Accenture are referred to collectively as "Defendants."

[2] *See* ECF No. 368 (selection of bellwether claims). Each party selected five claims, consisting of a cause of action and a jurisdiction from the Second Amended Consolidated Complaint, brought by the named plaintiffs from the relevant jurisdiction. *Id.*

1

23(c)(4), and 23(b)(2), respectively.[3] For the reasons discussed below, Plaintiffs' motion is GRANTED IN PART, and DENIED IN PART.[4]

## FACTUAL BACKGROUND

On November 30, 2018, Marriott announced that it was the target of one of the largest data breaches in history. Pls.' Tab 18.[5] The breach took place in its Starwood guest reservation database. *Id.* Marriott International acquired Starwood Hotels and Resorts in September 2016. When guests make a reservation to stay at a Marriott property, they must provide personal information including name, address, email address, phone number, and payment card information. Pls.' Tab 19. In some instances, Marriott also collects passport information, room preferences, travel destinations, and other personal information. *Id.* Both Marriott and Starwood had privacy statements, dated May 18, 2018 and October 5, 2014 respectively, concerning their collection and use of this personal information and touting their ability to protect the security of this sensitive information. Pls.' Tab 50.

---

[3] The motion has been fully briefed. *See* Pls.' Mot. for Class Cert. ("Pls.' Mot."), ECF Nos. 858 (redacted), 859/863/865 (sealed); Defs.' Opp'n, ECF Nos. 885 (sealed), 888 (redacted); Pls.' Reply, ECF Nos. 905 (sealed), 910 (redacted). (All references in this opinion are to these documents. As previously ordered, the parties will be submitting documents to the Court with updated redactions pursuant to the Special Master's resolution of the parties' confidentiality designation disputes. *See* ECF No. 1009. Those updates, however, do not affect this opinion.) In addition to the written briefing, a hearing was held on April 20, 2022. Because it was critical to Plaintiffs' motion for class certification, the Court resolved Defendants' motion to exclude the opinions of Plaintiffs' expert Dr. Jeffrey Prince, Ph.D., colloquially known as a *Daubert* motion, in a simultaneously issued companion opinion to this one. Plaintiffs filed two *Daubert* motions of their own, seeking to exclude the opinions of Defendants' experts, Kevin Poindexter and Tom Snyder. As neither of those two experts' opinions were critical to deciding the class certification motion, I DENY those motions WITHOUT PREJUDICE. To understand why I need not fully consider those *Daubert* motions now, see the "Standard of Review" discussion in the companion *Daubert* opinion.

[4] At this time, I would like to thank my chambers' two spring semester judicial interns, Alan Harrison and Michelle Lim, for their able assistance in preparing this opinion.

[5] For all Plaintiffs' exhibits, see ECF Nos. 859 (sealed) and 863 (sealed) and their attachments.

Investigations into the data breach indicated that for over four years, from July 2014 to September 2018, hackers had access to Starwood's guest information database—the "New" Data Storage ("NDS") database. Pls.' Tabs 18–19. In other words, the data breach was ongoing before and after Marriott's acquisition of Starwood. During the data breach, the hackers exported customers' personally identifiable information ("PII"). Pls.' Tab 19. Marriott discovered the breach on September 8, 2018 when Accenture—a consulting company Starwood contracted to provide data security services, *see* Tab 48—reported an anomaly pertaining to the NDS database. Pls.' Tab 18. In total, the breach impacted approximately 133.7 million guest records associated with the United States, including an estimated 47.7 million records associated with the bellwether states. Defs.' Ex. 12.[6]

Plaintiffs are consumers who provided their PII to Marriott to stay at a Starwood property or use Starwood's services before the data breach. Plaintiffs allege that Marriott and Accenture are liable for the data breach under theories of tort, contract, and breach of statutory duties.[7] The gravamen of these allegations is that Marriott and Accenture failed to take reasonable steps to protect Plaintiffs' personal information against the foreseeable risk of a cyberattack and, in the case of Marriott, contrary to its express privacy statements and statutory duties.

Pending is Plaintiffs' motion to certify thirteen damages classes and subclasses under Rule 23(b)(3), various liability issues under Rule 23(c)(4), and a class for injunctive or declaratory relief under Rule 23(b)(2).

---

[6] For all Defendants' exhibits, see ECF No. 885 (sealed) and its attachments.

[7] The contract and statutory theories are applicable only to Marriott, not Accenture.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23 contains the requirements for class certification. A class action must first meet the prerequisites of Rule 23(a):

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). These prerequisites are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *Id.*

In addition to meeting the requirements of Rule 23(a), a class action must fit one of the categories in Rule 23(b). As relevant here, Rule 23(b)(2) provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In addition, Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors relevant to the "predominance" and "superiority" requirements include:

4

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*; *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Federal Rule of Civil Procedure 23(c)(4) states that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). A class action for particular issues under Rule 23(c)(4) must then meet the requirements of Rule 23(a) and the criteria for one of the types of class actions in Rule 23(b). *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003).

In addition to the explicit requirements listed in Rule 23, the Fourth Circuit has recognized that Rule 23 "contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358. This is commonly referred to as the "ascertainability" requirement. *See id.*

Rule 23 "'does not set forth a mere pleading standard.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 350). Instead, "a party must...' be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). Likewise, "[t]he party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod. Co.*, 764 F.3d at

358 (citing *Wal-Mart*, 564 U.S. at 350.) "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 350. "Although Rule 23 does not give district courts a 'license to engage in free-ranging merits inquiries at the certification stage,' a court should consider merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT Prod. Co.*, 764 F.3d at 357–58 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

## DISCUSSION

Plaintiffs move to certify classes for monetary damages under Rule 23(b)(3), for liability issues under Rule 23(c)(4), and for injunctive or declaratory relief under Rule 23(b)(2). Before addressing the requirements for these specific class action types, I will address standing and the explicit, as well as implicit, Rule 23(a) prerequisites that are applicable to all class action types.

### I.    Standing

In class actions, "the standing inquiry focuses on the class representatives." 2 W. Rubenstein, *Newberg on Class Actions* § 2:3 (5th ed. 2021). For a class representative, or named plaintiff, to establish standing, he or she must have (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) "fairly traceable to the challenged action of the defendant," and (3) "likely...[to] be redressed by a favorable decision." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (same). Each of the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (quoting *Lujan*, 504 U.S. at 561). For example, "[a]t the pleading stage, general factual allegations of injury resulting from the

defendant's conduct may suffice," but at the summary judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing. *Lujan*, 504 U.S. at 561.

The applicable evidentiary burden to apply to standing at the class certification stage has sparked some disagreement between courts. *See Earl v. Boeing*, 339 F.R.D. 391, 411–12 (E.D. Tex. 2021) (comparing *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 414 (S.D.N.Y. 2012) (adopting pleading standard) with *Gomez v. Trump*, No. 20-CV-1419, 2020 WL 3429786, at *6 n.7 (D.D.C. June 23, 2020) (adopting heightened standard)). Nevertheless, for a number of reasons, I am persuaded that the pleading-stage burden applies until summary judgment. *Lujan* laid out only three general phases of litigation—pleading, summary judgment, and trial, *see* 504 U.S. at 561, and Rule 23 "does not—and cannot—add an additional step to the litigatory life cycle." *Earl*, 339 F.R.D. at 412 (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 360 (3d Cir. 2015); *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012)). Given that a plaintiff "remains several 'successive stages' away from resolving a given dispute" at the class certification stage, no shift in the burden should occur just yet. *Earl*, 339 F.R.D. at 412 (citations omitted). This position makes particular sense in a case such as this one where merits discovery will continue post-certification. Accordingly, my prior standing analysis still applies. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 456–67 (D. Md. 2020); *Marriott*, No. 19-md-2879, 2020 WL 6290670, at *4–5 (D. Md. Oct. 27, 2020). Undoubtedly, Defendants will raise further challenges to the class representatives' standing in this litigation, but those challenges will have to wait until the summary judgment stage.

Defendants do raise an argument related to absent class members' standing, however, that I must address now. Defendants argue that the inclusion of absent class members who lack standing in Plaintiffs' proposed class definitions makes class certification improper. *See* Defs.' Opp'n at

29–30. Last year, the Supreme Court declared, "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). However, the Court declined to address "whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at n.4. (emphasis added). As the Supreme Court noted, the Eleventh Circuit has directly addressed this question and declined to require that district courts "ensure that the class definition does not include *any* individuals who do not have standing before certifying a class." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276 (11th Cir. 2019) (emphasis added). The Fourth Circuit has also declined to create such a requirement. *See Krakauer v. Dish Network L.L.C.*, 925 F.3d 643, 657–58 (4th Cir. 2019) (affirming class certification when satisfied that the class did not include "a large number of uninjured persons," meaning the inclusion of a small number of uninjured persons who lack standing would have been reconcilable with granting class certification.);[8] *but see Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 551 (E.D. Va. 2018) (applying out-of-circuit standard that "no class may be certified that contains members lacking Article III standing") (citations omitted). Thus, Plaintiffs need not demonstrate that *every* class member has standing at the class certification stage.

Nevertheless, Plaintiffs must show that differences *between* class members as to standing—i.e., the inclusion of uninjured individuals alongside injured ones in the class—are not so significant that the class runs afoul of Rule 23. Courts often address this issue of "uninjured class members" in the context of Rule 23(b)(3)'s predominance requirement. *Krakauer*, 925 F.3d at 657 (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51–53 (1st Cir. 2018); *Kleen Prods. v.*

---

[8] The First and Seventh Circuits have also taken this approach. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 25 (1st Cir. 2015) ("We think that a certified class may include a de minimis number of potentially uninjured parties."); *Kleen Prods. v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016) ("[I]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.") (citation omitted).

*Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013)); *see also Henderson v. Corelogic, Nat'l Background Data, LLC*, No. 12-cv-97, 2016 WL 4611570, at *3 (E.D. Va. Sept. 2, 2016).[9] As explained earlier, a court can only certify a class if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In other words, a class must be "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). As implied in *Krakauer*, the presence of "a large number of uninjured persons" in a proposed class would undermine predominance. 925 F.3d at 657.

Here, the proposed classes that do not limit membership to those who bore the economic burden for a hotel stay would surely include a large number of uninjured persons under the overpayment theory. Individuals do not experience any overpayment injury when they are reimbursed by another individual or entity for a hotel stay. They do not suffer any economic loss. The proposed classes likely include many such individuals. As Defendants note, multiple bellwether plaintiffs traveled for work and were reimbursed by their employers for work travel, meaning that they did not bear the economic burden for work-related hotel stays. Defs.' Opp'n at 30. In addition to employer reimbursement, Defendants also indicate that some plaintiffs received reimbursement when booking hotel stays for others, such as family members. *Id.* While the bellwether plaintiffs pursuing the overpayment theory also paid for stays for which they did bear the economic burden of the overpayment, *see* Defs.' Exs. 40, 44, 48, 51–54, and thus are injured

---

[9] At least one court in this circuit has addressed the issue of uninjured class members through the lens of ascertainability instead of predominance, *see Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015), but I will follow the predominance approach.

individuals as to those stays, we can draw some conclusions from the stays for which they did not

bear the economic burden. *Id.*

Considering the information gathered from the bellwether plaintiffs, it is a near certainty

that the proposed class definitions include many individuals who solely traveled to Starwood hotels

for work and, therefore, have no hotel stays for which they were not reimbursed. The proposed

class definitions may also include a number of individuals who only paid for Starwood hotel stays

for which they were reimbursed by a family member. Given the size of the proposed classes, the

number of uninjured class members could be in the thousands. As a result, sizeable portions of the

various classes have differing *legal* arguments as to standing, undoing the cohesiveness of the

classes and preventing common questions of law from predominating.[10]

Essentially, this predominance analysis shows that the aforementioned proposed classes

are overbroad on the issue of standing. *See Earl*, 339 F.R.D. at 415 ("[U]sing Rule 23's

predominance requirement to evaluate a putative class for overbreadth on the issue of standing

makes sense from a functional perspective.") An overbreadth problem, however, "can and often

should be solved by refining the class definition[s] rather by flatly denying class certification

on that basis." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012); *see

also* 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and

Procedure* § 1760 (4th ed. 2021) ("[A court] has discretion to limit or redefine class[es] in an

appropriate manner to bring the action within Rule 23.") Accordingly, I find that the class

definitions related to the overpayment theory should be narrowed to prevent this overbreadth on

---

[10] Defining putative class members as those "who bore the economic burden" for a hotel stay raises
some concerns regarding ascertainability. However, one could sort through the *factual*
circumstances of reimbursement in a way that is consistent with predominance. *See* Section II.a.
below.

the issue of standing. *See In re Brinker Data Incident Litig.*, No. 18-CV-686, 2021 WL 1405508, at *6 (M.D. Fla. Apr. 14, 2021) (narrowing class definition to prevent the class definition from being overbroad and to prevent predominance issues regarding standing). All classes proceeding under the overpayment theory shall only include persons who bore the economic burden for hotel room(s). This change will exclude those individuals who are uninjured under the overpayment theory from being class members.[11]

In addition to this refinement, the Court will also limit the classes proceeding under the overpayment theory to individuals who made reservations at Starwood properties during the four-and-a-half-year period (2014–2018) in which hackers had access to Plaintiffs' PII. *See* Pls.' Tabs 18–19. Logically, an individual could only suffer an overpayment injury under Plaintiffs' overpayment damages model during that period. As Plaintiffs' own expert, Dr. Prince, cabined his model in this way, *see* Expert Class Cert. Rep. of Jeffrey T. Prince, Ph.D. ("Prince Initial Rep."), ECF No. 859-4 (sealed) at ¶ 104; Deposition of Jeffrey T. Prince ("Prince Dep. 1"), ECF No. 891-2 (sealed) at 14:5–10, this change merely corrects an oversight by Plaintiffs' Counsel when writing the proposed class definitions related to the overpayment theory.

## II.    Rule 23(a) Prerequisites

### a.    Ascertainability

In addition to the factors explicitly listed in Rule 23(a) and (b), the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Courts within the Fourth Circuit and in other circuits sometimes refer to this concept as the "ascertainability" requirement. *Id.*; *see also Souter*

---

[11] The Court will lay out the new class definitions, accounting for all alterations discussed, at the conclusion of the opinion.

*v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015). In the Fourth Circuit, this

requirement has two components. First, "[a] class cannot be certified unless a court can readily

identify the class members in reference to *objective criteria.*" *EQT Prod. Co.*, 764 F.3d at 358 (4th

Cir. 2014) (emphasis added). Second, there must be an "*administratively feasible* [way] for the

court to determine whether a particular individual is a [class] member." *Krakauer*, 925 F.3d at 658

(quoting *EQT Prod. Co.*, 764 F.3d at 358) (emphasis added).[12]

Plaintiffs have satisfied the objective criteria component. Neither the originally proposed

class definitions nor the court-modified class definitions rely on subjective terms. Whether one

resides in a state, is an SPG member, and so on, are not matters of belief or states of mind, but

objective facts. Defendants do not contest ascertainability on objective criteria grounds. *See* Defs.'

Opp'n at 46–49.

Unlike the objective criteria component, the parties strongly contest the administrative

feasibility of identifying class members. *Id.*; Pls.' Reply at 24–26. When analyzing the task of

identifying class members, the Fourth Circuit has stated, "[P]laintiffs need not be able to identify

every class member at the time of certification[,]" but "'[i]f class members are impossible to

---

[12] Circuit courts are split on the issue of administrative feasibility. The First and Third Circuits have incorporated administrative feasibility into a heightened ascertainability requirement. *See Nexium Antitrust Litig.*, 777 F.3d at 19; *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The Second, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits have rejected an administrative feasibility prerequisite for class certification as a component of ascertainability or otherwise. *See In re Petrobras Sec.*, 862 F.3d 250, 267 (2d Cir. 2017); *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015); *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 662 (7th Cir. 2015); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995–96 (8th Cir. 2016); *Briseno v. ConAgra Foods Inc.*, 844 F.3d 1121, 1123–24 (9th Cir. 2017); *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). While the Fourth Circuit requires administrative feasibility as a component of ascertainability, *see EQT Prod. Co.*, 764 F.3d at 358–59, it has not directly addressed the circuit split that has developed. *See Krakauer*, 925 F.3d at 658; *Peters v. Aetna Inc.*, 2 F.4th 199, 241–43 (4th Cir. 2021).

identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). District courts within the Fourth Circuit have interpreted the meaning of "extensive and individualized fact-finding or 'mini-trials'" in this context differently. In the eyes of one court, "[t]he individualized fact-finding giving rise to mini-trials that defeat ascertainability are those requiring determinations *on the merits*—not an administrative review to determine whether an objective element of a class definition is met." *Soutter*, 307 F.R.D. at 197 (citing *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012)) (emphasis added). Another court took a conflicting approach, finding that an exceptionally complicated *administrative* review of company records constituted the kind of individualized fact-finding that defeated ascertainability. *See Spotswood v. Hertz Corp.*, No. 16-1200, 2019 WL 498822, at *6–8 (D. Md. Feb. 7, 2019) (emphasis added).

It is unnecessary to resolve these different approaches here. Even if this Court adopts the stricter approach and accepts that an exceptionally complicated administrative review constitutes an impermissible "mini-trial," the case law "does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015). "If that were the case, no Rule 23(b)(3) class could ever be certified." *Id.* Even the Third Circuit, which originated the heightened ascertainability requirement, has stated: "[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012) (collecting cases)).

Bearing this case law in mind, the question becomes whether the administrative review required here constitutes an impermissible "mini-trial." To answer that question, this Court must

13

engage in a fact-specific analysis. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675 (N.D. Ga. 2016) ("[T]he [ascertainability] inquiry is so fact-specific that judicial decisions setting forth the broad legal principles described above offer little meaningful guidance in applying them, particularly with respect to the administrative feasibility requirement.")[13]

Taking account of the facts in this case, I conclude that Plaintiffs have satisfied the ascertainability requirement. Plaintiffs assert that the proposed classes are ascertainable because Marriott's NDS database contains the names and contact information for virtually all class members, and the parties can use that database to identify class members. *See* Pls.' Mot. at 25. "[B]ecause each class is defined generally as people who, because they gave their [PII] to Starwood and it wound up in Starwood's NDS database, had that information compromised as a result of the announced Data Breach," as Plaintiffs put it, an individual's very presence in the database indicates their membership in the class. *See id.* Of course, that membership is subject to verification, but the NDS database is a strong starting point from which to identify class members.[14] Acknowledging that records may be incomplete for some individuals in the NDS database, Plaintiffs also propose filling in any gaps, or outdated information, with Marriott's current customer data. *See* Pls.' Reply at 25.

Defendants' first objection to Plaintiffs' approach is that the NDS data is too unreliable to identify class members. *See* Defs.' Mot. at 47–48. However, "[i]n general, courts do not look

---

[13] While the Eleventh Circuit no longer requires the administratively feasible component of ascertainability, *see Cherry*, 986 F.3d at 1304, it did at the time *Delta/Air Tran* was decided. That the court grappled with administrative feasibility as required by the Fourth Circuit makes the case particularly relevant.

[14] It is worth noting that Marriott actually has this data, distinguishing it from cases where ascertainability was complicated by data being hypothetical or being held by third parties who had not yet agreed to cooperate. *See Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 55–56 (E.D. Va. 2021).

favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class." *Souter*, 307 F.R.D. at 197–98. As Plaintiffs note, Defendants' argument is particularly unavailing here because they used the NDS database to notify the proposed class members of the data breach. *See* Pls.' Mot. at 25 (citing Marriott Amend. Ans. to Compl., ECF No. 620 at ¶ 199); Pls.' Reply at 24. Defendants certainly viewed the database as reliable enough for that notification process. That said, the bellwether discovery process has revealed that some reservation "rows" in the database lack the full complement of up-to-date information needed to verify class members' identity. *See* Defs.' Mot. at 47–48 (citing Defs.' Ex. 38; Ex. 41). For example, some rows do not include information about a guest's state of residence, or if reservations do include that information, it may be outdated. *Id.* But any gaps can be resolved by cross-referencing reservations made by the same guest within the NDS database and, if necessary, with Marriott's current customer data. If all else fails, the database contains enough contact information, i.e., email addresses and phone numbers, that one could easily verify the objective fact of where a class member lives. At the class certification hearing, Plaintiffs also asserted that address finding services could help locate class members.

Defendants' second objection to Plaintiffs' approach is that there is no way to identify those who bore the economic burden for a hotel stay, i.e., those who did not receive reimbursement, without falling into an impermissible "mini-trial." *See id.* at 48–49. The Court's decision to narrow the proposed classes pertaining to the overpayment theory to include only those who bore the economic burden surely raises the salience of this concern. Defendants' objection, though, is faulty. First, Defendants imply that individualized review (which the Court agrees is certainly required here) will defeat administrative feasibility. *See id.* As explained previously, however, "the need to review individual files to identify [class] members [is] not [a] reason[] to deny class

certification." *Byrd*, 784 F.3d at 171. Second, Defendants assume that "self-certification" through affidavits is the only source from which the parties can identify those who bore the economic burden. While self-certification may be part of the identification process, it will not be self-certification standing alone. Any affidavits can and will be cross checked against the NDS database, which can confirm whether a reservation was made, the dates of that reservation, the payment card used, etc. In the event that the NDS database lacked corroborating information, Plaintiffs also could use class members' own records such as receipts and bank and credit card statements as an informational supplement.[15] Such records would be particularly helpful for confirming that individuals did not receive reimbursement for hotel stays. *See Delta/AirTran*, 317 F.R.D. at 692 ("To the extent class members retained receipts or credit card statements documenting payment...these objective records can be used to permit self-identification of class members in a reliable manner.").

Because the NDS database and these other records exist, Plaintiffs can use affidavits to help ascertain the class. *See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017) (quoting *Byrd*, 784 F.3d at 170–71 ("Affidavits from potential class members, standing alone, without 'records to identify class members or a method to weed out unreliable affidavits,' will not constitute a reliable and administratively feasible means of determining class membership," however, "affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard.")). As in *Delta/AirTran*, the Court is "cognizant of the concerns raised by self-identification." 317 F.R.D. at 692. However, "where the charge at issue is so small that it is unlikely to induce fraudulent claims," as here, and

---

[15] At the class certification hearing, Plaintiffs suggested that such records could be useful.

16

when "class members can obtain objective records with relative ease that would confirm their membership in the class," as here, "those concerns are minimized." *Id.*

Defendants' concern regarding their due process rights is misplaced at this stage of the litigation. Their ability "to challenge the proof used to demonstrate class membership," *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013), is not implicated by this ascertainability finding. "The due process question is not whether the identity of class members can be ascertained with perfect accuracy at the certification stage but whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward." *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 56 (E.D. Va. 2021) (quoting *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 670 (7th Cir. 2015)).

While the potential class sizes here are large and review of individual files will be required, Plaintiffs have adequately shown—at this stage in the proceedings—that any review in this case is administratively feasible and not the kind of administrative review that would preclude ascertainability. [16] Identifying class members will no doubt be time consuming, but that fact does not defeat ascertainability.

The Court will carefully monitor any developments related to the NDS database and other methods of class member identification to ensure continued administrative feasibility. *Cf. Delta/Air Tran,* 317 F.R.D. at 692 ("As the process for submitting and confirming class members' claims is further developed, the Court (and no doubt Defendants) will remain vigilant that the process be structured in a manner to eliminate as much of the uncertainty as possible."); *Earl,* 339

---

[16] As discussed in the companion *Daubert* opinion, Defendants objected to producing the NDS database for individuals other than the bellwether plaintiffs, so Plaintiffs were given relatively limited information with which to address Defendants' representations related to administrative feasibility.

F.R.D. at 423 ("The Court concludes that Plaintiffs satisfy the ascertainability requirement. Of course, Plaintiffs are not finished with this element—as the litigation progresses, the Court will scrutinize this ascertainability.") The Court can limit or modify class definitions "to provide the necessary precision" on the ascertainability requirement. *Earl*, 339 F.R.D. at 423 (quoting *In re Monumental Life Ins.*, 365 F.3d 408, 414 (5th Cir. 2004)). Further, "if an ascertainability issue eventually becomes 'truly insoluble, the [C]ourt may decertify the class at a later stage of the litigation.'" *Id.* at 422–23 (quoting *Mullins*, 795 F.3d at 664).[17]

### b.    Numerosity

Rule 23(a)'s numerosity requirement is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Though '[n]o specified number is needed to maintain a class action,' . . . '[a]s a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.'" *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967); 1 *Newberg* § 3:12). Plaintiffs need not establish the precise number of class members at the certification stage to satisfy the

---

[17] The Court notes that its references (here and elsewhere in the Memorandum Opinion) to the ability to amend its class certification order, or even decertify the classes, should not be construed as conditional certification. The 2003 amendments to Rule 23 deleted the provision that explicitly enabled courts to conditionally certify class actions. Fed. R. Civ. P. 23 Advisory Committee Note (2003). Courts disagree as to whether conditional certification is still permissible, *see* 2 *Newberg* § 4:80 (citations omitted), but, in any case, the Court is not relying on conditional certification here. It is merely referring to its "authority to 'modify[] its certification if it becomes clear, as the case develops, that the class action vehicle is in fact inappropriate.'" *Id.* (quoting *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 26 n.27 (1st Cir. 2008)). It is well established that courts retain this authority even if conditional certification is no longer permitted. *See id.* Rule 23(c)(1)(C) explicitly states, "An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).

numerosity requirement so long as they provide "a reasonable estimate of the number of class members." *Harris v. Rainey*, 299 F.R.D. 486, 489 (W.D. Va. 2014) (quoting *Wiseman v. First Citizens Bank & Tr. Co.*, 212 F.R.D. 482, 486 (W.D.N.C. 2003).

Here, Plaintiffs assert—and Defendants do not contest—that each of the proposed classes contains "no less than tens of thousands of class members." Pls.' Mot. at 20. This assertion is a reasonable estimate in this case. As Plaintiffs note, when Marriott discovered the data breach— one of the largest in history—the company itself estimated that the breach affected hundreds of millions of guest records. *Id.* After de-duplication efforts, Marriott updated its estimate, stating that the data breach affected approximately 133.7 million guest records associated with the United States. Defs.' Ex. 12. Of those records, 47.7 million may be associated with the bellwether states.[18] *Id.* Even if "significant duplication remains," *id.*, and the final class definitions exclude certain individuals, one can reasonably expect that the proposed classes will consist of tens of thousands of members.[19] These class sizes far surpass the presumption of impracticability of joinder based on numbers alone.[20] Plaintiffs' reasonable estimate satisfies the numerosity requirement.

### c.    Commonality

Rule 23(a)'s commonality requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has explained that under this

---

[18] Specifically, Marriott provided the following estimate of associated guest records by state:

| California | Connecticut | Florida | Georgia | Maryland | Michigan | New York |
|---|---|---|---|---|---|---|
| 19,904,659 | 2,502,905 | 7,370,612 | 4,190,332 | 2,407,570 | 2,824,108 | 8,518,671 |

[19] As Marriott only produced transactional data from the NDS database for named Plaintiffs, it would have been exceedingly difficult for Plaintiffs to offer a more precise figure. *See* ECF No. 751.

[20] Given that these class sizes are far outside the "gray area" cases consisting of classes between twenty and forty members, the Court need not engage in the factor-by-factor analysis required for such cases. *Cf. Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 234–36.

19

requirement, "[w]hat matters to class certification . . . is not the raising of common 'questions'—
even in droves—but rather, the capacity of a class-wide proceeding to generate common answers."
*Wal-Mart*, 564 U.S. at 350. "A single common question will suffice, . . . but it must be of such a
nature that its determination 'will resolve an issue that is central to the validity of each one of the
claims in one stroke.'" *EQT Prod. Co.*, 764 F.3d at 360 (quoting *Wal-Mart*, 564 U.S. at 350).
"Where the injuries complained of by named plaintiffs allegedly result from the same unlawful
pattern, practice, or policy of the defendants, the commonality requirement is usually satisfied."
*Parker v. Asbestos Processing, LLC*, No. 11-CV-01800, 2015 WL 127930, at *7 (D.S.C. Jan 8.,
2015) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376–77 (2d Cir. 1997) ("[C]ommonality
satisfied...where injuries...were alleged to have arisen 'from a unitary course of conduct by a
single system'")); *see also In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136,
153 (2018) (noting uniformity, "both in definition and implementation," of policy at issue).

Plaintiffs pose multiple questions that are common to the various classes, that would
generate common answers, and the resolution of which are central to the validity of the various
claims. Common questions of fact include whether Defendants knew about their data security
vulnerabilities, what Defendants did or did not do to address those vulnerabilities, and whether the
hacker(s) exploited those vulnerabilities to exfiltrate customers' PII. Pls.' Mot. at 21. These
questions of fact, and their answers, are common because every class member was subject to the
same Marriott and Accenture policies and practices related to data security. Defendants' decisions
(or implementation of decisions) regarding multifactor authentication, account access, account
monitoring, and encryption applied company-wide and did not vary by individual guest. *See* Pls.'
Mot. at 9–17 (citations omitted). Nor did these decisions vary hotel by hotel; rather Defendants
operated one data security system with centralized leadership. *See* Pls.' Mot. at 8–9; Defs.' Opp'n

20

at 3. This uniform course of conduct contrasts sharply with the more dispersed course of conduct (i.e., allowing discretion by local supervisors to make individualized determinations as to employment matters) that the Supreme Court rejected as insufficiently common in *Wal-Mart*. 564 U.S. at 355–60. Instead, Marriott and Accenture's course of conduct is more of a piece with the corporate overdraft fee policy that supported finding commonality in *TD Bank*, 325 F.R.D. at 152, or (perhaps even more on the nose) the corporate data security policies and practices that supported finding commonality in *Brinker*, 2021 WL 1405508, at *1, *8.

The common answers to the common questions of fact discussed above will ultimately generate yet more common answers to common questions of law—i.e., whether Defendants failed to adequately protect customers' PII such that they breached a duty or contract or violated a state consumer protection statute. Pls.' Mot. at 21. These are central issues, i.e., key elements, for the various claims in this lawsuit. Plaintiffs have successfully demonstrated that they satisfy the commonality requirement.

Defendants raise several concerns regarding individualized inquiries that one might apply in assessing the commonality requirement, but Defendants declined to contest commonality directly. Instead, they chose to discuss their concerns regarding individualized inquiries in the context of the related, yet "far more demanding," Rule 23(b)(3) predominance requirement. *See Amchem Prods.*, 521 U.S. at 624. Accordingly, the Court will address those concerns in its predominance analysis. But as for the commonality requirement of Rule 23(a), Plaintiffs have met their burden.

### d.    Typicality

Rule 23(a)'s typicality requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff,

so go the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)

(quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)

(quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (internal quotation

marks omitted))). "Although a representative's claims and the claims of other members of the class

need not be 'perfectly identical or perfectly aligned,'. . .the representative's pursuit of his own

interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy v.

Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 304–05 (4th Cir. 2013) (quoting *Deiter*, 436 F.3d

at 467). "Factual differences do not necessarily render a claim atypical, but the claims must be

based on the same course of conduct and legal theory." *Gresser v. Wells Fargo Bank, N.A.*, No.

12-987, 2014 WL 1320092, at *2 (D. Md. Mar. 31, 2014) (citing *Minter v. Wells Fargo Bank,

N.A.*, 279 F.R.D. 320, 325 (D. Md. 2012); *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211,

217 (D. Md. 1997)).

    To conduct the typicality analysis, the Court must compare the named plaintiffs' claims or

defenses with those of absent class members. *Ealy*, 514 F. App'x at 405; *Deiter*, 436 F.3d at 407.

The way in which the class representatives will advance their negligence,[21] breach of contract, and

consumer protection claims is typical of the various classes.[22] *See* Pls.' Mot. at 22 (outlining how

the class representatives are advancing the same legal arguments with regards to the same course

of conduct as absent class members). The reasons that the class representatives' claims are typical

are very similar to the reasons that Plaintiffs satisfied commonality, and "[c]ourts have recognized

that the commonality and typicality requirements...tend to merge. *Spotswood*, 2019 WL 498822,

at *11 (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S, 147, 157 n.13 (1982)). In short, the class

---

[21] Plaintiffs' negligence claims include negligence per se claims. *See* Pls.' Mot. at 4–5.
[22] While the elements for these claims vary somewhat by state, they are broadly similar. *See* Bellwether Class Certification Claims and Defenses Chart, ECF No. 982.

representatives and the absent members are similarly situated legally and factually because Marriott and Accenture pursued the same course of conduct as to all class members.

Defendants do not argue that the class representatives are atypical because of differences in their claims. They instead attack Plaintiffs' compliance with typicality by arguing that the class representatives are subject to unique defenses. *See* Defs.' Opp'n at 39–41, 59. Unique defenses defeat typicality when "they threaten to dominate the litigation, particularly when they go to the ability to prove a defendant's liability to the named plaintiffs." *Gresser*, 2014 WL 1320092, at *3 (citing *Wu v. MAMSI Life & Health Ins. Co.*, 269 F.R.D. 554, 563 (D. Md. 2010); *Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 529 (D. Md. 2001)).

First, Defendants argue that the class representatives' claims and defenses are not typical of the class because their contractual relationships with Marriott differ from other class members. *See* Defs.' Opp'n at 39–40. Specifically, each of the class representatives was a Starwood Preferred Guest ("SPG") member and, accordingly, the SPG Program Terms & Conditions contract is applicable to the class representatives. Defs.' Opp'n at 36–37 (citing Exs. 25–39).[23] The SPG Program Terms & Conditions—and the legal issues surrounding that document—would not apply to non-SPG members. Despite this significant difference in the contractual relationship, Plaintiffs have included non-SPG members in their proposed negligence and consumer protection classes. *See* Pls.' Mot. at 4–6.[24]

Plaintiffs argue that such contractual differences do not affect their negligence claims. *See* Pls.' Reply at 3. Presumably, they apply the same logic to their consumer protection claims as

---

[23] It appears Defendants used several incorrect exhibit numbers when citing the class representatives' depositions in their Opposition. Here, the Court has cited the correct exhibit numbers based on Defendants' reference to the depositions.

[24] Plaintiffs' proposed definitions for the contract classes would only include SPG members. *See* Pls.' Mot. at 6–7.

well, although they do not explicitly say so. Nevertheless, that the SPG Terms & Conditions apply

to all the named Plaintiffs, but not to a significant number of absent class members raises serious

typicality concerns.[25] As Defendants outline in the Bellwether Class Certification Claims and

Defenses Chart, they will raise affirmative defenses stemming from provisions in the SPG Terms

& Conditions and the Website Terms of Use, which are directly referenced by the SPG Terms &

Conditions. *See* ECF No. 982; *see also* Defs.' Opp'n at 36–37. For example, Marriott will argue

that SPG members have released Marriott from liability for its conduct and that SPG members

have waived their ability to bring a class action at all. *Id.* These affirmative defenses will be

relevant in the negligence and consumer protection context, not just the contract context. In fact,

these affirmative defenses directly relate to whether Plaintiffs can use the class action device to

establish liability as to their negligence and consumer protection claims. *See In re Titanium*

*Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 862 (D. Md. 2013) (finding lack of typicality when

some class members were "subject to contractual provisions that expressly foreclose their ability

to proceed in this case" and others were not).

Accordingly, the negligence and consumer protection classes, as currently defined, do not

satisfy the typicality requirement. Nevertheless, the Court will amend the class definitions to

address this typicality problem. *See* 7A *Federal Practice and Procedure* § 1760 ("[A court] has

discretion to limit or redefine class[es] in an appropriate manner to bring the action within Rule

23."); *see also Titanium Dioxide*, 962 F. Supp. 2d at 863 (redefining class because of typicality,

commonality, and predominance concerns related to differences in contractual relationships). All

---

[25] This fact raises concerns related to adequacy of representation as well that the Court will address
later.

24

classes are redefined to only include SPG members and so the affirmative defenses allegedly applicable to the representative parties are typical of the class.[26]

Accenture advances a second—and separate—argument related to typicality and unique defenses. It argues that Bellwether Plaintiff Amarena of Connecticut is an atypical class representative because she stayed at only one Starwood hotel, and that stay occurred before Accenture took on data security for Starwood. *See* Defs.' Opp'n at 59. The Court does not see how the number of stays or whether the stays occurred before Accenture contracted with Starwood matters in the context of her negligence claim. By virtue of her PII being stored by Starwood while Accenture provided data security, Ms. Amarena was just as foreseeable a victim of Accenture's alleged failure to adequately protect that PII as someone who stayed at Starwood properties dozens of times or someone who stayed at a Starwood property after Accenture's contract with Starwood began. The "measure of attenuation between [the defendant's] conduct, on the one hand, and the consequences to and the identity of the plaintiff, on the other hand," *id.* (quoting *RK Constructors,*

---

[26] Plaintiffs raise a strong argument that Defendants have waived their right to enforce the class action waiver. *See* Pls.' Reply at 7–9. "[A]side from a one-line, boilerplate affirmative defense, Defendants litigated this case for more than 31 months before asserting that Plaintiffs are subject to a class waiver. Defendants did not raise it as part of the bellwether negotiation process, address it in dozens of meet-and-confer and scheduling conferences, or raise it as part of any motion practice [prior to Defs.' Opp'n]." *Id.* at 8. Nevertheless, the Court need not rule on this issue at this time. Given that the Court has amended the class definitions, all class members will have the same (or substantially similar) contractual relationship with Marriott. Rule 23 typicality, adequacy, and predominance issues are thus not present. Therefore, the Court may address the class action wavier defense—as it will all affirmative defenses—at the merits stage of the litigation. At that time when all discovery is complete, the Court can consider the arguments both parties have made as to the applicability of contractual provisions, such as the class action waiver, as well as the arguments related to waiver of the waiver provision. Any ruling on those issues will apply to all class members.

*Inc. v. Fusco Corp.*, 650 A.2d 153, 156–57 (1994)), would be the same for all individuals whose PII was stored with Starwood under Accenture's watch.[27]

### e.    Adequacy of Representation

Rule 23(a)'s adequacy requirement is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. "'[A] class representative must be part of the class and "'possess the same interest and suffer the same injury'" as the class members.'" *Id.* at 625–26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974))). "Determining adequacy of representation...requires the Court to determine: (1) whether the named plaintiffs...have any conflicts of interest with other class members; and (2) whether the named plaintiffs...will prosecute the action vigorously on behalf of the entire class." *Parker*, 2015 WL 127930, at *8 (citing *Thorn v. Jefferson-Pilot Life Ins. Co.*, No. 00-2782-22, 2004 WL 5745993, at *7 (D.S.C. Dec. 2, 2004), *aff'd and remanded*, 445 F.3d 311 (4th Cir. 2006) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998))).[28]

---

[27] It may very well be that Accenture's conduct is too attenuated to establish liability—that is an issue to resolve later—but the measure of attenuation would be the same for all class members.

[28] While district courts' adequacy analysis under Rule 23(a)(4) traditionally evaluated the adequacy of class representatives *and* class counsel, the 2003 amendments to Rule 23 indicate that courts should change this approach. Adequacy of class representatives should still be analyzed under Rule 23(a)(4), but adequacy of class counsel should be analyzed separately under Rule 23(g)—a new subdivision created in 2003. *See* 1 *Newberg* § 3:80 ("The Advisory Committee noted that Rule 23(g) migrated the discussion of counsel's adequacy away from 23(a)(4), writing: 'Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision.'") Courts have been slow to adapt to this change, but "locat[ing] [a court's] entire discussion of class counsel within the 23(g) analysis and restrict[ing] [a court's] analysis under Rule 23(a)(4) to the topic of adequacy of the proposed class representative" appears to be the approach "intended by the rule makers" and "has the backing of the only circuit court decision

"[T]here is an overlap between the requirement of adequacy of representation and the requirement of typicality." *Wu*, 269 F.R.D. at 564 (citing *Gen. Tel. Co. of Sw.*, 457 U.S. at 157–58). Accordingly, the contractual relationship differences that raised concerns with regards to typicality also raise concerns with regards to adequacy. Had the Court not redefined the classes already, the class representatives would not have satisfied the adequacy requirement for the same reasons that they would not have satisfied typicality. However, because the classes have been redefined, those concerns that would have prevented a finding of adequate representation have fallen away.

With the classes redefined, Plaintiffs satisfy the first prong of the adequacy requirement. The named Plaintiffs' interests are not opposed to those of other class members. The named Plaintiffs suffered the same alleged injuries as the absent class members, and the absent class members would receive the same forms of damages should the named Plaintiffs succeed in this litigation. Other than the previously resolved differences in contractual relationships and a minor nominal damages issue,[29] Defendants do not raise any intraclass conflict issues.

---

directly on the topic." *Id.* (citing *Sheinberg v. Sorensen*, 606 F.3d 130, 132–35 (3d Cir. 2010)). Accordingly, the Court will address the adequacy of class counsel separately under Rule 23(g) in this Memorandum Opinion's conclusion. *See, e.g.*, *Earl*, 339 F.R.D at 420 n.15.

[29] Defendants rely upon *Gardner v. Equifax Info. Servs., LLC*, No. 06-CV-3102, 2007 WL 2261688, at *5 (D. Minn. Aug. 6, 2007), to argue that Plaintiffs' pursuit of nominal damages could raise adequacy (and typicality) concerns. In *Gardner*, the named plaintiffs voluntarily forwent a claim for actual damages in order to pursue statutory damages only. *Id.* Thus, the court was concerned that absent class members would be forced to forego their own claims for actual damages unless they opted out of the class. *Id.* The court believed that the proposed opt-out measures for absent class members to retain their possible "significant actual damage claims" was too great a burden considering failure to opt out would result in an adverse res judicata effect for such individuals. *Id.* Accordingly, the court found that the class representatives were inadequate. *Id.* However, *Gardner* is inapplicable to the present litigation. Plaintiffs are not voluntarily foregoing actual damages. In fact, they are pursuing actual damages on behalf of the proposed classes. Defendants' argument does nothing to alter the Court's view that Plaintiffs have satisfied the adequacy (and typicality) requirement.

Plaintiffs also satisfy the second prong of the adequacy requirement. The class representatives have demonstrated that they will vigorously pursue the claims of the class. As Plaintiffs note, the class representatives have "participated actively in this case by reviewing pleadings, responding to significant discovery (including enduring forensic scans of their electronic devices, engaging in supplemental document collections to address questions from defense counsel, supplementing their discovery responses several times, and reviewing extensive productions of documents from third parties…and sitting for lengthy depositions." Pls.' Mot. at 23–24; *see also* Defs.' Exs. 14–19, 25–54. These actions show the named Plaintiffs' commitment to representing the class.

### III.    Rule 23(b)(3) Damages Classes

#### a.    Proposed Classes

Plaintiffs seek to certify a total of thirteen classes and subclasses for damages. The classes are grouped into three categories, which I will refer to as the Negligence Classes, the Contract Classes, and the Consumer Protection Classes. These classes correspond to the remaining bellwether claims. Some of the putative classes seek relief from both Marriott and Accenture, while others seek relief from either Marriott or Accenture only. Pursuant to these proposed classes, Plaintiffs seek classwide damages related to overpayment for hotel stays, the loss of the market value of their PII, statutory damages, and nominal damages.[30]

Plaintiffs seek to certify the following Negligence Classes:

---

[30] Plaintiffs also allege claims for individual damages, such as time spent monitoring accounts or out-of-pocket expenses for credit monitoring or fraudulent charges. However, plaintiffs do not seek to certify these damages for classwide treatment, and instead propose issue classes under Rule 23(c)(4) to bifurcate liability and damages issues—the former to receive classwide treatment and the latter to be resolved through follow-on individual determinations.

*Florida Negligence Class (Against Marriott and Accenture)*

All natural persons residing in Florida whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representatives are Irma Lawrence, Michaela Bittner, and Kathleen Frakes Hevener.

*Georgia Negligence Per Se Class (Against Marriott and Accenture)*

All natural persons residing in Georgia whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representatives are Brent Long and David Viggiano.

*Maryland Negligence Class (Against Accenture Only)*

All natural persons residing in Maryland whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representative is Peter Maldini.

*Connecticut Negligence Class (Against Accenture Only)*

All natural persons residing in Connecticut whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representative is Anne Marie Amarena.

*Connecticut Negligence Per Se Class (Against Accenture Only)*

All natural persons residing in Connecticut whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representative is Anne Marie Amarena.

Pls.' Mot. at 4–5.

Plaintiffs seek to certify the following Contract Classes:

29

*Maryland Breach of Contract Class (Against Marriott Only)*

All natural persons residing in Maryland who had a Starwood
Preferred Guest ("SPG") membership and whose Personal
Information, given to Starwood in connection with the making of a
reservation at a Starwood property, was compromised in a data
breach announced by Marriott on or about November 30, 2018. The
proposed Class Representative is Peter Maldini.

> *Maryland Breach of Contract Benefit of the Bargain
> Subclass (Against Marriott Only)*
>
> All natural persons residing in Maryland who had a
> Starwood Preferred Guest ("SPG") membership and who
> paid for a stay at a Starwood property and whose Personal
> Information, given to Starwood in connection with the
> making of a reservation at a Starwood property, was
> compromised in a data breach announced by Marriott on or
> about November 30, 2018. The proposed Class
> Representative is Peter Maldini.

*New York Breach of Contract Class (Against Marriott Only)*

All natural persons residing in New York who had a Starwood
Preferred Guest ("SPG") membership and whose Personal
Information, given to Starwood in connection with the making of a
reservation at a Starwood property, was compromised in a data
breach announced by Marriott on or about November 30, 2018. The
proposed Class Representatives are: Roger Cullen, Eric Fishon, and
Paula O'Brien.

> *New York Breach of Contract Benefit of the Bargain
> Subclass (Against Marriott Only)*
>
> All natural persons residing in New York who had a
> Starwood Preferred Guest ("SPG") membership and who
> paid for a stay at a Starwood property and whose Personal
> Information, given to Starwood in connection with the
> making of a reservation at a Starwood property, was
> compromised in a data breach announced by Marriott on or
> about November 30, 2018. The proposed Class
> Representatives are: Roger Cullen, Eric Fishon, and Paula
> O'Brien.

Pls.' Mot. at 6–7.

Plaintiffs seek to certify the following Consumer Protection Classes:

*California Unfair Competition Law ("UCL") Class (Against Marriott Only)*

All natural persons residing in California who paid for a stay at a Starwood property and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representatives are Robert Guzikowski, Denitrice Marks, and Maria Maisto.

*Maryland Consumer Protection Act ("MCPA") Class (Against Marriott Only)*

All natural persons residing in Maryland who paid for a stay at a Starwood property and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representative is Peter Maldini.

*Michigan Identity Theft Protection Act ("ITPA") Class (Against Marriott Only)*

All natural persons residing in Michigan whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representatives are Bryan Wallace and Laura Gononian.

*New York General Business Law ("GBL") Class (Against Marriott Only)*

All natural persons residing in New York who paid for a stay at a Starwood property and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018. The proposed Class Representatives are: Roger Cullen, Eric Fishon, and Paula O'Brien.

Pls.' Mot. at 5–6.

Each of these proposed classes must satisfy the requirements of Rule 23(b)(3), analyzed below. Before turning to those requirements, however, I will first address the applicability of Plaintiffs' two classwide theories of harm to this analysis.

### b.    Classwide Theories of Harm

Plaintiffs assert that two theories of harm support the certification of "full" damages classes. First, Plaintiffs argue that their overpayment theory is consistent with classwide damages. That overpayment theory can be summarized as follows: Marriott was able to charge higher prices for hotel rooms than they would have in a hypothetical "but-for" world in which consumer willingness to pay for a hotel room had shifted in response to consumer knowledge of Starwood's inadequate data security; consequently, named plaintiffs overpaid for their respective hotel stays as a result of Marriott's alleged data security failures. In the companion *Daubert* opinion, the Court determined that Plaintiffs' model calculating damages pursuant to this theory is admissible under Federal Rule of Evidence 702—at least for purposes of ruling on class certification. Plaintiffs are seeking compensatory damages under the overpayment theory for their contract and consumer protection claims. The overpayment theory is also relevant to Plaintiffs' request for statutory damages under New York's consumer protection statute and nominal damages under Maryland and New York contract law as an overpayment injury may supply the underlying injury required to seek those damages. Plaintiffs conceded at the class certification hearing that they are not seeking compensatory damages under the overpayment theory for their negligence claims.

Second, Plaintiffs assert that their loss of market value of PII theory is consistent with classwide damages. Contending that Starwood customers' PII had market value, Plaintiffs argue that putative class members lost that value when hackers gained access to, and/or exported, PII from the NDS database. While one could conceive of multiple ways of defining—and calculating market value—Plaintiffs and their expert Dr. Prince chose a loss of revenue (to individual class members) approach. Dr. Prince estimated the prices at which various combinations of Plaintiffs' PII (e.g., email address, phone number, credit card number, passport number) could be sold by entities (whether legal or illegal) that sell consumer data to others, in order to calculate the revenue

these sales would have generated for each class member. Unlike the model accompanying the overpayment theory, the Court rejected Plaintiffs' loss of market value model under Rule 702.

In correspondence with the Special Master, *see* ECF No. 993, and at both the *Daubert* and class certification hearings, Plaintiffs raised another methodology by which one could measure market value—Marriott's own valuation of the monetary value of reward customers' PII *to* Marriott.[31] As Judge Facciola noted in his Report and Recommendations on this issue, this methodology is disconnected from Dr. Prince's chosen model—and the conceptualization of Plaintiffs' theory underlying that model—and so it was irrelevant to the *Daubert* issues already addressed by the Court in its companion opinion. However, one can understand how this valuation might be used to demonstrate damages on a classwide basis. This approach, though, has not been adequately developed on the record at this time. Without an accepted damages model, the loss of market value theory cannot support class certification today—even as to liability. In the absence of a working damages model that fleshes out the loss of market value theory, too many open questions remain as to individualization to satisfy the predominance requirement. A working model could show the Court how it should understand fact of injury, injury causation, etc. under a loss of market value theory.

Taking into account my ruling on the *Daubert* motion, the emergence of Marriott's own valuation of customers' PII, and the undeveloped nature of the record on this issue, I DENY WITHOUT PREJUDICE Plaintiffs' motion for class certification as to damages (and liability) classes that would rely on the loss of market value theory. Following the issuance of this opinion

---

[31] Pursuant to a California Consumer Privacy Act ("CCPA") regulation that took effect August 20, 2020, Marriott publicly provided a valuation of Bonvoy Program members' PII. ECF No. 993-3. (Bonvoy is Marriott's customer rewards program. *Id.*) Marriott represented that members' PII was worth, on average, approximately $0.42 per consumer in 2021 *to* Marriott. ECF No. 993-2.

and its accompanying order, the Court will schedule a call with the parties to discuss issues related
to Marriott's valuation of customers' PII. The Court will ask Plaintiffs to further describe what
discovery they seek on these issues and the mechanics of the discovery. The Court will hear from
Defendants as well and schedule further communications with the parties as needed.

With the loss of market value theory presently excluded as a theory of harm, the remaining
Rule 23(b)(3) analysis will focus on the overpayment theory.[32]

### c.   Predominance

Rule 23(b)(3)'s requirement that common questions of law or fact predominate over
individual ones is similar to, but "far more demanding" than Rule 23(a)'s commonality
requirement. *Amchem Prods.*, 521 U.S. at 623–24; *Stanley v. Cent. Garden & Pet Corp.*, 891 F.
Supp. 2d 757, 771 (D. Md. 2012). "An individual question is one where 'members of a proposed
class will need to present evidence that varies from member to member,' while a common question
is one where 'the same evidence will suffice for each member to make a prima facie showing [or]
the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (quoting
2 *Newberg* § 4:50 (5th ed. 2012)). In conducting the predominance analysis, a court first
characterizes issues as common or individual. 2 *Newberg* § 4:50 (5th ed. 2021). Then, it "'asks
whether the common, aggregation-enabling, issues in the case are more prevalent or important
than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 577 U.S. at 453
(quoting 2 *Newberg* § 4:49 (5th ed. 2012)). "This is not simply a matter of counting common versus
noncommon questions and checking the final tally. 'Rule 23(b)(3)'s [predominance] test is

---

[32] As Plaintiffs are not seeking overpayment damages for their negligence claims, those claims
will not be discussed in the Damages Classes section. Instead, the Court will only address the
negligence claims in the context of issues certification. (Plaintiffs do seek nominal damages for
their negligence claims, but they cannot pursue those damages at this time as neither the
overpayment theory nor loss of market value theory is presently available to Plaintiffs for use in
their negligence claims.)

qualitative rather than quantitative.'" *Soutter*, 307 F.R.D. at 214 (quoting *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 272 (4th Cir. 2010) (citing *Gunnells*, 348 F.3d at 429)). "If the 'qualitatively overarching issue[s]' are common, a class may be certified notwithstanding the need to resolve individualized issues." *Id.* (citing *Ealy*, 514 F. App'x at 305). Thus, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each "elemen[t] of [her] claim [is] susceptible to classwide proof," but it "does require [] that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc.*, 568 U.S. at 469 (quoting Fed. Rule Civ. P. 23(b)(3)) (emphasis in *Amgen*, internal citation omitted). Ultimately, the predominance inquiry "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods*, 577 U.S. at 453 (quoting *Amchem Prods.*, 521 U.S. at 623).

"Rule 23(b)(3) is normally satisfied where there is an essential common factual link, such as standardized documents and practices, even though the nature and amount of damages may differ among class members." *TD Bank*, 325 F.R.D. at 154 (citations omitted). "[T]he glue binding this putative class action" is Defendants' data security policies and practices and the form contract outlining Defendants' responsibilities to class members regarding data protection to which all class members are subject. *Cf. Earl*, 339 F.R.D. at 435. This glue is strong enough such that Plaintiffs have satisfied the predominance requirement across two varieties of claims—breach of contract and consumer protection—as to the overpayment theory.[33] Defendants ably raise a number of important issues that they argue preclude a finding of predominance: injury, payment, contractual

---

[33] Plaintiffs have not satisfied predominance as to every single claim though within those categories, nor have they satisfied predominance for full liability or damages as to the non-overpayment theories.

relationships, causation, reliance, exposure, affirmative defenses,[34] and damages. Some of these issues are applicable to each of Plaintiffs' claims; others are specific to a particular type of claim. After weighing all the arguments, these issues do not defeat predominance for the overpayment theory—at least for a majority of the putative classes for which that theory is applicable.[35]

### 1. Standing, Predominance, and Overpayment Theory

I have addressed Defendants' concern regarding uninjured class members and predominance previously in the standing section. To briefly summarize, Defendants argue that class members under the original class definitions would include many individuals who received reimbursement for their hotel stays and who booked outside the damages period. These individuals suffered no injury and had no standing under the overpayment theory. Consequently, legal issues of standing would defeat predominance. Taking stock of this argument, the Court has already redefined the classes so that only individuals who bore the ultimate economic burden of a hotel stay and only individuals who made reservations during the damages period are included. Thus, this predominance argument is no longer applicable. Having address this threshold predominance issue, the Court now turns to a predominance analysis by claim type.

### 2. Breach of Contract Claims

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The essential elements of breach of contract in the bellwether states are broadly similar. Under Maryland law, "[t]he elements of a claim for breach of contract include 'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan*

---

[34] Defendants specifically addressed the statute of limitations defense. *See* Defs.' Opp'n at 51.
[35] Plaintiffs are pursuing the overpayment theory via their claims against Marriott only. *See* Pls.' Reply at 28. The theory is inapplicable to Accenture.

*Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 17 A.3d 744,

749 (Md. Ct. Spec. App. 2011)). Under New York law, "the elements of a breach of contract claim

are (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and

(4) resulting damages." *Alloy Advisory, LLC v. 503 West 33rd St. Assoc., Inc.*, 195 A.D.3d 436,

436 (N.Y. App. Div. 2021) (Mem.) (citing *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425,

426 (N.Y. App. Div. 2010)).

"[C]ourts properly refuse to certify breach of contract class actions where the claims

require examination of individual contract language." *In re U.S. Foodservice Pricing Litig.*, 729

F.3d 108 (2d Cir. 2013) (citing *Broussard*, 155 F.3d at 340; *Spencer v. Hartford Fin. Servs. Grp.,

Inc.*, 256 F.R.D. 284, 304 (D. Conn. 2009) (declining to certify class for breach of contract claims

where contracts defined cost and value differently such that the language of each contract "would

need to be carefully considered to determine whether defendants breached each contract at issue");

*Sprague*, 133 F.3d at 398 (decertifying class of early retirees in ERISA case where "side deals"

contained myriad variations as to what each retiree was promised)). Because the examination of

individual contract language defeats class certification, contract claims that are successfully

certified for class action typically involve form contracts. "It is the form contract, executed under

like conditions by all class members, that best facilitates class treatment." *Sacred Heart Health

Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) (citations

omitted); *see also TD Bank*, 325 F.R.D. at 155 ("Rule 23(b)(3) predominance is therefore satisfied.

This conclusion arises from the fact that TD's checking account policies and practices were

governed by form contracts with terms applicable to Plaintiffs and class members alike.")

"[S]tandardized agreements should be 'interpreted wherever reasonable as treating alike all those

similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.'" *Id.* at 157 (D.S.C. 2018) (quoting *Restatement (Second) of Contracts* § 211(2)).

The contract at issue here—the SPG Terms & Conditions and its incorporated elements like Starwood's Privacy Statement—is a classic form contract. *See* Pls.' Tab 50. What's more, it is a classic contract of adhesion, "involving non-negotiable terms and a vast bargaining/information imbalance between the parties." *See id.* Starwood offered the SPG Terms & Conditions on a "take-it-or-leave-it basis," *see id.* (quoting *Simpson v. MSA of Myrtle Beach, Inc.*, 644 S.E.2d 663, 669 (S.C. 2007)), with no individualized negotiations.

The written contract itself does not vary person by person. *See* Pls.' Tab 50.[36] It is similar in its consistency to the standardized checking account agreement at issue in *TD Bank* that warranted a finding of predominance in that case. *See TD Bank*, 325 F.R.D. at 155–59. The contract standardization makes this case dissimilar from those where variation between class members' written contracts defeated class certification. *Cf. EQT Prod. Co.*, 764 F.3d at 367–68 (involving leases with language that varied with regards to the payment of royalties and post-production deductions); *Broussard*, 155 F.3d at 340 (involving franchise and trademark agreements with language that varied with regards to authorizing use of funds for advertising). Further, there is no evidence of individualized side agreements—oral or written—that supplemented or altered the form contract. *Cf. Broussard*, 155 F.3d at 340–41 (involving plaintiffs who "relied heavily on

---

[36] Marriott attempts to cast doubt on this uniformity by noting that the SPG Program Terms and Website Terms of Use "went through several iterations since 2002." Defs.' Opp'n at 40 (citing Pls.' Tab 43). However, Plaintiffs note that the relevant contractual language has not changed since 2002, and further, each iteration of the contract "supersede[d] all previous terms and conditions." Pls.' Reply at 4 (quoting Pls.' Tab 50). Plaintiffs' response on this point is persuasive—the SPG members are all similarly situated as to the relevant terms of the contract.

audiotapes of non-standard final review sessions" before signing contract). In other words, there is no need for individualized extrinsic evidence to interpret the contract.

Because all the class members are subject to this same form contract,[37] common questions predominate—i.e., "the same evidence will suffice for each member to make a prima facie showing" of breach of contract, or at least "the issue is susceptible to generalized, class-wide proof." *See Tyson Foods*, 577 U.S. at 453 (quoting 2 *Newberg* § 4:50). Establishing contractual obligation or the existence of a contract relies upon the same set of facts for each class member. *See* Pls.' Mot. at 29. The Court will look to the standardized agreement to determine what obligations Marriott undertook to protect class members' data. Establishing breach will similarly rely upon the same evidence for each class member. That evidence will include Plaintiffs' expert Mary Frantz's report, Pls.' Tab 4, and the documents and testimony upon which it is based. *See, e.g.*, Pls.' Tabs 17, 19.

### i.    Affirmative Defenses

Affirmative defenses "must be factored into the calculus of whether common issues predominate." *Gunnells*, 348 F.3d at 438. "[W]hen the defendants' affirmative defenses...may depend on facts peculiar to each plaintiff's case, class certification is erroneous." *Id.* (quoting *Broussard*, 155 F.3d at 342). Some have interpreted this statement as establishing a per se rule in the Fourth Circuit precluding a finding of predominance if there are *any* individualized issues raised by affirmative defenses. *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 n.4 (1st Cir. 2000). However, such an interpretation is implausible given the Fourth Circuit's post-*Broussard* jurisprudence. At the very least, individualized issues that can be resolved by

---

[37] Because the Maryland and New York contract classes are limited to SPG members, each class member was subject to the SPG contract. *See* Pls.' Mot. at 27 (citing Tab 50).

"ministerial" exercises do not preclude predominance. *See Alig v. Quicken Loans Inc.*, 990 F.3d 782, 792–93 (4th Cir. 2021), *vacated and remanded for other reasons*, 142 S. Ct. 748 (2022). Further, interpreting that statement in *Broussard* as a per se rule would be inconsistent with the overall approach to Rule 23(b)(3): "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 577 U.S. at 453 (quoting 2 *Newberg* § 4:50) (emphasis added). If *any* individualization defeated predominance, this inquiry related to prevalence and importance would be irrelevant. While the Fourth Circuit may take a stricter approach compared to other circuits, *see* 2 *Newberg* § 4:55 (5th ed. 2021), it still follows the basic principle of Rule 23(b)(3) when analyzing affirmative defenses in the predominance context. As with all other aspects of class certification, Plaintiffs bear the burden of showing compliance with Rule 23 as to this issue. *See Thorn*, 445 F.3d at 321–22.

Defendants note several affirmative defenses that they plan to raise. *See* Bellwether Class Certification Claims and Defenses Chart, ECF No. 982. Defendants focused on contractual defenses, such as class action waiver and limitation of liability, and the statute of limitations defense in their briefing. *See* Defs.' Opp'n at 36–42. As explained above, all class members will have the same, or substantially similar, contractual relationship with Marriott, and, so, these affirmative defenses will not raise individualized issues that defeat predominance. Resolving issues related to the applicability and waiver of these contractual defenses will not involve individualized inquiries because of the amended class definitions. Accordingly, the Court will spend more time addressing the statute of limitations issue than the other defenses.[38]

---

[38] In the parties' jointly submitted Bellwether Class Certification Claims and Defenses Chart, ECF No. 982, Defendants noted affirmative defenses they may raise beyond the contractual defenses and statute of limitations defense. However, at this time, the Court does not see how those other

ii. **Statute of Limitations**

When "the statute-of-limitations question is straightforward and susceptible to class-wide determination," it does not defeat predominance. *Alig*, 990 F.3d at 792. A statute of limitations question that can be answered by referring to objective information to determine whose claims fall inside and outside the applicable limitations period does not defeat predominance. *See id.* at 792–93. In other words, individual variation may exist between plaintiffs. A statute of limitations question that that can only be answered by analyzing "the contents of the plaintiff's mind," on the other hand, defeats predominance. *See Thorn*, 445 F.3d at 320–21.

Defendants assert that each putative class member's breach of contract cause of action accrued at a distinct time—when the individual gave his or her PII to Starwood. *See* Defs.' Opp'n at 42 (citing *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 736 (W.D.N.Y. 2020)). These differences, Defendants contend, present individualized issues that preclude a finding of predominance. *See id.* Plaintiffs counter that Defendants are relying upon an inapplicable theory of liability to make this argument. *See* Pls.' Reply at 27. Plaintiffs assert that each class member's cause of action accrued at the same time—when Plaintiffs' PII "was exfiltrated from Defendants' network in November 2018"—so no individualized inquiries on this score are required. *See id.* However, as Plaintiffs argue in the alternative, *see id.* at 27–28, even if individual class members' causes of action accrued at different points in time and some members' claims are time-barred, the Court can mechanically determine whose claims are time-barred by referring to the hotel reservation dates in the NDS database. This type of individual inquiry will certainly not outweigh

---

affirmative defenses raise predominance issues—at least as to the overpayment theory. Defendants did not raise these other affirmative defenses in their briefing with regards to the damages classes, and, therefore, the Court will not address them at this time.

the common issues in the case.[39] It is quintessentially "straightforward and susceptible to class-wide determination." *Alig*, 990 F.3d at 792. Without resolving the dispute between the parties as to when the statute of limitation began running, the Court finds that predominance is not defeated by this particular affirmative defense.[40]

### 3.   Consumer Protection Claims

#### i.   New York General Business Law ("GBL") § 349 Class

In a private action under GBL § 349, a consumer must establish "(1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171 N.E.3d 1192, 1197 (N.Y. 2021). Section 349 actions "do[] not require proof of actual reliance." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 48 (W.D.N.Y. 2015) (citations omitted). Instead of showing reliance, the plaintiff must demonstrate that a deceptive practice, such as a misrepresentation or omission, is "likely to mislead a reasonable consumer acting reasonably under the circumstances"—an objective test. *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 43 (E.D.N.Y. 2008) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744–45 (N.Y. 1995))).[41] Of course, to conduct this analysis, one must at least know whether a plaintiff was "exposed" to the allegedly deceptive conduct even if one does not need to know whether he or she relied upon the conduct. *See Fero*, 502 F. Supp. 3d at 740.

---

[39] For comparison, consider that individual damages calculations of a mechanical nature do not defeat predominance. *See 4 Newberg* § 12:5.

[40] The Court can resolve the underlying statute of limitations dispute at the merits stage.

[41] Omissions are actionable under Section 349. *See Dupler*, 249 F.R.D. at 43 (citing *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 445 (E.D.N.Y. 2005)).

That Plaintiffs need not show reliance reduces the possibility that individualized inquiries will outweigh common issues. Yet, Defendants still argue that Plaintiffs cannot satisfy predominance as to the Section 349 claims. Defendants contend that individualized inquiries will be required to determine exposure, and these inquiries will overwhelm the common issues. *See* Defs.' Opp'n at 44–45. This contention hinges on Defendants' view that Plaintiffs have failed to demonstrate that class members were uniformly exposed to the allegedly deceptive conduct. *Id.* Whatever merit that argument had originally, it now falls flat as the Court has already limited the consumer protection class definitions to SPG members only. SPG members "were subjected to the same or similar putative misrepresentations or omissions" as they all received the same contract and did not have individualized negotiations with Marriott. *TD Bank*, 325 F.R.D. at 161.[42] Contrary to Marriott's assertion, the Court does not see a "mixed bag of interactions" between individual class members and the company. *See* Defs.' Opp'n at 45 (citing *Fero*, 502 F. Supp. 3d at 740). Instead, the Court sees incredibly similar interactions between individual class members and Marriott.[43] In such circumstances involving uniform disclosures, "courts have certified Rule 23(b)(3) classes under [New York's] consumer protection statute[]." *TD Bank*, 325 F.R.D. at 161 (citing *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 681 (S.D. Fla. 2012)).

---

[42] Plaintiffs may argue that this analysis is unnecessary as they are only seeking class certification based on Marriott's omissions, Pls.' Reply at 9 n.6, and "thus no individual issues of what the defendant[] said will predominate." *Id.* at 9 (quoting *Dupler*, 249 F.R.D. at 44 (quoting *In re Coordinated Title Ins. Cases*, 784 N.Y.S.2d 919, at *7 (N.Y. Sup. Ct. 2004))). Nevertheless, I find it prudent to grapple with Defendants' arguments here.

[43] I am satisfied at this time that the SPG member limitation has adequately addressed concerns regarding individualized exposure inquiries. Even if class members used different means of booking reservations with Marriott, they are all SPG members and received (or do not receive) disclosures related to data security through that membership. Should this conclusion be upended by further developments in this litigation, the Court may modify its class certification order. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (Sotomayor, J.); *see also* 2 *Newberg* § 4:80.

In addition to challenging predominance based on the exposure issue, Defendants argue that New York's statute of limitations for consumer fraud raises individualized issues that overwhelm common issues in this case. *See* Defs.' Opp'n at 41–42. For the same reasons that New York's statute of limitations for breach of contract did not defeat predominance, issues related to New York's consumer fraud statute of limitations do not defeat predominance.

Given this analysis related to exposure and the statute of limitations, the Court finds that the predominance requirement as to liability for the New York GBL § 349 class is satisfied.

### ii.    Maryland Consumer Protection Act ("MCPA") Class

In a private action under the MCPA, a consumer must establish "(1) an unfair or deceptive practice…that is (2) relied upon, and (3) causes them actual injury." *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 319 (D. Md. 2014). A deceptive practice has been defined to include a "[f]ailure to state a material fact if the failure…tends to deceive." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 484 (C.D. Cal. 2012) (quoting Md. Code Ann., Com. Law § 13–301(3)).[44] The MCPA is distinct from the New York GBL § 349 because it requires reliance, and "[i]t is true that reliance as an element of proof typically forecloses class treatment because of the individualized questions it raises." *TD Bank*, 325 F.R.D. at 161. However, it does not foreclose class treatment in this case.

Under the MCPA, whether the failure to state a material fact tends to deceive is "judged from the point of view of a reasonable, but unsophisticated consumer." *Tait*, 289 F.R.D. at 484 (quoting *Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524 (D. Md. 2012) (citing *Luskin's, Inc. v. Consumer Prot. Div.*, 726 A.2d 702, 713 (1999))). The use of an objective test to determine materiality allows courts to presume classwide reliance under the MCPA when the

---

[44] Plaintiffs are pursuing class certification based on Marriott's alleged omissions. Pls.' Reply at 9 n.6.

alleged omission is uniformly applicable to the putative class. *See TD Bank*, 325 F.R.D. at 161–62

(citing *Tait*, 289 F.R.D. at 484 ("[T]he MPCA imposes an objective test whereby a plaintiff's

reliance on a defendant's omission can be presumed by the materiality of the omitted fact.");

*Demmick v. Cellco P'ship*, No. Civ.A. 06-2163 JLL, 2010 WL 3636216, at *23 (D.N.J. Sept. 8,

2010) (presuming satisfaction of reliance element under the specific circumstances of the claim,

and certifying MCPA subclass based on uniform, material misrepresentation)).

As outlined in the New York consumer protection analysis, the Court is persuaded that the

alleged omissions were uniformly made to the putative class, and the objective test under the

MCPA will afford Plaintiffs the opportunity to prove their claims without individualized inquiries

overwhelming the common issues. Accordingly, the Court finds that the predominance

requirement as to liability for the MCPA class is satisfied.

### iii. California Unfair Competition Law ("UCL") Class

As in a MCPA action, reliance is an element in establishing "deceptive or fraudulent acts

or practices" in a UCL action. *See Watkins v. MGA Entm't, Inc.*, 550 F. Supp. 3d 815, 833–34

(N.D. Cal. 2021) (citations omitted).[45] However, in UCL *class* actions involving these acts or

practices, i.e., misrepresentations or omissions, class members "are not required to prove their

*individual* reliance on the allegedly misleading statements [or omissions]." *Bradach v.*

*Pharmavite, LLC*, 735 F. App'x 251, 254 (9th Cir. 2018) (emphasis added). Instead, the standard

in class actions under the UCL is whether "members of the public are likely to be deceived"—an

objective test. *Id.* (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (2002), *as modified* (May 22,

---

[45] Plaintiffs allege at least three violations of law that serve as predicates for their UCL claim, and each predicate has its own elements in addition to elements common to all UCL claims. *See* Compl. at ¶¶ 452–55; Bellwether Class Certification Claims and Defenses Spreadsheet, ECF No. 982. For purposes of summary judgment or trial, each element is important, but for class certification purposes, the parties have concentrated their attention on reliance. The Court also focuses on reliance as its effect on predominance is at issue.

2002)) (internal quotations omitted). "UCL...claims that rely on a theory of fraudulent omission [as is the case here] are also susceptible to classwide proof because under California law, reliance can be inferred when an omission is material, and whether an omission is material is determined using a 'reasonable consumer' standard." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 365 (N.D. Cal. 2018) (citing *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 178 (Cal. Ct. App. 2010)).[46] At least one court has stated that UCL claims are "ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." *Id.* at 254–55 (quoting *Tait*, 289 F.R.D. at 480). Of course, this statement assumes that class members were uniformly exposed to the conduct at issue. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595–96 (9th Cir. 2012) (citations omitted).

The Court's predominance analysis regarding the California UCL class follows from the New York and Maryland analyses and, accordingly, the Court finds that the predominance requirement as to liability for the UCL class is satisfied.

### iv.    Michigan Identity Theft Protection Act ("ITPA") Class

The Michigan Identity Theft Protection Act "requires businesses to provide notice of a security breach 'without unreasonable delay' to a Michigan resident if that resident's unencrypted and unredacted 'personal information' was accessed by an unauthorized person. *Marriott*, 440 F. Supp. 3d at 390 (quoting Mich. Comp. Laws § 445.72(1)). "Courts have found that consumers may bring a civil action to enforce Michigan's data breach notice statute through Michigan's consumer protection statute or other laws." *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, No. 19-CV-2284, 2020 WL 2214152 (S.D. Cal. May 7, 2020); *see also In re Target*

---

[46] As stated previously, Plaintiffs are pursuing class certification based on Marriott's alleged omissions. Pls.' Reply at 9 n.6.

*Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1169 (D. Minn. 2014). "As there is no Michigan Consumer Protection Act bellwether claim, Plaintiffs seek to enforce the [ITPA] under the other laws they have brought." Pls.' Mot. at 33.

As Defendants note, this cause of action is not tied to Plaintiffs' classwide theories of harm. *See* Defs.' Opp'n at 45. The injury at issue in this cause of action is an "incremental harm suffered by Plaintiffs as a result of any delay." *Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600, 2015 WL 3916744, at *5 (C.D. Cal. June 15, 2015). Assessing this harm would naturally involve individualized inquiries into whether and how a delay caused the theft of an individual's identity, etc. Plaintiffs fail to adequately demonstrate that common issues will predominate as to liability for this class, and the Court will not certify an ITPA class.

### 4. Compensatory Damages

Having analyzed predominance with respect to liability issues, the Court now addresses the predominance question as to damages. As described in the *Daubert* decision, Plaintiffs plan to use Dr. Prince's BLP model—informed by Ms. Butler's conjoint analysis—to formulaically calculate the amount that class members overpaid for their respective hotel stays.

To satisfy predominance, Plaintiffs' damages must be "capable of measurement on a classwide basis." *See Comcast*, 569 U.S. at 34. However, there is no requirement that Plaintiffs' damages "must be *calculated* on a class-wide basis." *Parker*, 2015 WL 127930, at *14; *see also* 4 *Newberg* § 12:5 ("The fact that damage calculations would require individualized inquiries does not defeat certification.").[47] Instead, "where the case is complex and certified for both liability and

---

[47] It remains true that individual damage calculations *can* "overwhelm questions common to the class," thus defeating predominance, *see Comcast*, 569 U.S. at 34 (emphasis added), but they do not in all, or even most, cases. *See id.* at 42 (Ginsburg, J., dissenting) (citing 2 *Newberg* § 4:54) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."); *see also Stillmock*, 385 F. App'x at 274 (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("The individuation of damages in consumer

damages, class proponents can demonstrate that they have a common, classwide *method* for determining individual damages." *Id.* at § 12:4 (emphasis added). Plaintiffs can demonstrate that such a common, classwide method exists by using a variety of techniques, including "mathematical, mechanical, and statistical formulae." *Id.* at § 12:5. "Moreover, damages calculations made pursuant to a common methodology 'need not be exact' at the class-certification stage." *TD Bank*, 325 F.R.D. at 173 (citing *Comcast*, 569 U.S. at 35).

In addition to putting forward a model that calculates damages via a common, classwide method, Plaintiffs must show that their model only measures "those damages attributable to the theory [of harm]" advanced. *Comcast*, 569 U.S. at 35. In other words, "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id.*

The outcome of this predominance analysis largely hinges on the Court's determination as to whether Dr. Prince's model is a common statistical formula that applies classwide. At the outset, I acknowledge that this model is complex in that it requires a large amount of data and will be run thousands of times—at least once for each class member.[48] Despite this complexity, however, each class member will use the same model to calculate his or her individual overpayment damages. The model relies upon the same set of variables for every hotel stay. Of course, the numerical value assigned to those consistent variables will change for each class member based on the personal and market data related to their hotel stay(s). However, such differences in the computation of damages does not undermine the common, classwide nature of a methodology. *See Parker*, 2015 WL 127930, at *14 (citing *Gunnells*, 348 F.3d at 428) ("The mathematical

---

class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.")).

[48] For a fuller discussion of the model's attributes, see the Court's *Daubert* opinion.

48

computation of the [] damages, of course, is different. And, the Fourth Circuit has made it clear that Rule 23 'explicitly envisions class actions with...individual damage determinations.'"); *see also Earl*, 339 F.R.D. at 442 ("[C]lass members will be able to use this class-wide theory of damages to calculate their *own* individual damages") (emphasis added); *Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) ("[V]ariations in the amount of damages do not preclude certification.") The numerical inputs vary by class member, but the model itself stays consistent.

Even if individual damages calculations accord with predominance, Defendants still argue that acquiring the information necessary to calculate damages requires too much individualized inquiry. *See* Defs.' Opp'n at 20–22. However, the kind of individualized inquiry required here does not preclude a finding of predominance. The information that the model needs to work is objective and administrative in nature. *See Parra v. Bashas' Inc.*, 291 F.R.D. 360, 393 (D. Ariz. 2013) (citations omitted) ("Furthermore, through a computer program, and relying upon 'objective factors' such as 'the individual employee payroll record (dates of employment job position, hours worked) and the wage scale,' which is part of the record, the plaintiffs will be able to calculate back pay losses for 'each eligible class member[.]'"). The model requires (1) personal data of an administrative nature that is in Defendants' NDS database, including the exact Starwood hotel at which a class member stayed, the price paid for that hotel stay, and the date(s) of that stay, and (2) verifiable market data information such as historical prices and hotel attributes that Dr. Prince has demonstrated are available. *See* Rebuttal Rep. of Jeffrey T. Prince, Ph.D. ("Prince Rebuttal Rep."), ECF No. 916-1 (sealed). Acquiring, and then processing, this information will be time intensive, but it does not require resolving individualized issues of a substantive nature.[49] *See Checking*

---

[49] Importantly, overpayment damages are not wrapped up in individualized causation issues like damages related to identity theft, time spent responding to the data breach, or other out-of-pocket losses would be. Such individualized causation issues have led other courts to deny class

*Account Overdraft Litig.*, 286 F.R.D. 645, 658 (S.D. Fla. 2012) ("[C]alculations will be merely

ministerial in nature, and will not be plagued by resolution of individual class member issues.")

Of course, the BLP model does not quite reduce the question of individualized damages to "mouse-

clicking simplicity." *See Dreher v. Experian Info. Sols., Inc.*, No. CIV-02-0591, 2014 WL

2800766, at *5 (E.D. Va. June 19, 2014). Nevertheless, the necessary inquiries are really part of a

"mechanical process," *Parra*, 291 F.R.D. at 393, that is qualitatively unimportant even if it is

quantitatively significant—and the predominance test is a qualitative, not a quantitative test. *See*

*Soutter*, 307 F.R.D. at 214 (quoting *Stillmock*, 385 F. App'x at 272 (citing *Gunnells*, 348 F.3d at

429)). Despite individualized inquiries related to damages, the qualitatively overarching issues are

still common. *See id.* (citing *Ealy*, 514 F. App'x at 305).

Reading Defendants' arguments regarding individualized inquiries, one wonders whether

"Defendants are essentially arguing that due to the [hotel] market's nature and the myriad variables

involved, determining the existence of the alleged overcharge is impossible." *Earl*, 339 F.R.D. at

428. However, "[t]his contention cannot be correct—this train of 'logic would have the effect of

immunizing…any [unlawful]…conduct concerning…[the hotel industry]' from class treatment."

*Id.* at 428–29 (citation omitted). Plaintiffs' proposed model respects that hotel markets vary by

geography and tier and avoids problems related to averaging that would have arisen with a simpler

model—e.g., one that generated a nationwide overpayment percentage—while remaining

formulaic in nature.

---

certification of damages classes in data breach cases. *See S. Indep. Bank v. Fred's, Inc.*, No. 15-CV-799, 2019 WL 1179396, at *19 (M.D. Ala. Mar. 13, 2019); *McGlenn v. Driveline Retail Merch., Inc.*, No. 18-cv-2097, 2021 WL 165121, at *6, *10–11 (C.D. Ill. Jan 19, 2021); *but see Brinker*, 2021 WL 1405508, at *12–13. However, that individualized causation issue is not applicable in the overpayment context.

Dr. Prince has not provided precise calculations for overpayment damages for each class member yet—indeed it would have been impossible for him to do so given that he does not have access to the full NDS database—but he is not required to provide precise calculations at this time to satisfy predominance. *See TD Bank*, 325 F.R.D. at 173 (citing *Comcast*, 569 U.S. at 35). As fully discussed in the *Daubert* opinion, he adequately tested his model using bellwether plaintiffs' data and he sufficiently demonstrated how his model would precisely calculate damages for each class member once it is applied classwide.

Further, Dr. Prince's model is consistent with Plaintiffs' overpayment theory of harm, satisfying the *Comcast* requirement that "[a] plaintiff's damages case [] be consistent with its liability case." *Comcast*, 569 U.S. at 35. As stated previously, that overpayment theory can be summarized as follows: Marriott was able to charge higher prices for hotel rooms than they would have in a hypothetical "but-for" world in which consumer willingness to pay for a hotel room had shifted in response to consumer knowledge of Starwood's inadequate data security; consequently, named plaintiffs overpaid for their respective hotel stays as a result of Marriott's alleged data security failures. Dr. Prince's model, which incorporates Ms. Butler's conjoint analysis, only measures the amount that class members overpaid pursuant to that theory. The model works independently of Plaintiffs' other theories of harm and it has isolated the overpayment damages from the other types of damages that Plaintiffs seek.[50]

---

[50] Defendants argue that the overpayment model's failure to account for international hotel stays speaks to a disconnect between the model and the theory of harm. *See* Defs.' Opp'n at 24–25. Meanwhile, Plaintiffs assert that they did not—and do not—intend for their model to produce overpayment damages for international hotel stays. *See* Prince Dep. 1 at 336:9–337:10. But rather than revealing a *Comcast* "fit" issue, this dispute simply highlights that Plaintiffs' proposed overpayment damages class definitions are imprecisely written, since they apparently encompass international hotel stays. Accordingly, I will narrow the relevant class definitions to hotel stays within the United States, which Plaintiffs agreed to do during the class certification hearing. I will

Finally, if at a later point in the litigation the individual inquiries related to damages calculations metastasize to an impermissible level, the Court retains the ability to modify its class certification order. The Court could create subclasses, bifurcate liability and damages,[51] or decertify the class altogether to address these individualized damages issues. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (Sotomayor, J.); *see also* 2 *Newberg* § 4:80.

### 5.    Statutory Damages

Section 349 of the New York General Business Law authorizes "any person who has been injured by reason of any violation of this section [to] bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages *or fifty dollars*, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h) (emphasis added). These statutory damages "can be assessed on the basis of common proof, as they are [set] at $50." *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015). Any possible individualization as to calculating damages would be mechanical in nature, i.e., counting the number of hotel stays for which a class member is eligible for damages. When individualized statutory damages questions

---

not flat-out deny certification of overpayment damages classes, however, as Defendants ask me to do.

[51] Under bifurcation, liability issues would proceed as a class action—given that the liability issues would still satisfy the class action requirements—and damages would be left for follow-on proceedings. The Fourth Circuit has not directly addressed whether courts may use Rule 23(c)(4) to bifurcate liability and damages, but it has implied that it would follow the majority of circuits in adopting such a view. 2 *Newberg* § 4:91 (citing *Gunnells*, 348 F.3d at 439–45). Lower courts within the Fourth Circuit have adopted a broad view of Rule 23(c)(4)'s use. *See, e.g., Parker*, 2015 WL 127930, at *11 ("Under [*Gunnells*], which appears to follow the practice of the Second, Seventh, and Ninth Circuits, this Court holds that it may use Rule 23(c)(4) to certify a class as to an issue regardless of whether the claim as a whole satisfies the predominance test in Rule 23(b)(3)."); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 296 (S.D. W. Va. 2015) (quoting *Manual for Complex Litig.*, § 21.24 (4th ed. 2004)) ("Rule 23(c)(4)(A) permits a class to be certified *for specific issues or elements of claims* raised in the litigation....An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on questions such as proximate causation and damages.").

are "simple and straightforward"—as they would be here—they do not preclude a finding of predominance. *See Soutter*, 307 F.R.D. at 217 (quoting *Stillmock*, 385 F. App'x at 273).

Indeed, Defendants do not challenge predominance as to statutory damages based on the calculation method. *See* Defs.' Opp'n at 35–36. Instead, Defendants argue that proving "actual injury" or the "fact of damage," as required under § 349,[52] is too individualized. *Id.* This assertion merely recycles arguments made in the overpayment theory context. The Court has already found that establishing liability, and even damages, under the overpayment theory is consistent with predominance. Defendants' arguments regarding individualization are no more successful in the statutory damages context. Plaintiffs have satisfied the predominance requirement as to statutory damages under § 349.

### 6.    Nominal Damages

One may recover nominal damages in breach of contract actions in the bellwether states.[53]

*See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020); *Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 638 (D. Md. 2012).[54] Of course, by their nature, nominal damages do not require individualized calculation and, thus, they are consistent with a predominance finding on that score.

---

[52] "'Actual injury' is an element of any claim asserted under GBL § 349." *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 57 (S.D.N.Y. 2019) (citing *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897–98 (N.Y. 1999)).

[53] Under certain circumstances, one may recover nominal damage in negligence actions in the bellwether states as well, but the Court need not address nominal damages for negligence claims here. As indicated previously, Plaintiffs have not established the fact of injury classwide that could support nominal damages—neither the overpayment theory nor the loss of market value theory are applicable to the negligence claims at this time. As for the consumer protection claims, Plaintiffs are not seeking nominal damages. *See* Pls.' Mot. at 34–35; Pls.' Reply at 18–20.

[54] Defendants assert that New York law applies to the breach of contract claims, *see* Defs.' Opp'n at 37, but the Court need not decide that issue now. Accordingly, the Court includes the applicable Maryland case law here, in addition to the New York case law.

As with statutory damages, Defendants do not challenge predominance as to nominal damages based on the calculation method. *See* Defs.' Opp'n at 34. Defendants make a few other arguments against Plaintiffs' effort to certify nominal damages classes. *See* Defs.' Opp'n at 33–35.[55] One such argument unrelated to the predominance requirement is easily addressed here. Defendants assert that Plaintiffs cannot obtain nominal damages because Plaintiffs did not seek nominal damages in the Complaint. *Id.* at 33. While Plaintiffs did not use the term "nominal damages" in their request for relief, they did seek "general damages," Compl. at ¶ 355, which encompasses nominal damages. *See Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.*, 554 F. App'x 176, 190 (4th Cir. 2014) (citing *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 853 (4th Cir. 1992)) ("Nominal damages need not be specifically pleaded where a party alleges a claim for general damages; the general damage allegation sufficiently encompasses nominal damages.") Therefore, Plaintiffs have adequately pleaded nominal damages in the Complaint. Based on this analysis, the Court finds that Plaintiffs have satisfied the predominance requirement as to nominal damages.

### d.    Superiority

"[A Rule 23(b)(3)] class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court must compare possible alternatives to the class action to determine "whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock*, 385 F. App'x at 274 (quoting 7AA *Federal Practice and Procedure* § 1779 (3d ed. 2005). Courts consider the following four factors when assessing the superiority of the class action:

---

[55] The Court has already addressed Defendants' res judicata/adequacy requirement argument related to nominal damages in the adequacy of representation section.

54

(1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3); *see also Thorn*, 445 F.3d at 319.[56] Ultimately, the "determination of superiority necessarily depends greatly on the circumstances surrounding each case." *Stillmock*, 385 F. App'x at 274 (quoting 7AA *Federal Practice and Procedure* § 1779).

After considering each factor, the Court finds that a Rule 23(b)(3) class action is "superior to the other available methods for fairly and efficiently adjudicating" this case. The first factor clearly weighs in favor of class certification. "The vast majority of class members have a *de minimis* interest in individually controlling the prosecution of their [] claims because the monetary value of their damages would be dramatically outweighed by the cost of litigating an individual case." *TD Bank*, 325 F.R.D. at 162 (citing Fed. R. Civ. P. 23(b)(3)).[57] In other words, this case "is the classic negative value case; if class certification is denied, class members will likely be precluded from bringing their claims individually because the cost to bring the claim outweighs the potential payout." *Brinker*, 2021 WL 1405508, at *13; *see also Earl*, 339 F.R.D. at 445.[58] "For

---

[56] "Rule 23 states that these factors are pertinent to the assessment of predominance and superiority, but most courts analyze [these] factors solely in determining whether a class suit will be a superior method of litigation." 2 *Newberg* § 4:68 (5th ed.).

[57] "If any individual class member does wish to retain control of his claim, or seek actual damages where a different remedy might be imposed upon him, the opt-out mechanism will allay such a presumption upon his individual interests." *TD Bank*, 325 F.R.D. at 162.

[58] This analysis holds true for statutory damages as well as overpayment damages. Overpayment damages are clearly quite small here. *See* Prince Rebuttal Rep. at Figure 3. Statutory damages are potentially larger—the court may exercise its discretion under N.Y. Gen. Bus. § 349(h) to award treble damages up to $1,000 and award reasonable attorneys' fees. However, the damages are still small enough that class members' calculus with regards to bringing individual lawsuits would not change. *See Stillmock*, 385 F. App'x at 274 (citations omitted) ("[T]here is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory

most class members the only realistic alternative to a class action is no action at all." *TD Bank*,

325 F.R.D. at 162. In such a case, "the adjudication of [the] matter through a class action

[is]…superior to no adjudication of the matter at all." *Gunnells*, 348 F.3d at 426 (citing 5 *Moore's*

*Federal Practice* § 23.48[1] (1997)). "As the Supreme Court put the matter, '[t]he policy at the

very core of the class action mechanism is to overcome the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" *Id.*

(quoting *Amchem*, 521 U.S. at 617 (citation omitted)).

The second factor also supports class certification. Because "numerous putative class

action lawsuits based on the same facts and containing substantively identical claims have already

been filed against Defendants," the Judicial Panel on Multidistrict Litigation "has seen fit to

consolidate the handling of those common claims" in this Court. *TD Bank*, 325 F.R.D. at 162. This

decision "favors a consolidated disposition generally." *Id.*

The third factor weighs in favor of class certification as well. This factor "embodies two

independent concerns: (1) 'the desirability of concentrating the trial of the claims…by means of a

class action, in contrast to allowing the claims to be litigated separately,' and (2) 'the desirability

of concentrating the trial of the claims in the particular forum … in contrast to … forums to which

they would ordinarily be brought.'" 2 *Newberg* § 4:71 (quoting Fed. R. Civ. P. 23(b)(3) advisory

committee's note to 1966 amendments). The Court's preceding predominance analysis implicitly

addressed the first of these two concerns. It is nevertheless worth noting that class certification

will likely reduce litigation costs by consolidating recurring common issues here. *See Gunnells*,

348 F.3d at 427 (citing *Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir.

---

damages of up to $1,000 will result in…individual actions of a scale comparable to the potential
enforcement by way of class action.").

1993)). Proving the common issues addressed in the commonality and predominance sections in individual trials would "require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues." *Id.* If the litigation were to proceed via individual trials, plaintiffs could use requests for admission under Fed. R. Civ. P. 36 to request that Defendants admit to the accuracy of certain undisputed factual statements and thereby expedite the individual trials. *See Parker*, 2015 WL 127930, at *14. However, this case has a sufficient number of contested issues that a significant amount of duplication and redundancy across individual trials would remain.

Further on this point regarding the desirability of concentration via class action, the Court notes that class certification serves Defendants here. Class certification "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications." *Gunnells*, 348 F.3d at 427 (quoting 5 *Moore's Federal Practice* § 23.02 (1999)); *see also Stillmock*, 385 F. App'x at 275 ("[C]lass certification promotes consistency of results, giving [the defendant] the benefit of finality and repose."). "This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members…By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel…." *Id.* (citing Fed. R. Civ. P. 23(c)(2)(B)).

As to the second concern embodied in the third factor, it is desirable to concentrate the litigation in this particular forum. That this Court has issued many rulings over three years in this case weighs in favor of class certification. *See Earl*, 339 F.R.D. at 445 ("[T]he value of concentrating litigation in the Eastern District of Texas is clear given that this Court has already ruled on a number of matters in this case."); *see also Brinker*, 2021 WL 1405508, at *13. That

57

Marriott is headquartered in Maryland and that many of its corporate employees live and work here also supports concentrating the litigation in this forum. *See Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 347 (D. Md. 2014).

The fourth factor—manageability—also supports class certification. Manageability is "the most critical concern in determining whether a class action is a superior means of adjudication." 2 *Newberg* § 4:72. Even so, "courts deny class certification on manageability grounds relatively infrequently and primarily in certain carefully circumscribed situations. This is so...because the cases most likely to be unmanageable are those involving myriad individual issues, the manageability concern often simply echoes the predominance analysis. Therefore, courts generally hold that if the predominance requirement is met, then the manageability requirement is met as well." *Nichols v. GEICO Gen. Ins. Co.*, No. 18-cv-01253, 2021 WL 1661158, at *11 (W.D. Wash. 2021) (quoting 2 *Newberg* § 4:72). Here, the manageability concerns raised by Defendants echo their predominance concerns, i.e., they believe that the overpayment model requires too much individualized inquiry. *See* Defs.' Opp'n at 32. However, in the predominance section, the Court concluded that Plaintiffs' overpayment model provides a common, formulaic method for calculating individual damages and does not require too much individualized inquiry. Accordingly, the Court is satisfied that the overpayment model does not make this litigation unmanageable.

Of course, the size of the proposed classes and the administrative logistics discussed previously in the ascertainability section do raise some additional manageability concerns. It will be time consuming to identify class members, review Defendants' administrative records, and collect supporting documentation from class members. However, as with the superiority analysis overall, courts compare the effectiveness of a class action with the alternatives. *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) (quoting *Klay v. Humana*, 382 F.3d

58

1241, 1273 (11th Cir. 2004) ("[W]e are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives.")). While this class action presents management difficulties, those difficulties are ultimately outweighed by those associated with the alternative: thousands of individual trials. *See TD Bank*, 325 F.R.D. at 162 (citing Fed. R. Civ. P. 23(b)(3)(D)). As discussed earlier, "separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Id.* (quoting *Checking Account Overdraft Litig.*, 286 F.R.D. at 659 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983))).

If existing manageability concerns were to grow or new issues arise—particularly as it relates to individualized damages—the Court "recognize[s] its ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately [becomes] necessary." *Visa Check/MasterMoney*, 280 F.3d at 141; *see also* 2 *Newberg* § 4:80.

## IV.    Rule 23(c)(4) Issues Classes

### a.    Proposed Issues Classes

Plaintiffs ask the Court to certify the following issues:

1. Were Marriott or Accenture Negligent?

    a. Did they owe a common law duty to the class;

    b. Did they breach that duty; and

    c. Did the breach of that duty cause harm to the class.

2. Were Marriott or Accenture Negligent Per Se?

    a. Did they owe a statutory duty to the class;

    b. Did they breach that duty; and

    c. Did the breach of that duty cause harm to the class.

3. Did Marriott and Starwood breach their contracts?

    a. Did the companies' Privacy Policies create contractual obligations?

    b. Did the companies breach those obligations?

    c. Did those breaches cause harm?

4. Did Marriott violate state consumer protection statutes?

    a. Did Marriott and Starwood make actionable representations or omissions about their security?

    b. Did they fail to meet those representations?

    c. Did those failures cause harm?

As the Court has certified Rule 23(b)(3) damages classes pertaining to the breach of contract and consumer protection claims, separately certifying questions related to Issues 3 and 4—as well as their sub-issues—under Rule 23(c)(4) is unnecessary at this time.[59] Those issues will be resolved in the Rule 23(b)(3) context anyway. However, the Court must still consider whether to certify the negligence-related liability issues, i.e., Issues 1 and 2—as well as their sub-issues. Given that (1) the overpayment theory is inapplicable to Accenture, (2) Dr. Prince's inherent value model has been excluded, and (3) nominal damages for Plaintiffs' negligence claims are unavailable (at this time) without the classwide fact of injury provided by the loss of market value theory, Rule 23(c)(4) issue certification is the remaining classwide path for Plaintiffs to take with regards to their negligence claims against Marriott and Accenture. As for these proposed liability issues, individualized damages like time spent responding to the data breach and out-of-pocket

---

[59] Of course, should the damages classes be decertified at any time, the Court may revisit the question of certifying issues classes.

fraud losses are the relevant harms to bear in mind during the analysis—not an overpayment or loss of market value injury.

### b.    Scope and Function of Rule 23(c)(4)

In considering Plaintiffs' request for certification of various issues, the Court must start with an analysis of Rule 23(c)(4) and its scope and function. "Rule 23 specifically dictates that '[w]hen appropriate' a class action may be 'maintained' as to 'particular issues' and, *after* that is done, 'the provisions of this rule,' such as the predominance requirement of (b)(3), 'shall *then*...be construed and applied.'" *Gunnells*, 348 F.3d at 439 (quoting Fed. R. Civ. P. 23(c)(4)). Given the rule's language, judicial interpretation has coalesced in recent years around a "broad view" of Rule 23(c)(4) in which common questions need predominate over individual ones only for the specific issues that are certified, not for the entire cause of action." 2 *Newberg* § 4:91.[60] Under the broad view, courts may use Rule 23(c)(4) to certify a class as to an issue "regardless of whether the claim as a whole satisfies the predominance test in Rule 23(b)(3)." *Parker*, 2015 WL 127930, at *11; *see also Martin v. Behr Dayton Thermal Prods., LLC*, 896 F.3d 405, 411 (6th Cir. 2018) (citations omitted), *cert. denied*, 139 S. Ct. 1319 (Mem.) (2019) ("The broad view permits utilizing Rule 23(c)(4) even where predominance has not been satisfied for the cause of action as a whole."); *but see Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) ("The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)."). As the district court in *Good v. Am. Water*

---

[60] While the Fourth Circuit has not explicitly adopted the broad view, courts and commentators have interpreted *Gunnells* to indicate support for it. *See Parker*, 2015 WL 127930, at *11; *see also Martin v. Behr Dayton Thermal Prods., LLC*, 896 F.3d 405, 411 (6th Cir. 2018) (citations omitted), *cert. denied*, 139 S. Ct. 1319 (Mem.) (2019); 2 *Newberg* § 4:91. *Gunnells* found that Rule 23(c)(4) could be used to maintain a class action as to particular causes of action—if those causes of action satisfied the requirements of Rule 23—even if the lawsuit as a whole did not satisfy all the Rule 23 requirements. 348 F.3d at 441 (quoting *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989)).

*Works Co., Inc.*, put it: "There is no impediment to certifying particular issues in a case as opposed to entire claims or defenses. That is the very approach urged by the authoritative *Manual for Complex Litigation*: 'Rule 23(c)(4)(A) permits a class to be certified for specific issues or elements of claims raised in the litigation.'" 310 F.R.D. 274, 296 (S.D. W. Va. 2015) (quoting *Manual for Complex Litig.* § 21.24 (4th 2004)). This approach accords with the Fourth Circuit's admonition to district courts to "'take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues' in order 'to promote the use of the class device and to reduce the range of disputed issues' in complex litigation." *Central Wesleyan*, 6 F.3d at 185 (quoting *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 740 (4th Cir. 1989)). Accordingly, the Court adopts the broad view as to Rule 23(c)(4)'s usage.

### c.    Applying Rule 23(c)(4)

Having established that the Court may certify specific issues, I must now apply the provisions of Rule 23(a) and (b)(3)—discussed at length above—to the specific issues for which Plaintiffs seek certification. The Court's prior overall Rule 23(a) findings apply across Plaintiffs' theories of harm and claim types and, for the most part, apply to both Defendants. I have also already found that specific concerns raised by Accenture regarding the Connecticut class representative did not defeat typicality. Per that prior analysis, the Rule 23(a) prerequisites are satisfied as to the negligence issues classes.

As with my Rule 23(b)(3) predominance analysis related to the breach of contract and consumer protection claims, I begin the predominance analysis of the negligence and negligence per se issues by looking at the elements of the causes of action.[61] The elements of negligence and

---

[61] The rules pertaining to the predominance requirement laid out in the damages classes section of this opinion apply here as well. I adopt them for this analysis and, therefore, it is not necessary to repeat them again in this section.

negligence per se are quite consistent across the bellwether states, and Plaintiffs' proposed issues align with the consistent elements: duty (either common law or statutory), breach, and causation.[62] *See Right v. Breen*, 890 A.2d 1287, 1294 (Conn. 2006); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007); *Warr v. JMGM Group, LLC*, 70 A.3d 347, 353 (Md. 2013); *Duncan v. Mill Mgmt. Co. of Greenwich*, 60 A.3d 222, 238–39 (Conn. 2013); *Goldstein, Garber, & Salama v. J.B., LLC*, 797 S.E.2d 87, 92 (Ga. 2017) (quoting *Murphy v. Bajjani*, 647 S.E.2d 54, 58 (Ga. 2007)).

When considering Plaintiffs' identity fraud and related mitigation theories of harm—which are the relevant theories of harm here—individualized issues related to causation are quite significant. As the discovery taken to date from the bellwether plaintiffs has demonstrated, a large number of class members' PII may have been exposed in data breaches other than the Starwood breach or exposed in another manner. *See* Defs.' Exs. 26, 34. As a result, substantial individualized inquiry is required to determine whether Defendants proximately caused any actual identity theft that might have occurred. "The functional equivalent of a full-blown trial on damages causation for each putative class member would be required to determine to which individuals [Defendants are] liable…." *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 149 (4th Cir. 2001). Defendants have raised substantial doubts regarding predominance as it relates to the proposed certification of causation issues that are separate and apart from the overpayment theory, and Plaintiffs have not met their burden of demonstrating compliance with Rule 23(b)(3) here. Consequently, common issues do not predominate within the causation sub-issues, i.e., Issues 1(c) and 2(c).

While individual issues block a predominance finding as to the causation sub-issue, they do not for the duty and breach sub-issues. Plaintiffs will use the same evidence in their attempt to

---

[62] Actual injury, or damages, are a fourth consistent element—one that is required to establish liability—but Plaintiffs do not seek to certify that issue given the individualized nature of the non-overpayment theories of harm.

establish duty and breach for their negligence and negligence per se claims against Marriott and Accenture. As to claims against Marriott, that evidence includes Plaintiffs' expert Mary Frantz's report, Pls.' Tab 4, and the documents and testimony upon which it is based. *See, e.g.*, Pls.' Tabs 17, 19. As to claims against Accenture, that evidence includes testimony regarding Accenture's business relationship with Starwood and Marriott, Accenture's data security responsibilities, and Accenture's data security practices related to multifactor authentication, account privileges, monitoring, and encryption. *See* Pls.' Tabs 36, 47–49.

Marriott largely does not contest that common issues predominate as to duty and breach. *See* Pls.' Reply at 3. Marriott primarily challenges predominance as to Plaintiffs' negligence claims by arguing that different contractual relationships between class members and Marriott undermine the necessary cohesiveness for class certification. *See* Defs.' Opp'n at 41. Because the originally proposed negligence classes were not restricted to SPG members, some class members may have been subject to the SPG Terms & Conditions and the agreements incorporated therein, such as the Website Terms of Use, while other class members may not have been subject to these same documents. Because the SPG Terms & Conditions included provisions like a liability release clause that Defendants would use as affirmative defenses, *see* Defs.' Opp'n at 36–37; ECF No. 982, one would have to engage in individual inquiry as to the contractual relationships of class members. This individualized inquiry would likely defeat predominance in this context. However, because of related typicality concerns, the Court has already redefined the proposed negligence classes to only include SPG members. Therefore, Marriott's argument regarding these contractual relationship differences is no longer applicable.

At least with respect to common law duty in Connecticut, Florida, and Maryland, Accenture does challenge Plaintiffs' assertion that common issues predominate. Accenture

contends that individualized issues will emerge when analyzing class members' respective relationships with the company. *See* Defs.' Opp'n at 58. However, there is little or no variation between class members as to this relationship. As Plaintiffs note, "it is difficult to see how [there] could [be] given Accenture's argument that it made 'no representation to plaintiffs, had no interactions with plaintiffs, and did not request, accept, or store their personal information.'" Pls.' Reply at 28 (quoting ECF No. 464-1 at 10; 14). Ultimately—with regards to Accenture and Marriott—common issues will predominate over any individual questions as to the duty and breach elements of negligence and negligence per se, i.e., Issues 1(a)–(b) and 2(a)–(b).

Because "Rule 23(c)(4) eases the demands of the predominance requirement" by isolating specific issues for analysis, it "shifts the focus to Rule 23(b)(3)'s second requirement, superiority." *Romig v. Pella Corp.*, No. 14-cv-00433, 2016 WL 3125472, at *13 (D. S.C. June 3, 2016).[63] For the most part, the factors supporting a finding of superiority as to the damages classes—the class members' de minimis interest in individually pursuing their claims, the Judicial Panel on Multidistrict Litigation's decision to consolidate the handling of Plaintiffs' claims, the protection for Defendants against inconsistent adjudications, and the Court's accumulated time spent with this case—also support a finding of superiority here.

When considering superiority in the context of Rule 23(c)(4) however, courts should additionally consider whether the "efficiency gains of certification...outweigh[]...the fact that individualized issues requiring significant time and attention remain for later. *See id.* at *13–16; *Parker*, 2015 WL 127930, at *14–16. Importantly, courts are "not required under Rule 23...to sacrifice class adjudication of a driving issue in the case simply because many individualized

---

[63] The rules pertaining to the superiority requirement laid out in the damages classes section of this opinion apply here as well and are adopted for that purpose. Therefore, they need not be repeated.

inquiries will remain thereafter." *Good*, 310 F.R.D. at 298. Nevertheless, courts should evaluate

this question of efficiency carefully.

Clearly, important issues related to causation, affirmative defenses, and damages related to

Accenture's conduct will not be resolved during issue-class adjudication. Nevertheless, efficiency

gains stemming from certification of the duty and breach issues outweigh this fact. Given that the

Court has certified damages classes against Marriott, the Court will already be analyzing the

intertwined factual circumstances relevant to the duty and breach issues. Not certifying the duty

and breach issue classes would result in totally unnecessary duplication as Plaintiffs and

Defendants litigated the Marriott class action and the presumably numerous individual Accenture-

related cases. The parties would have to repeatedly put on the same witnesses and produce the

same documents, incurring considerable expense. This situation speaks to the "economy" of class

treatment for these issues. *Cf. Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (citation

omitted) ("[H]ere there is an economy to class treatment of the question whether the ProLine

windows suffer from a basic design defect, the resolution of which has the potential to eliminate

the need for multiple, potentially expensive expert testimony and proof that would cost

considerably more to litigate than the claims would be worth to the plaintiffs.")

Now, it is true that other methods such as Fed. R. Civ. P. 36, the submission of special

verdicts, and collateral estoppel, may exist to avoid relitigating an issue in each individual case.

*See Parker*, 2015 WL 127930, at *15. However, in my mind, they are not as efficient as issue

certification here, particularly because the Court is already certifying some damages classes. At

this juncture, it is worth reiterating that in the event that the results of the issues trials are favorable

to Marriott and Accenture, the litigation against them as to the negligence and negligence per se

claims would end. Defendants would not obtain this benefit by any of the foregoing alternatives to certifying an issues class. This observation supports a finding of superiority as well.

Finally, "[b]efore certifying an issues class…the judge should be satisfied that common questions are sufficiently separate from other issues and that a severed trial will not infringe any party's constitutional right to a jury trial and will permit all the parties fairly to present the claims and defenses." 2 *Newberg* § 4:90. As the preceding analysis demonstrates, certifying the described issues against Accenture does not raise concerns on this front.

## V.    Injunctive or Declaratory Relief Class

A class may be certified pursuant to Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In interpreting the requirements of Rule 23(b)(2), the Fourth Circuit has held that certification is appropriate where final injunctive relief is sought and will settle "the legality of the behavior with respect to the class as a whole." *Thorn*, 445 F.3d at 329 (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendments). Further, where the harm referenced in the requested relief refers to a ceased activity or no longer present practice, it is "moot and cannot serve as a predicate for Rule 23(b)(2) certification." *Id.* at 331. I find certification of the Rule 23(b)(2) class to be inappropriate as Plaintiffs have not established that the proposed relief would provide "an indivisible injunction benefitting all its members at once," in relation to a present, imminent, or possible future harm. *Wal-Mart*, 564 U.S. at 362.

Plaintiffs "seek certification of declaratory and injunctive relief claims, the substance of which will be reserved for a later time deemed appropriate by the Court," and "the opportunity to conduct discovery into data security measures" to determine the substance of the future injunction. Pls.' Mot. at 40. Defendants challenge certification arguing that Plaintiffs cannot "offer the basic

67

contours of the injunctive and declaratory relief." Defs.' Opp'n at 49. Defendants also state that Plaintiffs can offer no evidence of any "ongoing security inadequacies...that would justify declaratory or injunctive relief," regarding the "retired and now safely offline" database containing the PII at issue. *Id.* at 50.

Without any direction as to the nature of the injunction sought, besides a request for further discovery, Plaintiffs' motion goes no further than requesting that Defendants discontinue their current practices with respect to the PII at issue. Such a general request does not support class certification under Rule 23(b)(2).[64] *See Ginwright v. Exeter Fin. Corp.,* 280 F. Supp. 3d 674, 690 (D. Md. 2017). While lack of specificity describing an injunctive remedy sought is not a bar to class certification, "general contours of the requested injunction" are still necessary. *See Adkins v. Facebook, Inc.,* 424 F. Supp. 3d 686, 698 (N.D. Cal. 2019) (certifying an injunction compelling security measures correction pending specific remedies to be determined at a future time). Here, Plaintiffs fail to establish the general contours for an injunctive remedy under Rule 23(b)(2) that go beyond a general statement for Defendants not to continue as they currently are.

Plaintiffs also seek a declaratory remedy under Rule 23(b)(2). Declaratory relief "as a practical matter [] affords injunctive relief or serves as a basis for later injunctive relief." Fed. R. Civ. P. 23(b)(2) Advisory Committee Commentary. Plaintiffs assert that Defendants "are still in possession of class members' PII" at issue in this case, and that Defendants have not "adequately secured the PII." The Court finds Plaintiffs' asserted declaration unpersuasive to support stand-alone declaratory relief or a declaration for the basis of future injunctive relief. For declaratory relief to serve as a basis for an injunctive relief there must be some present harm or alternatively a

---

[64] Plaintiffs ask the Court "[to] issue corresponding prospective injunctive relief requiring Marriott to employ adequate security protocols consistent with law and industry standards to protect consumers' Personal information." Compl. at ¶ 351.

"likelihood of a future harm."[65] A declaratory judgment would be appropriate if it established a

benefit of a "valuable injunctive relief that will accrue to all members" relief from the harm or

threatened harm, *Berry v. LexisNexis Risk and Info. Analytics Grp., Inc.*, No. 11-CV-754, 2014

WL 4403524, at *12 (E.D. Va. Sept. 5, 2014), but here no classwide benefit is clear. Defendants

counter, and the record supports, that the "systems [housing the PII at issue] are now retired,

offline, and boxed away." *See* Defs.' Opp'n at 51.; *see also* Pls.' Tab 19.

The Court finds that Plaintiffs have failed to establish either the general contours of the

injunctive relief requested beyond a general discontinuance statement or provide evidence of some

present or likely future harm regarding the PII at issue to support declaratory relief either

independently or as the basis for a future injunctive relief.[66]

## CONCLUSION

In sum, Plaintiffs' motion for class certification is GRANTED IN PART and DENIED IN

PART. As Judge Corrigan did in *Brinker*, I acknowledge that this Court is one of the first to certify

Rule 23(b)(3) classes involving individual consumers complaining of a data breach. *See* 2021 WL

---

[65] The current requested declaration is not comparable with the requested relief in *Adkins*, 424 F. Supp. 3d at 698. First, in *Adkins* the existing personal data at issue was still in use by the defendant. Second, the defendant's assertion that it had fixed the specific security vulnerability that had "caused the data breach" was viewed insufficient by the court to prevent Rule 23(b)(2) class certification and award an injunctive remedy. The defendant's "repetitive losses of users' privacy supplie[d] a long-term need for supervision," given a "likelihood of future harm" to the plaintiffs' PII. *Id.*

[66] Should further proceedings produce evidence that provides details currently missing from the motion, Plaintiffs may be afforded the opportunity to seek a Rule 23(b)(2) class at that time. Before renewing their motion to certify an injunctive or declaratory relief class, however, Plaintiffs would need to submit a three-page letter to the Court setting forth the anticipated grounds for doing so. The Court would hold a scheduling conference with respect to briefing the motion. Mindful of this possibility, I DENY WITHOUT PREJUDICE the motion to certify a class for injunctive or declaratory relief. I reiterate, however, that the present record does not warrant a 23(b)(2) class, and Plaintiffs would need to put forward a substantially more detailed motion in order for the Court to grant class certification in this respect.

1405508, at *14.[67] Nevertheless, Plaintiffs have satisfied the Rule 23 requirements as to several

classes. Accordingly, the Court CERTIFIES the following Rule 23(b)(3) damages class with

respect to Plaintiffs' Maryland breach of contract and MCPA claims:

> All natural persons residing in Maryland whose Personal
> Information, given to Starwood in connection with the making of a
> reservation at a Starwood property in the United States, was
> compromised in a data breach announced by Marriott on or about
> November 30, 2018, and who: (1) had a Starwood Preferred Guest
> ("SPG") membership, (2) bore the economic burden for the hotel
> stay, and (3) made the reservation from July 28, 2014 to November
> 30, 2018.

Peter Maldini will serve as the Class Representative.

The Court CERTIFIES the following Rule 23(b)(3) damages class with respect Plaintiffs'

New York breach of contract and GBL § 349 claims:

> All natural persons residing in New York whose Personal
> Information, given to Starwood in connection with the making of a
> reservation at a Starwood property in the United States, was
> compromised in a data breach announced by Marriott on or about
> November 30, 2018, and who: (1) had a Starwood Preferred Guest
> ("SPG") membership, (2) bore the economic burden for the hotel
> stay, and (3) made the reservation from July 28, 2014 to November
> 30, 2018.

Roger Cullen, Eric Fishon, and Paula O'Brien will serve as the Class Representatives.

The Court CERTIFIES the following Rule 23(b)(3) damages class for Plaintiffs' California

UCL claim:

> All natural persons residing in California whose Personal
> Information, given to Starwood in connection with the making of a
> reservation at a Starwood property in the United States, was
> compromised in a data breach announced by Marriott on or about
> November 30, 2018, and who: (1) had a Starwood Preferred Guest
> ("SPG") membership, (2) bore the economic burden for the hotel

---

[67] Of course, as Judge Corrigan also noted, many cases do not reach this point "either due to settlement or other disposition." *See Brinker*, 2021 WL 1405508, at *14.

stay, and (3) made the reservation from July 28, 2014 to November 30, 2018.

Robert Guzikowski, Denitrice Marks, and Maria Maisto will serve as the Class Representatives.

The Court CERTIFIES the following Rule 23(c)(4) class as to the common law duty and breach issues relevant to Plaintiffs' Florida negligence claims:

> All natural persons residing in Florida who had a Starwood Preferred Guest ("SPG") membership and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018.

Irma Lawrence, Michaela Bittner, and Kathleen Frakes Hevener will serve as the Class Representatives.

The Court CERTIFIES the following Rule 23(c)(4) class as to the common law duty and breach issues relevant to Plaintiffs' Maryland negligence claims:

> All natural persons residing in Maryland who had a Starwood Preferred Guest ("SPG") membership and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018.

Peter Maldini will serve as the Class Representative.

The Court CERTIFIES the following Rule 23(c)(4) class as to the common law duty, statutory duty, and breach issues relevant to Plaintiffs' Connecticut negligence and negligence per se claims:

> All natural persons residing in Connecticut who had a Starwood Preferred Guest ("SPG") membership and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018.

Anne Marie Amarena will serve as the Class Representative.

71

The Court CERTIFIES the following Rule 23(c)(4) class as to the statutory law duty and breach issues relevant to Plaintiffs' Georgia negligence per se claims:

> All natural persons residing in Georgia who had a Starwood Preferred Guest ("SPG") membership and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property, was compromised in a data breach announced by Marriott on or about November 30, 2018.

Brent Long and David Viggiano will serve as the Class Representatives.

Each of the class definitions incorporate the modifications that the Court previously discussed. The Court DENIES the motion to certify the Michigan ITPA damages class. The Court DENIES WITHOUT PREJUDICE damages (and liability) classes that rely on the loss of market value theory. The Court also DENIES WITHOUT PREJUDICE the motion to certify a class for injunctive or declaratory relief.

The Court "must appoint class counsel" at this stage of the litigation. Fed. R. Civ. P. 23(g)(1). When appointing class counsel, courts must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Courts must also consider whether class counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The Court previously appointed interim class counsel in accordance with Rule 23(g). *See* ECF No. 238 ("Case Mgmt. Order No. 2."). At the time that order was issued, I indicated that— based on counsel's submissions to the Court and representations at oral argument—proposed Class Counsel had adequate professional experience in this type of litigation and had access to sufficient resources to advance this litigation in a timely manner. *Id.* Since that order, Plaintiffs' attorneys

have ably engaged in a complex discovery process, conducted numerous depositions, and submitted well-researched briefing to the Court, among other tasks. *See* Pls.' Mot. at 24–25. These efforts have shown that proposed Class Counsel have appropriately identified and investigated potential claims in this action and that they have appropriate knowledge of the applicable law. Accordingly, considering this experience and the Rule 23(g) factors, I will remove the interim designation and appoint the following individuals as Co-Lead Class Counsel: Andrew Friedman of Cohen Milstein Sellers & Toll PLLC, Amy Keller of DiCello Levitt Gutzler LLC, and James Pizzirusso of Hausfeld LLP. I will also remove the interim designation for Consumer Plaintiffs' Liaison Counsel and Consumer Plaintiffs' Steering Committee. The individuals currently serving in those roles shall continue doing so. The duties for Co-Lead Class Counsel, Liaison Counsel, and members of the Steering Committee remain the same as outlined in the case management order. *See* Case Mgmt. Order No. 2. As in that order, all the foregoing appointments are personal to the individual attorney appointed. Although the Court expects that the individual attorneys will draw upon their firms, including their firms' resources, to assist them with their duties, each individual attorney is personally responsible for his or her duties. The Court may add or replace individual attorneys, if and as circumstances warrant.

A separate ORDER memorializing this opinion follows.

___May 3, 2022___
Date

Paul W. Grimm
United States District Judge

73

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | * |
| | *     MDL No. 19-md-2879 |
| CONSUMER ACTIONS | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

The Consumer Plaintiffs ("Plaintiffs") of this MDL have filed a motion to certify a number of classes. Among the various classes that Plaintiffs have asked the Court to certify are thirteen classes or subclasses for classwide damages, to be tried along with the injunctive or declaratory relief class and various liability issues for which they also seek certification. Mot. for Class Cert., ECF Nos. 858 (redacted), 859 (sealed), 863 (sealed), 865 (sealed).[1] Certification of the damages classes is sought pursuant to Federal Rule of Civil Procedure 23(b)(3), so it is necessary for Plaintiffs to show that common issues of law and or fact predominate over individual issues, and that class certification would be superior to any other means of determining damages, in the event that liability is found.

Plaintiffs rest their hope of certifying classwide damages classes on one of their designated expert witnesses, Jeffrey T. Prince, Ph.D., a highly credentialed economist and Professor at the Kelley School of Business at Indiana University. Defendants Marriott and Accenture[2]

---

[1] All references in this opinion are to these documents. As previously ordered, the parties will be submitting documents to the Court with updated redactions pursuant to the Special Master's resolution of the parties' confidentiality designation disputes. *See* ECF No. 1009. Those updates, however, do not affect this opinion.

[2] Plaintiffs named as defendants Marriott International, Inc., Starwood Hotels and Resorts Worldwide, LLC, and Accenture LLP. Second Amended Consolidated Complaint ("Compl."), ECF Nos. 413 (sealed), 537 (redacted) at ¶¶ 12–14. Marriott International acquired Starwood

1

("Defendants") seek to undermine Dr. Prince's classwide damages models with their own highly credentialed economist, Catherine Tucker, Ph.D., a Professor of Management Science and Marketing at Massachusetts Institute of Technology.

As might be expected, when the Court and the parties conferred to set a schedule for discovery in advance of class certification motions, deadlines were set for Dr. Prince to file his Federal Rule of Civil Procedure 26(a)(2) expert report, Dr. Tucker to file hers, Dr. Prince to file a rebuttal, and for them both to be deposed. Deadlines also were set for filing class certification motions, and for motions to challenge the admissibility of expert testimony, colloquially referred to as "*Daubert*"[3] motions. In a perfect world, the deadlines for all these events would line up in harmonious sequence, and, at first, they did. But given the complexity of this case, and issues related to the completion of discovery, the sequencing became less than ideal.

Dr. Prince's Rule 26(a)(2) initial report was filed on July 12, 2021. Expert Class Cert. Rep. of Jeffrey T. Prince, Ph.D. ("Prince Initial Rep."), ECF No. 859-4 (sealed). He was deposed on August 13, 2021. Deposition of Jeffrey T. Prince ("Prince Dep. 1"), ECF No. 891-2 (sealed). Dr. Tucker's Rule 26(a)(2) report was filed on September 7, 2021, Expert Rep. of Catherine Tucker, Ph.D. ("Tucker Rep."), ECF No. 894-5 (sealed), and Defendants filed their *Daubert* motion challenging Dr. Prince's methodology on September 20, 2021. Defs.' Mot. to Exclude ("*Daubert* Mot."), ECF Nos. 894 (sealed), 895 (redacted). Dr. Tucker was deposed on September 29, 2021, Deposition of Catherine Tucker ("Tucker Dep."), ECF No. 916-4 (sealed), and Dr. Prince filed his Rule 26(a)(2) rebuttal report on October 12, 2021. Rebuttal Rep. of Jeffrey T. Prince, Ph.D.

---

Hotels and Resorts in September 2016, and I will refer to Marriott International, Inc., and Starwood Hotels and Resorts Worldwide, LLC, using one name—either "Marriott" or "Starwood"—in this opinion.

[3] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

("Prince Rebuttal Rep."), ECF No. 916-1 (sealed). Plaintiffs filed their opposition to Defendants'

*Daubert* motion on October 25, 2021. Pls.' Opp'n, ECF Nos. 916 (sealed), 922 (redacted).

Defendants did not file a reply to Plaintiffs' opposition to their *Daubert* motion, but an animated

dispute arose regarding Defendants' contention that Dr. Prince had materially changed his

methodology with respect to his two classwide damages models between the filing of his original

report, and his rebuttal report. Defs.' Letter Corresp., ECF No. 930. Plaintiffs were equally

animated in denying that Dr. Prince had changed his methodology, and once more the Special

Master, Judge (Ret.) John Facciola, was called upon to intervene, following which I ordered that

Dr. Prince was to be re-deposed for limited purposes, and that Judge Facciola would preside. Letter

Order of November 30, 2021, ECF No. 940. Following Dr. Prince's second deposition, the parties

filed letter motions: Defendants seeking to strike Dr. Prince's "new" opinions and methodology,

Defs.' Letter Mot., ECF Nos. 961 (sealed), 963 (redacted); and Plaintiffs opposing this motion,

and requesting, in turn, that I "strike" Dr. Prince's second deposition. Pls.' Letter Mot., ECF No.

964. I did neither, but instead ordered that Dr. Tucker be afforded an opportunity to file a rebuttal

report addressing Dr. Prince's rebuttal report and testimony in his second deposition. Letter Order

of January 18, 2022, ECF No. 967. Dr. Tucker's second report was filed on February 18, 2022.

Suppl. Expert Rep. of Catherine Tucker, Ph.D. ("Tucker Suppl. Rep."), ECF Nos. 984 (sealed),

985 (redacted).

 What the above chronology reveals is that the record upon which the parties based their

*Daubert* filings (the last of which was made on October 25, 2021) changed materially after the

briefing was concluded: Dr. Prince filed a substantial rebuttal report, he was deposed, and Dr.

Tucker filed a substantial report addressing Dr. Prince's rebuttal report and deposition. In addition,

I have had the benefit of an expert "tutorial" with both Dr. Prince and Dr. Tucker, during which I was able to question them directly and hear their views with regard to the damages issues.[4]

Having carefully reviewed all the experts' reports, their depositions, Defendants' motion, and Plaintiffs' opposition, as well as the academic literature that figured prominently in the development of Dr. Prince's methodology, I am DENYING, for the purposes of ruling on the pending motions for class certification, Defendants' motion to exclude Dr. Prince's classwide model for determining "overpayment damages" (the difference between what the class plaintiffs actually paid for a Starwood hotel room, and the price that Starwood would have been able to charge in a hypothetical "but-for" world in which consumer willingness to pay for a Starwood room had shifted in response to consumer knowledge of Starwood's inadequate data security), and GRANTING Defendants' motion to exclude Dr. Prince's model for calculating the "market value" of Plaintiffs' personally identifiable information ("PII") that was compromised due to the data breach.[5]

---

[4] During a status conference, held on November 30, 2021, I raised with counsel my interest in appointing John de Figueiredo, Ph.D., Russell M. Robinson II Professor of Law, Strategy, and Economics at Duke University School of Law, as a court technical advisor, to assist me "in understanding the economic theories relied upon by the parties' experts with respect to damages models." Letter Order of November 30, 2021, ECF No. 940 at 2. As noted in that Letter Order, courts have inherent authority to appoint such a technical advisor to assist the Court in understanding scientific or technical information. *See, e.g., TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1377 (Fed. Cir. 2002); *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 590 (9th Cir. 2000); *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 695 n.1 (D. Md. 2017), *aff'd*, 937 F.3d 1359 (Fed. Cir. 2019). The parties agreed, and Dr. de Figueiredo provided invaluable assistance in aiding the Court's ability to understand the many complex economic concepts underlying Plaintiffs' overpayment and market value damages models, and in understanding the many economic publications cited by Dr. Prince and Dr. Tucker in their reports. Dr. de Figueiredo's exceptional assistance made it possible for the Court to have a meaningful dialogue with Dr. Prince and Dr. Tucker during the expert tutorial that took place on March 21, 2022.

[5] At this time, I would like to thank my chambers' two spring semester judicial interns, Alan Harrison and Michelle Lim, for their able assistance in preparing this opinion.

It is important to understand the limited scope of this ruling. For reasons that I will explain, I conclude that the methodology described by Dr. Prince (which he tested using the limited amount of "New" Data Storage ("NDS") database information then available to him) is sufficient for me to rule on whether Dr. Prince's "overpayment damages" model meets admissibility standards under Federal Rule of Evidence 702 for purposes of ruling on class certification. This is because he has not yet had the opportunity to fully test this methodology on non-bellwether class member data contained in the Starwood NDS database, on which the model depends in order to actually calculate the amount of overpayment damages. Defendants objected to producing NDS database information relating to any but the bellwether class members until after a ruling on class certification, and Dr. Prince was unable to test his overpayment damages model in the context of the members of a specific certified class, which I conclude is necessary in order to evaluate Dr. Tucker's criticisms of the reliability of Dr. Prince's methodology in general, and as to whether the model produces reliable results when applied to the particular facts of a specific certified class. But, I have concluded that Dr. Prince has identified a reliable methodology for determining overpayment damages in general, and tested it on the bellwether plaintiffs' NDS database information. This is sufficient for purposes of considering his methodology in ruling on Plaintiffs' motion to certify classwide damages classes. Once Dr. Prince has had access to the NDS database with respect to the non-bellwether class members in the specific classes for which I have granted Plaintiffs' motion for class certification, and he has calculated his classwide overpayment damages, I will order that Dr. Prince provide a supplemental report setting forth these calculations and allow Defendants to depose him on his final calculations. I will then allow Dr. Tucker to provide a supplemental report and give Plaintiffs an opportunity to depose her. At that time, I will allow limited additional briefing on the admissibility of Dr. Prince's overpayment damages and

make a final ruling. If I exclude Dr. Prince's damages model and calculations, I will de-certify the classwide damages classes.

As for Dr. Prince's model for calculating classwide loss of market value of class member compromised PII, however, I agree with Defendants that Dr. Prince's methodology does not meet the requirements of Rule 702, principally because he failed to articulate (and test, using NDS data for the bellwether plaintiffs) a particular method for determining the number of times a particular class member's PII was "sold" in his hypothetical market for PII, without which he cannot determine classwide damages. I explain below the basis for my rulings.

## STANDARD OF REVIEW

Defendants challenge the admissibility of Dr. Prince's formulaic models for calculating classwide damages for Plaintiffs. As already noted, they style their motion as a *Daubert* challenge, based on the now-famous case of *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) and its progeny, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) and *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) (collectively, "*Daubert*"). As a preliminary matter, it is not yet a settled matter that a full-blown *Daubert* challenge should be entertained by the court when deciding a class certification motion. 3 William B. Rubenstein, et al., *Newberg on Class Actions* § 7:24 (5th ed. 2021). ("Issues arising out of the use of expert witnesses at the class certification stage have beguiled the federal courts. . . . The issue is beguiling for the simple reason that certification is generally not the time to *decide* the merits of the case, yet expert witness testimony relevant to the merits often is proffered as also relevant to a prong of certification inquiry. The problem, if problem it be, is one of a mismatch between evidence and timing, with ultimate merits evidence being weighed before the conclusion of the discovery phase of the lawsuit."). Newberg states that the circuit courts have split in their approach to the applicability of *Daubert* challenges at class

certification stage, with some circuits opting for a "limited" *Daubert* analysis, while others have required a "full" *Daubert* examination. *Id.*

Newberg sums up the score as follows: "[R]eported decisions suggest that courts in the Second, Fourth, and District of Columbia Circuits follow a serious [(i.e., "full")] *Daubert* approach; courts in the First, Fifth, Sixth, and Tenth Circuits tend to follow a limited *Daubert* approach." *Id.* (footnotes omitted). At least three district courts within the Fourth Circuit have considered whether to use a "full *Daubert*" analysis, ultimately adopting the "necessary to decide class certification" test discussed by Newberg. *See, e.g., Childress v. JP Morgan Chase & Co.*, No. 16-CV-298, 2019 WL 2865848, at * 2 (E.D.N.C., July 2, 2019) ("At the outset, the Court notes that there is no controlling precedent which dictates whether to conduct a *Daubert* analysis at the class certification stage or how focused or full that analysis should be....The Court is persuaded by authorities which have concluded that where a movant has proffered expert testimony in support of its motion for class certification, and such testimony is critical to the issue of class certification, a full *Daubert* inquiry is appropriate."); *Robinson v. Nationstar Mortg. LLC*, No. 14-3667, 2019 WL 4261696, at *13 (D. Md. September 9, 2019) (holding when an expert's opinions are "critical" to class certification, the court must make a "conclusive ruling" on the evidentiary challenge before it can rule on class certification); *Baxley v. Jividen*, 504 F. Supp. 3d 539, 542–43 (S.D.W. Va. 2020) (noting that when "courts have required a full or thorough *Daubert* analysis, they have largely done so when 'expert testimony is in fact critical to class certification,'" but declining to do such a full analysis because the expert's analysis was not critical to ruling on the class certification issue).

I find that Dr. Prince's formulaic models for determining overpayment and inherent value damages are essential to Plaintiffs' efforts to certify classwide damages classes in addition to

liability-only classes. Accordingly, I will undertake a "full" *Daubert* analysis in this case. The

starting place for this analysis is Federal Rule of Evidence 702, as amended in 2000 to incorporate

the teaching of *Daubert* and its progeny.

## I.      Rule 702

Fed. R. Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principle and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The advisory note to the 2000 amendments to Rule 702 ("2000 Advisory Note")

is essential reading for judges and lawyers who undertake a *Daubert* analysis. There are several

key takeaways that should be kept in mind. First, Rule 702 was amended in 2000 for the express

purpose of incorporating the teachings of *Daubert* and its progeny, to fulfill their requirement that

trial judges act "as gatekeepers to exclude unreliable expert testimony" with regard to all expert

testimony, not just that which is science-based. 2000 Advisory Note (case citations omitted).

Second, the 2000 amendment to Rule 702 "provides some general standards that the trial

court must use to assess the reliability and helpfulness of proffered expert testimony." *Id.* To do

so, the trial court must apply Federal Rule of Evidence 104(a), which requires that the "proponent

[of the expert testimony] has the burden of establishing that the pertinent admissibility

requirements are met by a preponderance of the evidence." *Id.*

Third, the 2000 Advisory Note observes that:

> *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific [or any other] expert testimony. The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can or has been tested— that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

*Id.*

Fourth, the so-called "*Daubert* factors" "were neither exclusive nor dispositive. Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony." *Id.* And, additional factors may be relevant to the inquiry, such as: whether the expert will be testifying about matters that grow "naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes of testifying"; whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; whether "the expert has adequately accounted for obvious alternative explanations"; whether "the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting'"; and whether "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Id.*

Fifth, "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role of gatekeeper is not intended to serve as a replacement for the adversary system'"—where "[v]igorous cross-examination, presentation of contrary evidence, and careful

9

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (internal citations omitted). "Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert." *Id.*

If the foregoing *Daubert* factors provide "up-close" guidance about how a challenge to expert testimony should be addressed by the trial judge, *Daubert* itself provides a helpful "birds-eye" view, to make sure the court does not overlook the evidentiary forest for the many scientific and technical "trees." As Justice Blackmun helpfully observed in *Daubert*, there are four related and sometimes overlapping concepts that help guide a trial judge in deciding a *Daubert* challenge. The expert evidence must be *relevant* (tending to prove or disprove facts that are consequential to the determination of the case), *reliable* (sufficiently accurate to be counted on, elsewise it is of no relevance), *helpful* to the factfinder (otherwise it is entirely unnecessary, as experts are only allowed to offer opinion testimony when the factfinders lack the knowledge and expertise to evaluate the scientific or technical evidence on their own), and must *"fit"* the facts and issues of the specific case (otherwise it is irrelevant, and unhelpful). *Daubert*, 509 U.S. at 591–93 (emphasis added).

Since Rule 702 and *Daubert* contemplate that the trial judge must be the "gatekeeper" determining whether expert evidence is admissible or not, trial judges would welcome the most focused and helpful analysis of the admissibility factors from the experts retained by the parties and the briefing by counsel on both sides of the admissibility issue. In a very real sense, when an expert witness files his or her Rule 26(a)(2) disclosure,[6] it would be wise for it to be written with

---

[6] Experts retained by the parties to offer opinion testimony at trial are required to make comprehensive pretrial disclosures of the opinions they will express at trial, as well as the facts or data they considered in reaching them. Fed. R. Civ. P. 26(a)(2)(B). They must timely supplement them if they change in any material respect. Fed. R. Civ. P. 26(e)(1)(A). Experts are required to provide the information in accordance with these rules, or to supplement their opinions within the

the recognition that the trial judge is, in essence, an audience of one who must understand the opinions the expert expresses, the factual support for them, the methodology applied to reach the opinions that will be testified to (and, vitally, why they are reliable), and how the methodology has been applied to the facts of the particular case. Since the *Daubert* factors include consideration of whether the methodology selected has been subject to peer review or similar scrutiny by other experts in a particular field, it would be of enormous help for the expert and the parties to provide the judge with copies of the most important peer expert articles, and especially so if the key passages have been highlighted to facilitate review by the judge.

Just as importantly, counsel for the proponent and opponent of the expert evidence at issue would demonstrate the most effective advocacy if they organized their memoranda to address the key *Daubert* factors and the evidence supporting their position with respect to each. Unfortunately, all too often, expert reports are drafted as if their intended audience was another expert in the same field. The reports are filled with undefined technical jargon and calculations likely to be indecipherable to a generalist judge; key peer reviewed literature is neither clearly identified, nor attached as an exhibit (with underlining to facilitate review); and counsel fail to organize their memoranda in a manner that allows the judge to undertake the required analysis.

## II.     Applicable Case Law

The post-*Daubert* case law largely tracks the requirements of Rule 702, as amended in 2000. For example, in *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476 (4th Cir. 2018), the Fourth

---

time allowed by the court's scheduling order that imposes deadlines for the completion of discovery. Experts are prohibited from using undisclosed information at a subsequent trial or hearing unless the failure to do so is excused by the court for substantial justification or because it is harmless. Fed. R. Civ. P. 37(c)(1). Thus, when, as here, the court is required to rule on a *Daubert* motion, the challenged expert's reports filed pursuant to Rule 26(a)(2)(B), as well as the deposition testimony of the expert, become the primary sources of the information that will inform the court's ruling.

Circuit summarized the standards governing a *Daubert* challenge. The court noted that in fulfilling their gatekeeping duty, trial judges "'have considerable leeway' in excluding evidence," and are required to ensure that "[e]xpert testimony must be 'based on sufficient facts or data,' and the expert must arrive at his opinions by properly applying 'reliable principles and methods' to the facts." *Id.* at 480 (internal citations omitted). As for determining the reliability of expert evidence, the court referenced the well-known *Daubert* factors, namely, whether the methodology: has been tested; has been subjected to peer review; when employed, produces an ascertainable potential error rate (that is not excessively high); is governed by standards controlling its operation; and enjoys general acceptance within the relevant scientific or technical community. *Id.* at 480–81 (citing *Cooper v. Smith Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) and *Daubert*, 509 U.S. at 592–94). Further, the Rule 702 inquiry is intended to be a "flexible" one, which means that the *Daubert* factors are "helpful, not definitive." *Hickerson*, 882 F.3d at 481 (citing *Kumho Tire*, 526 U.S. at 150–51 and *Daubert*, 509 U.S. at 593). Finally, when applying these standards "courts 'should be conscious of two guiding, and sometimes competing principles[:] Rule 702 was intended to liberalize the introduction of relevant expert evidence [and] expert witnesses have the potential to be both powerful and quite misleading.'" *Hickerson*, 882 F. 3d at 481 (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

In *Cooper*, the court stated that "a trial judge, faced with a proffer of expert scientific testimony, must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically [or technically[7]] valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Cooper*, 259 F.3d at 199 (citing

---

[7] While the focus of *Daubert* was scientific evidence, *Kumho Tire* made it clear that Rule 702 and the *Daubert* standards applied to all expert evidence within the scope of Rule 702, whether scientific, technical, or specialized. *Kumho Tire*, 526 U.S. at 149–50.

*Daubert*, 509 U.S. at 592–93, n.10). Additionally, the proponent of expert evidence must make

these required showings by "a preponderance of proof." *Id.* Because the Rule 702/*Daubert* analysis

is intended to be flexible, "particular [*Daubert*] factors may or may not be pertinent in assessing

reliability, depending on the nature of the issue, the expert's particular expertise, and the subject

of his testimony." *Cooper*, 259 F.3d at 200 (citing *Kumho Tire*, 526 U.S. at 150). And, importantly,

the "trial judge must have considerable leeway in deciding in a particular case how to go about

determining whether particular expert testimony is reliable." *Cooper*, 259 F.3d at 200 (citing

*Kumho Tire*, 526 U.S. at 152).

    Finally, and particularly relevant in this case, when the filing of a class certification motion

occurs prior to full discovery having been afforded to the party seeking to certify one or more

classes (and the moving party relies on the opinions of an expert to do so), the inability of the

expert to express opinions that are fully supported by all the facts does not provide a basis for

striking the expert's opinions. As Judge Chuang of this court aptly has noted "where the [expert's]

broad methodology is sound, the lack of considerations of unproduced data cannot provide a basis

to strike the expert's testimony. Rather than striking the testimony, the Court may need to consider

permitting supplemental discovery to correct for the lack of relevant data not previously made

available" to the expert. *Robinson*, 2019 WL 4261696, at *14. Here, Defendants objected to

producing NDS database information for any plaintiffs other than the bellwether plaintiffs prior to

determination of class certification. And that limited production was provided to Dr. Prince a mere

two days before his initial report was due. In his rebuttal report and his deposition testimony, Dr.

Prince explained why his opinions regarding the overpayment damages model were cabined by

the limited class discovery produced by Defendants. Therefore, because, for the reasons explained

below, I find that Dr. Prince's "broad methodology" for determining overpayment damages is

"sound," and that he still requires full class member access to the NDS database to fully calculate

overpayment damages, his opinions regarding this model are appropriate to consider in ruling on

the class certification motion.

Having discussed the standards that govern the admissibility of expert testimony in general

and at class certification, I now turn to each of the damages models that Dr. Prince developed for

measuring classwide damages.

## DISCUSSION

### I.      Overpayment Damages

In his initial report, Dr. Prince "considered whether it is possible to formulaically estimate

the amount of any change in market price for the value of the rooms that Plaintiffs booked in a

'but for' world" in which consumers were aware that Marriott[8] was not protecting consumer PII

appropriately. It is an empirical question whether consumer demand for Marriott hotel rooms

would have been reduced in the but-for world in which it had been disclosed to potential customers

that Marriott's data security practices were inadequate. Prince Initial Rep. at ¶ 7. Relying on the

results of a conjoint consumer survey prepared by another of Plaintiffs' experts, Sarah Butler,[9] Dr.

Prince stated:

---

[8] Dr. Prince repeatedly refers to "Marriott" in his written reports and deposition testimony when describing his overpayment damages model, but that was as a convenience, since Marriott is one of the defendants. It is clear that all of the overpayment damages were incurred from stays at Starwood properties between 2014–2018. Because Dr. Prince referred to "Marriott" throughout, I will also use Marriott and Starwood interchangeably for the purposes of this ruling.

[9] Defendants designated their own expert, Olivier Toubia, Ph.D., who criticized Ms. Butler's survey methodology and results, Expert Rep. of Olivier Toubia, Ph.D. ("Toubia Rep."), ECF No. 885-4 (sealed), but they have not sought to exclude Ms. Butler's methodology or the results of her consumer survey. For her part, Ms. Butler vigorously defended her methodology and results in the face of Dr. Toubia's criticisms. *See* Expert Class Cert. Rep. of Sarah Butler ("Butler Initial Rep."), ECF No. 859-3 (sealed); Rebuttal Rep. of Sarah Butler ("Butler Rebuttal Rep."), ECF No. 905-5 (sealed). Defendants have not sought to exclude Ms. Butler's methods and survey results, and my own review of the reports and depositions of Ms. Butler and Dr. Toubia leads me to conclude, for purposes of this motion, that Dr. Toubia's criticisms go to the weight of Ms. Butler's findings, not

I can use accepted scientific methods to estimate prices that Plaintiffs would have paid in a but-for world where Marriott had disclosed its inadequate data security practices by drawing on the empirically estimated reduction in consumer demand from Ms. Butler's results. The estimates of these but-for prices can be obtained through econometric modeling of the pricing decisions that Marriott likely would have made upon observation of lower consumer demand and the responses of Marriott's rivals to any change in Marriott's prices. That is, I can use econometric modelling techniques employed in economic literature to estimate equilibrium pricing decisions that account for both demand and supply responses to reduced consumer demand.

*Id.* at ¶ 8.

Dr. Prince initially tested his model using current (as of 2021) hotel pricing information (as opposed to "historical" hotel pricing information relating to the relevant time period that the data breach took place, between 2014–2018) for Marriott hotels and their competitors in four cities. Prince Dep. 1 at 68:1–17; 79:16–80:5. He did this not for purposes of calculating actual overpayment damages, but rather just to demonstrate that his model could be used for the purpose of calculating overpayment damages on a formulaic[10] basis. *Id.* at 90:1–3; 164:17–165:1. But Dr.

---

their admissibility. *See, e.g., Johannessohn v. Polaris Indus., Inc.* 450 F. Supp. 3d 931, 972 (D. Minn. 2020) (rejecting challenges to a conjoint survey conducted by Ms. Butler that were similar to those raised by Dr. Toubia, on the basis that they did not preclude admissibility, but were better reserved for cross examination.); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 753 (N.D. Ohio 2014) (rejecting challenges to the admissibility of another conjoint survey conducted by Ms. Butler that were similar to those raised here by Dr. Toubia, concluding "'[a] survey need not be perfectly conducted for testimony concerning its results to be admissible. So long as the expert's testimony and the underlying survey have probative value after all the survey's deficiencies are taken into account, testimony concerning the results for the survey that meets the basic requirements of usefulness and reliability is admissible into evidence, and the trier of fact may accord it the weight it deems proper.'" (citing 4 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence* § 702.06 (2d ed. 1997)). Therefore, I will accept that Dr. Prince appropriately relied on Ms. Butler's findings in developing his overpayment model.

[10] By "formulaic," Dr. Prince means that his overpayment model may be used by each member of a certified class to calculate their individual overpayment damages. *See* Prince Dep. 1 at 94:9–11. Since the exact same model may be used without modification by each class member (albeit, by inputting the data regarding each of their particular stays at a Marriott hotel during the data breach period), Plaintiffs assert that overpayment damages may be calculated classwide. This concept is

Prince was confident that, when called upon to calculate class member damages relating to hotel stays on a particular date during the data breach period and a specific Marriott "focal hotel," he would be able to locate the historical hotel pricing and competitor information needed to do so. *Id.* at 205:1–21; 210:2–211:10. He subsequently did so in his rebuttal report, when he tested his overpayment model for six Marriott focal hotels using historical pricing information and NDS database information for bellwether plaintiffs. Prince Rebuttal Rep. at ¶¶ 44–51.

It should be acknowledged that Dr. Prince's first report is not an easy read for lay persons lacking a solid (if not advanced) knowledge of economics. And he did not advance his cause by his unnecessarily guarded, equivocal, and at times evasive testimony during his first deposition. But what can be pieced together from his first report, first deposition, rebuttal report, and second deposition, is that he selected his economic model for measuring overpayment damages from a series of well-regarded economic publications (some of which were studies of the hotel industry, and employed methodology identical or similar to that used by Prince in his overpayment model) including: Barry, Levinsohn, and Pakes (1995)[11] ("BLP") (discussed at length in Prince Initial

---

discussed in more detail in the Memorandum and Opinion ruling on class certification. *See* Section III.

[11] Steven Berry, James Levinsohn, and Ariel Pakes, *Automobile Prices in Market Equilibrium*, 63 *Econometrica,* 841 (1995). This article introduced a new method to estimate demand and supply structurally in oligopolistic differentiated product markets. *Id.* It relied on aggregate level consumer and supplier data and undertook to demonstrate that market demand and supply curves can be determined on the basis of product-level and aggregate consumer-level data. *Id.* Although the market studied was the automobile industry, the underlying principles have widely been followed for other oligopolistic differentiated product industries, such as the hotel industry. *Id.*

Rep. at ¶¶ 95–120); Nevo (2000),[12] Mazzeo (2002),[13] Cho (2018),[14] Petrin (2002), [15] and Wilson (2011).[16] *See, e.g.,* Prince Rebuttal Rep. at ¶ 15 (citing Mazzeo and BLP), ¶¶ 19–21 (citing Nevo), ¶ 43 (citing Wilson); Prince Initial Rep. at ¶ 64 (citing Cho), ¶ 117, n.184 (citing Petrin). In addition, his model was designed to replicate Marriott's own internal program for pricing hotel rooms against the competition, known as "One Yield," Prince Rebuttal Rep. at ¶¶ 14, 18, 36, 40, as well as the testimony of a Marriott 30(b)(6) witness familiar with Marriott's pricing of hotel rooms to account for competitors' pricing, *Id.* at ¶¶ 14, 34 (citing Marriott Rule 30(b)(6) Deposition of Russell Vereb) (May 26, 2021)).

With respect to the methodology most heavily relied on by Dr. Prince, the BLP model, the articles cited by Dr. Prince and description given by him in his written reports and deposition

---

[12] Aviv Nevo, *A Practitioner's Guide to the Estimation of Random-Coefficients Logit Models of Demand,,* 9 J. of Econ. & Mgmt. Strategy 513 (2000). This is a very sophisticated and highly cited article aimed at advanced degree economists that extensively discusses how to implement the BLP model and similar models. *Id.* It concludes that the researcher does not need individualized information or data, but only market level price data, quantity data, and product characteristics data. *Id.* It analyzes competition based on product characteristics. *Id.* Moreover, it demonstrates that only a limited number of product characteristics, determined by the researcher, is needed to accurately estimate the model. *Id.* And, it provides a detailed discussion about how to determine the total market size, which is necessary to identify an "outside option." *Id.* Although this study focused on the cereal market, it has extensively been used for many other types of markets. *Id.*

[13] Michael J. Mazzeo, *Competitive Outcomes in Product-Differentiating Oligopoly,* 84 Rev. of Econ. and Stat. 716 (2002) (describing a structural model methodology of supply and demand in hotel markets and providing guidance as to how to measure prices and competition in the hotel industry, measures that Dr. Prince discussed and adopted as part of his overpayment methodology).

[14] Sungjin Cho et al., *Optimal Dynamic Hotel Pricing, Working Paper* (2018). Although not a peer reviewed article, it is a working paper co-authored by economics professors at Seoul National University and Georgetown University. It is a sophisticated study of the hotel industry showing that hotel prices reflect co-movement, which was relied on by Dr. Prince in developing his overpayment model. *Id.*

[15] Amil Petrin, *Quantifying the Benefits of New Products: The Case for the Minivan,* The J. of Pol. Economy (2002) (discussing, extending, and enhancing the BLP model).

[16] Nathan E. Wilson, *Branding, Cannibalization, and Spatial Preemption: An Application to the Hotel Industry,* FTC Bureau of Economics Working Paper No. 309 (using the BLP demand estimation analysis when studying the hotel industry).

testimony, it appears that his overpayment model would operate formulaically in three analytical steps, as follows. [17]

Step One: Gather data relating to each Marriott focal hotel where a class member stayed during the data breach period, for an appropriate time period (discussed below), which includes: identifying a Marriott focal hotel (where a class member stayed); identifying a set of competitors for that focal hotel (up to a maximum of nine, based in part on Marriott's One Yield program); identifying the core set of hotel features for the focal hotel and its nine competitors (collectively, the "choice set") (selected based on the results of the Butler conjoint consumer survey, academic literature, and historical information regarding the hotel tier, location, amenities, brand, and prices of each of the hotels in the choice set); identifying the minimum price charged by the ten hotels in the choice set for the appropriate time selected to run the model (taken from the Mazzeo paper and data collected from historical sources); identifying the appropriate number of hotel rooms for the particular market (measured by total rooms or number of rooms sold); and, finally, calculating the "outside option"[18] (meaning the statistical probability that a consumer would choose a hotel room other than from the ten choice set hotels in that particular market, a step apparently informed by the BLP, Nevo, and Jones and Chen studies, which does not prescribe any single immutable method of selecting an "outside option," provided the manner chosen generates a positive

---

[17] *See* Prince Initial Rep. at ¶¶ 95–119.

[18] In determining how to calculate the outside option in this case, Dr. Prince was guided by a paper that analyzed the hotel industry in Las Vegas, Nevada, Peter Jones & Meng-Mei Chen, *Factors Determining Hotel Selection: Online Behaviour by Leisure Travelers*, TOURISM AND HOSPITALITY RSCH. (2011), which he cited in his reports. Prince Initial Rep. at Appx. 3, n.209, Prince Rebuttal Rep. at ¶ 21, n.18. Dr. Tucker also referenced it. Tucker Rep. at ¶ 88, n.179–81. This paper studied consumer practices in selecting a hotel to stay in during leisure travel and concluded that the process is done in two stages. The first narrows all possible hotels to a "consideration set." At the second step, these hotels were filtered to obtain a "choice set," from which the one hotel was selected for the stay. Dr. Prince was influenced by this paper in choosing the consideration set and choice set in his BLP model, which are necessary to establish the outside option.

statistical probability that a consumer would choose lodging other than from the choice set for that market).

Step Two: Factor in the results of the Butler conjoint study as they relate to a consumer's willingness to pay for a hotel room in the hypothetical but-for world (that is, consumer willingness to pay for a hotel room when aware that Marriott may not have adequate data security protections, which could lead to a loss of consumer PII—a price that is lower than the actual price paid by the class member in the "real world," when he or she purchased a hotel room from Marriott at a particular focal hotel, at a particular time). This step is intended to simulate market dynamics (i.e., supply and demand dynamics) that generate the "overcharge" caused by the Marriott data breach. In other words, the percentage difference in price for the hotel room actually paid by the class member (the "real world price") and the reduced price that a consumer would be willing to pay in the "but-for" world, as determined by the Butler conjoint survey.

Step Three: Determine the actual overcharge damages for a particular class member and a particular stay during the data breach period. Only the following data would be required for each class member, all of which Prince stated could be derived from the Starwood NDS database: the class member for each stay, the focal Marriott hotel of the stay, the price that class member paid for the Marriott focal hotel room, and the dates of the stay.

Defendants, of course, challenge this methodology on a variety of bases. The clearest explanation of these objections is found in Dr. Tucker's supplemental report filed on February 18, 2022. Tucker Suppl. Rep. Dr. Tucker is particularly critical of Dr. Prince's overpayment model because, she contends, he only proposes to analyze the market for each focal Marriott hotel at a single point in time, despite the fact that class members may have stayed there at multiple times during the data breach period. This, Dr. Tucker contends, is economically unsound because the

19

competitive market for the same focal hotel can change in material ways over a four-and-a-half year period. *Id.* at ¶¶ 3, 6, 11, 16, 18, 20–22.

It is true that Dr. Prince generated considerable confusion about the frequency with which he would test the competitive market for each Marriott focal hotel. In his first deposition, he testified that, once he had access to the full Starwood NDS database, he planned to run his overpayment model for each class member stay at each focal hotel during the entire data breach period, meaning that he would have to run his model numerous times for each individual market. Prince Dep. 1 at 93:15–94:11; 97:21–98:16; 102:2–6. And, with as many as 1200–1400[19] focal hotel locations that might need to be examined, that could amount to an enormous number of calculations. In his rebuttal report, Dr. Prince clarified that only one run of the model is required for each focal hotel's competitive market. Prince Rebuttal Rep. at ¶ 43. But it mischaracterizes Dr. Prince's position to insist, as Defendants do, that his belief that he only needed to test each focal hotel's competitive market a single time was immutable. To the contrary, he clearly stated in his first deposition (and again in his second deposition) that it might be necessary to run the model more than once for each market, but he would need the full NDS database in order to determine this. *See, e.g.,* Prince Dep. 1 at 102:2–6 ("Well, I haven't gone to parsing it by time period, but I would say there may be a need to do analysis at different points in time. I just, sitting here now, don't want to go so far as to say what the segments in time would be"); Prince Dep. 2 at 359:1–14

---

[19] Prince Dep. 1 at 103:5–9. Of course, because I have only been asked to certify liability and damages classes for class members from California, Maryland, and New York under the overpayment theory, the number of Marriott focal hotel stays that must be examined once Dr. Prince has access to the NDS database will be substantially reduced. In other words, he will NOT be called upon to examine the competitive markets for each of the 1200–1400 Marriott focal hotels for each class member for all 50 states for the full 4.5-year data breach period. Rather, he would need to examine only the markets for the hotels where the relevant class members stayed for only the relevant time periods.

("Well, I think for each—with each market, what I would do is look to see if there's a change of competitors. If there was, I can assess multiple runs of the model for changes in the competitors. And then, I also can do sensitivity checks to runs at multiple points in time, even if there was the same number of competitors. . . . So, what I'm saying is that one is required, but that doesn't preclude me from doing checks to see if multiple runs providing any information about the usefulness of running multiple times.").

Moreover, Dr. Prince justified his impression that a single run of his overpayment model for each focal hotel could be sufficient by his explanation that there was support in the economic literature that hotel prices within the same competitive market reflect "co-movement" in prices over time. Prince Dep. 2 at 360:9–14 ("[Co-movement is] the simple idea of prices amongst, in this case, competing hotels, moving in a correlated way. So, one hotel's price goes up; other hotel's prices tend to also go up. One hotel's price goes down the other hotels' prices also tend to go down"); 361:9–24. Based on this characteristic of the hotel industry, Dr. Prince concluded that "predictable patterns of pricing"[20] could be derived allowing him to assume that within a particular Marriott focal hotel market, prices would co-move at the same rate throughout the data breach period, allowing him to apply the same percentage of overcharge for each stay of a class member at that focal hotel for the entirety of the data breach period. He based this assumption on a working paper published by four economists[21] (at least one of whom, John Rust, is highly respected amongst economists).[22]

---

[20] Prince Dep. 2 at 361:5–17.

[21] Sungjin Cho, Gong Lee, John Rust, and Mengkai Yu, *Optimal Dynamic Hotel Pricing* (Soc'y for Econ. Dynamics Meeting Papers 179, 2018), https://economics.sas.upenn.edu/index.php/system/files/2018-04/hp_final_update.pdf (cited by Dr. Prince at Prince Rebuttal Rep. at ¶ 43, n.46).

[22] As noted, Dr. Prince primarily relies on the empirical fact of "co-movement" of hotel prices to support his conclusion that he may need as few as one run (but, if more than one run, only a few)

Dr. Tucker strongly disagreed, of course, and criticized Dr. Prince for assuming co-movement of hotel prices without actually testing for it with respect to the Marriott focal hotels. Tucker Suppl. Rep. at ¶¶ 13–20. If Dr. Prince had reached final conclusions regarding the overpayment damages for all of the class members in this case, that criticism might doom his calculations. But, for purposes of class certification, that was NOT what he was asked to do. He was asked to develop a model for formulaically measuring overpayment damages that could be used to calculate these damages for each member of a specific certified class. He developed his model, initially tested it using current information, and later tested it again using historical data for bellwether plaintiffs in six cities. He supported his assumption that hotel prices reflect co-movement (thereby enabling him to assume that one run of his model for each focal hotel competitive market was sufficient) by reference to supporting economic literature. Dr. Prince candidly acknowledged that he might need to adjust the application of his model once he received the additional information from the NDS database, and he was confident that his model would allow him to do so. As he made clear:

> I note that there are many practical alternatives, none of which require individualized analysis at the class member level. . . . But it is not possible to know which calibration will be most accurate without reviewing information that Marriott has not yet had to produce: i.e., information on Marriott's non-class representatives

of the model for each Marriott focal hotel's competitors, rather than for each stay of each class member, as Marriott contends is necessary. *See, e.g.,* Prince Rebuttal Rep. at ¶¶ 40, 43, n.47; Prince Dep. 2 at 412:8–413:1; 421:1–25; 437:1–25. In one instance, he also contends that co-movement of hotel prices would allow him to "impute" the prices charged by Marriott focal hotel competitors during the more than four-year duration of the data breach, if he were unable to find the prices those competitor hotels actually charged. *See* Prince Rebuttal Rep. at ¶ 43, n.49 ("To the extent that price data are not available for competitors in an area for a comparable set of [Marriott] booking and stay dates, even these situations can be addressed through the calculation of an imputed price. . . . According to the results of empirical studies such as Cho et al. (2018) [the study that found strong evidence of co-movement of prices within the hotel industry], it would be reasonable to estimate an imputed price for [a competitor hotel based on the prices of other competitor hotels whose actual prices were ascertainable]. . . .").

22

> customers. . . . The markets upon which the model is applied
> ultimately depends upon the information that Marriott will provide
> for all class members at the damages phase. I do not have access to
> the complete list of stays by proposed class members, and it is my
> understanding that Marriott has not been required to turn over this
> information before plaintiffs are certified as a class.

Prince Rebuttal Rep. at ¶¶ 21, 25.

And the same applies to Dr. Tucker's many other criticisms of Dr. Prince's methodology,

including his method of calculating the outside option, changes in the competitive market for each

focal hotel market, changes in hotel characteristics (amenities, size, tier, and brand), as well as the

errors that Dr. Tucker found in some of Dr. Prince's data used to test his methodology. Tucker

Suppl. Rep., Section III.

I am persuaded, therefore, that Dr. Prince has met the requirements of Rule 702 for

purposes of identifying a model for formulaically calculating overpayment damages for the

discrete liability and damages cases for which Plaintiffs seek certification. First, there is no

question that Dr. Prince is highly qualified. Second, he supported his model with sufficient factual

data for its limited intended purpose (developing a model for future use to calculate damages

formulaically once additional discovery was received from Marriott). Third, he developed his

methodology by reference to reliable economic literature. And fourth, he tested his methodology

with both current and historical information relating to the bellwether plaintiffs, to whose NDS

database information he was given access, thereby applying his model, to the extent then possible,

to the facts of this case.

Moreover, once he receives the additional discovery he needs to run his model for the class

members that have been ascertained following classwide notice, and he has access to the NDS

database for those class members, he will be able to run his model for those specific class members

for their stays at Marriott focal hotels during the data breach period. This undoubtedly will entail

far fewer calculations than those Dr. Prince was challenged with by Defendants during his depositions. It also will enable him to test whether he only needs one run of his model for each focal hotel during the entire data breach period, or whether more are needed (for example, because prices for that particular market did not co-move as anticipated throughout the data breach period, or the competitor set for that focal hotel changed in some significant way). And he will be able to calculate the outside option in a manner that has been accepted as reliable by the economic literature. This testing will allow error rates to be assessed by both Dr. Prince and Dr. Tucker, and depending on their magnitude, the results of Dr. Prince's calculations may be evaluated for admissibility at trial. But that is a ruling for another day.

## II.    Market/Inherent Value Damages

Dr. Prince's second category of damages "considered whether damages stemming from the inherent value of [Plaintiff's]...data can be estimated formulaically for all Plaintiffs." Prince Initial Rep. at ¶ 10. Dr. Prince concluded that consumers "attribute value to preserving the privacy of their personal information. This value stems from consumers' incentives to protect their personal information" to avoid such undesirable consequences as identity theft, receipt of unwanted marketing communications (such as spam or telemarketing calls), or public disclosure of sensitive personal information. *Id.* Dr. Prince also opined that there was market demand for consumer personal information, and that "these economic incentives to protect personal information, combined with demand for consumer information, produce market value." *Id.* From these assumptions, Dr. Prince derived "a method for estimating the revenue one could reasonably expect to collect for various combinations of personal data that were plausibly stolen from the class members." *Id.* at ¶ 11. He then used "public information about market prices for personal data," and estimated the value that could be obtained from the market for selling Plaintiffs' data" that was compromised by the Marriott data breach. *Id.* And, because "individual records can be sold

multiple times...one can then multiply these prices by an estimated quantity of sales to obtain a

formulaic calculation of the damages for each Plaintiff." *Id.* Dr. Prince concluded by stating:

> I can apply the above damages methodology formulaically
> to all members of the proposed classes to whom a jury finds that
> Marriott is liable. . . . I understand that the Court has ruled that
> Marriott does not need to produce data for all proposed class
> members at this time, thus below I demonstrate the way in which
> my methodology could be applied to all proposed class members if
> Marriott does produce such data in the future.

*Id.* at ¶ 12.[23]

Unfortunately, due to some inartful descriptions by counsel for Plaintiffs of this second

category of damages as "diminishment of" the value of Plaintiffs' PII, a good deal of time, energy,

and resources of the parties was devoted to resolving a dispute about whether Dr. Prince had

changed his methodology between his first and second reports.[24] Defs.' Letter Mot., ECF Nos. 961

(sealed), 963 (redacted); Pls.' Letter Mot., ECF No. 964; Letter Order of January 18, 2022, ECF

No. 967. I ultimately ordered that Dr. Prince be deposed a second time for the limited purpose of

determining whether he had changed his methodology between his first and second reports, and

the Special Master, Judge (Ret.) Facciola, capably presided over this deposition. Letter Order of

November 30, 2021, ECF No. 940. Thereafter, counsel exchanged letter motions addressing

whether Dr. Prince's explanation of his market/inherent value damages model (in his rebuttal

---

[23] Dr. Prince also noted that Marriott had "produced a significant amount of data about the bellwether plaintiffs two days ago." Prince Initial Rep. at ¶ 12. Inasmuch as his initial report was dated July 12, 2021, and his rebuttal report was dated October 12, 2021, Dr. Prince had over 90 days in which to test his methodology for determining market/inherent value on the NDS database information for each of the bellwether plaintiffs. He did not, and the significance of this failure to do so is discussed below.

[24] I am satisfied that the Consolidated Amended Complaint does sufficiently plead that Plaintiffs suffered the loss of the economic value of their PII as a result of the Marriott data breach, such that what Dr. Prince undertook to quantify was indeed a category of damages that Plaintiffs had pleaded. *See, e.g.*, Compl. at ¶¶ 5 (alleging loss of the "inherent value" of PII), 270 (alleging loss of the inherent value of PII), 304 (same), 1349 (same).

report and second deposition) should be stricken, as well as Plaintiffs' motion that portions of Dr.

Prince's second deposition be stricken due to questioning by counsel for Defendants that Plaintiffs'

counsel argued exceeded the scope of the order allowing his second deposition. Defs.' Letter Mot.;

Pls.' Letter Mot. I denied both motions but ordered that Dr. Tucker could file a supplemental report

addressing Dr. Prince's second report and second deposition, ECF No. 967, which she did, ECF

No. 984, filed February 18, 2022.

Dr. Prince's second deposition provides the clearest and most concise explanation of his

methodology for formulaically determining Plaintiffs' market/inherent value damages. For ease of

reference, I will refer to this for the remainder of this opinion as Plaintiffs' "market value" damages

methodology.

In his second deposition, Dr. Prince unequivocally stated that his methodology for

determining market value damages did NOT measure the change in price (in other words,

diminution in value of PII caused by the data breach) of Plaintiffs' PII that was compromised in

the Marriott data breach. Prince Dep. 2 at 450:22; 451:8; 492:18–22 ("Q. Your methodology

doesn't calculate whether the market price of data decreased as a result of…the market price of

data decreased as a result of the data breach, correct? A. Yes, that's right"). Rather, he explained

that he undertook to calculate the *revenue* that could be estimated from the market value of

Plaintiffs' hacked PII. *Id.* at 451:13–452:1 ("I'm looking in terms of revenues, so price times

quantity. So, I'm not measuring whether or how the price has changed. But I am thinking in terms

of what it means in terms of a quantity change. Q. When you say 'quantity change,' can you clarify

what you mean by that? A. So, what I mean is the number of sales one could reasonably expect

those data could attain. Q. Right. And so, when you say you're talking about revenue, you're

talking about the number of sales times—multiplied by an assigned market value; is that fair? A. By an assigned market price, yes").

Thus, it is essential to the operation of Dr. Prince's market value model that he determine the revenue ("R") that would be generated by the total number of sales (i.e., quantity, or "Q") of an individual plaintiff's PII at a particular market price ("P"). Expressed formulaically, his model can be described as follows: R (revenue) = P (market price) x Q (total number of sales of each plaintiff's particular "bundle" of hacked PII (for example, name, address, email address, credit card number, credit card expiration date, credit card security code, passport number, etc.)). Therefore, Dr. Prince would need to determine the specific "bundle" of PII for each class member that was compromised by the data breach, determine the market value for that particular bundle, and, finally, determine the number of times that a plaintiff's bundle was "sold" in order to reach the total market value loss for that plaintiff. In response to skillful questioning by counsel for Accenture, Dr. Prince testified that there were four steps required under his methodology.

Step One: Dr. Prince agreed that the first step of his market value model required him to identify the data (PII) of each class member that was compromised by the breach. *Id.* at 456:2–12 ("Q. Okay. So it seems to me that the first step in your methodology is that you need to identify the data that are at issue for a given class member; is that fair? A. So, I would identify which types of data, for example, you know, home address, phone number, credit card number, that were compromised for a given class member, yes."). When asked how he would do this, Dr. Prince testified that he would get that information from the NDS database. *Id.* at 456:10–12 ("Q. How do you propose doing that? A. I believe that information, we would be able to get that from the NDS data."). Importantly, when Dr. Prince was asked, "Have you done that analysis for any potential

class member to date?", [25] he answered, "I don't believe I have damages calculation for a specific

class member for the inherent value thus far." *Id.* at 456:13–17.

When the obvious follow-up question was posed to Dr. Prince—"[w]hy didn't you attempt

to perform that at least for one or more of the bellwether plaintiffs?" —he answered:

> I'm trying to remember. I know we had some issues with the data
> the first time around. So, in the opening report, the data were
> basically unworkable for us until two days before the report was due.
> So that wasn't really a possibility. And then for the rebuttal, I think
> the method—the method, I think, is very clear. It's, I guess, it would
> be easy to do for any individual. But I think the method I thought
> was sufficiently clear.

*Id.* at 456:21–457:5.

On further questioning, he amplified his answer, saying "[b]ut, you know, I guess in this

case it's—I feel like it's eminently clear. If you give me an individual and tell me they lost their

address and phone number and credit card information, applying the method produces the number

with very minimal steps." *Id.* at 457:15–20. Thus, Dr. Prince had the data he needed to test his

market value methodology with respect to the NDS data for the bellwether plaintiffs (which he did

with regard to his overpayment model). He had ample time before he filed his rebuttal report to do

so. It would have been easy to do so. And he could have done so "with minimal steps." *Id.* But

because he felt his method was "sufficiently clear," he never bothered to apply it to the facts of

this case.[26] As will be emphasized below, this is one reason (but not the only reason), why Dr.

Prince's untested market value model is inadmissible.

---

[25] Recall that Dr. Prince stated in his first report, which was dated July 12, 2021, that he had
recently received the NDS data for the bellwether plaintiffs. Prince Initial Rep. at ¶ 12. His rebuttal
report was dated 90 days after his initial report (on October 12, 2021), and his second deposition
occurred on December 23, 2021. Thus, Dr. Prince had more than five months in which to test his
market value model on the NDS data for the bellwether plaintiffs in order to determine whether it
could accurately calculate market value damages. But he did not.
[26] As already noted, Dr. Prince did test his assumptions using bellwether plaintiff NDS data when
he formed his opinions regarding the overpayment damages, so his failure to do the same for the

Neither Defendants nor the Court is obligated to accept the untested *ipse dixit* pronouncement of an expert that he is satisfied that his method is reliable and will produce accurate results, without the inconvenience of having to test it to show that it is. This is precisely the type of opinion that Rule 702 (b)–(d) guards against, by requiring as a condition precedent to admissibility that the expert's conclusions be supported by "sufficient facts or data" and be "the product of reliable principles and methods," and that the expert "has reliably applied the principles and methods *to the facts of the case*." Fed. R. Evid. 702 (b)–(d) (emphasis added). And, while at the class certification stage, it is sufficient for Dr. Prince to show that he has a model that may reliably be applied to whatever class members are ultimately certified, this does not relieve him of the requirement to show that it can in fact produce reliable results by actually testing it. This is particularly so when, as here, Dr. Prince had access to the NDS data of the bellwether plaintiffs, ample time to test his model to demonstrate its reliability and the accuracy of its results, and it would have been "easy" for him to do so.

Step Two: Dr. Prince was asked, "So, is it fair to say that the next step here in your analysis would be to determine once you have an individual with a set of data, whether each component of that data set has value?" Prince Dep. 2 at 460:7–10. He answered, "Well, what I would say is I'd look for whether each component...I would look for in the market is there a comparable data for each type for which there is a market price. And for each one that has a market price, that would be included in the set that I would search over." *Id.* at 460:11–16. He amplified, explaining that he and his team first looked at "different entities that sell data, and what kind of data is it, what kind

---

market value model is contrary to his own approach. Inasmuch as Rule 702 and the *Daubert* factors place particular emphasis on the importance of testing expert assumptions, as opposed to conclusory assumptions, so that they will produce accurate results, the failure to test his assumptions regarding the market value model is especially concerning.

of prices do they charge." *Id.* at 461:14–16. Then, they "looked for subsets of those data that, at least, would be considered reasonably comparable to the type of data that, [in] my understanding, was breached from Marriott." *Id.* at 461:16–19.

As with his first step, Dr. Prince touted the ease with which he would be able to determine the market value of the bundle of PII of any particular class member, as documented in the NDS database. He was asked, "Have you performed that analysis for data pertaining to any of the potential class members in this case?" *Id.* at 463:13–15. He responded:

> So, looking at, for a given class member, what data was stolen from them, and then what's the value of those data? [Defendants' counsel said "Yes," and Dr. Prince continued] As I said…that wasn't even feasible with the opening report. And then the method, I believe it's so straightforward that, you know, literally you hand me any person, you tell me what the data fields are, name, address, phone number, I apply the method to that and the number pops out very easily."

*Id.* at 463:16–464:1. When Defendants' counsel followed up by asking, "And so, the answer is, no, you have not done it, at least to this point, as to any individual potential class member?", Dr. Prince replied, "I haven't." *Id.* at 464:2–5. Thus, as with the first step of his model, Dr. Prince had the bellwether plaintiff NDS data and the time to test the second step of his model, but he elected not to do so.

Step Three: Defendants' counsel then asked, "And then it seems to me that the third step in your methodology, Dr. Prince, is that you then determine the value of that bundle; is that fair?" *Id.* at 464:9–12. He answered, "I provide ways for measuring the value of that bundle." *Id.* at 464:13–14. He was asked how he would do this and responded that he described two approaches in his report. One was to set a "lower-bound" estimate, the other was a "less conservative" higher-bound value. *Id.* at 464:22–465:6. Defense counsel then asked whether Dr. Prince had "determined whether it's feasible to perform that analysis, the lower-bound and upper-bound analysis for all of the NDS data fields?" *Id.* at 465:6–9. He responded:

> I guess I'm—I'm hard pressed to see what would preclude me from being able to do that for all the NDS data fields. So, either if the data field doesn't have an associated price, then it wouldn't be included. If it has an associated price, then its included, and then I just apply the method. And literally I click "Go," and it would produce all the measures.

*Id.* at 465:10–17.

When he was asked by Defense counsel what he meant by "click 'Go,'" Dr. Prince explained that he and his team already did market analysis to determine the relevant data prices and had put together a table that summarized the prices so the remaining step would be to "execute the algorithms that I've laid out, and it will produce the damages figures." *Id.* at 466:15–467:1. But when Defense counsel asked him whether the data source tables included in Dr. Prince's report "reflect all available fields of data that exist in the NDS?" Dr. Prince responded, "I can't say that they necessarily cover all the fields in [the] NDS. So, you know, that—as I said, in the opening report, we didn't have the data in time to do that kind of analysis. For the rebuttal, I felt like the algorithm was clear and there was nothing further to elaborate on that." *Id.* at 467:7–15.

Algorithms are not omniscient, omnipotent, or infallible. They are nothing more than a systematic method of performing some particular process from a beginning to an end. Paul W. Grimm et al., *Artificial Intelligence as Evidence*, 19 Nw. J. Tech. & Intell. Prop. 9, 11 (2021) (defining algorithm). If improperly programmed, if the analytical steps incorporated within them are erroneous or incomplete, or if they are not tested to confirm their output is the product of a system or process capable of producing accurate results (a condition precedent to their admissibility),[27] then the results they generate cannot be shown to be relevant, reliable, helpful to the fact finder, or to fit the circumstances of the particular case in which they are used. As with the failure to test the first two steps of his market value model against the NDS data for the bellwether

---

[27] *See, e.g.,* Fed. R. Evid. 901(b)(9).

plaintiffs, as he so easily could have done, Dr. Prince's willingness to rely on his own untested conclusion that his model could reliably be applied to the facts of this case is insufficient to meet the requirements of Rule 702.

Step Four: Dr. Prince was questioned by Defense counsel regarding the final step of his market value model: "It seems to me that the final step of your methodology here is what you lay out at paragraph 138 of your original report. And that's to multiply the bundle price by what you call the quantity of sales, I believe. An estimated quantity of sales; is that right? A. Yes." Prince Dep. 2 at 471:4–10. When asked to explain how he was "going to make the determination of what that quantity of sales would be," Dr. Prince responded, "So I lay out the possibilities here. But the key thing that I emphasize is that none of these requires individual inquiry. It would be using—so, one of the papers I cite is the [OECD] paper in footnote 208 [Prince Initial Rep. at ¶ 138],[28] which talks about exactly this type of issue." Prince Dep. 2 at 471:14–19.

Dr. Prince stated that for "data-heavy" companies whose "value is largely determined by the data that they hold" he could:

> [S]imply do the ratio between the value of the company and the amount of data that they have as an approximation for, you know, how much—what kind of turnover they get out of the data that they have, which would then feed into the overall value of the company. So that's one way of going about it. That paper [OECD] also talks about looking at revenues, for example. But the bottom line is, there are multiple ways to think about that. And they're all very general, not requiring individual inquiry.

Prince Dep. 2 at 471:23–472:9. But when asked, "[S]itting here today, it sounds like you don't know precisely which direction you're going to take on this quantity of sales, right?", Dr. Prince

---

[28] Citing Org. for Econ. Coop. & Dev. ("OECD"), *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Valu*e, at 25, OCED Dig. Econ. Papers No. 220 (Apr. 2, 2013), http://dx.doi.org/10.1787/5k486qtxldmq-en. For ease of reference, I will also refer to this publication as the "OECD paper."

replied, "I would say I would probably start with exactly what I just described." *Id.* at 472:10–14.

When asked whether his model assumed that the same quantity of sales applied for "each and

every class member," Dr. Prince replied:

> It needn't necessarily be. I mean, one could potentially allow for a
> different estimate for Q [the number of sales of data for each class
> member] for different combinations of data. But one could very
> plausibly just estimate kind of a baseline Q that would be applied to
> everyone as well. That would be another reasonable approach.

*Id.* at 472:17–22.

This exchange reveals a number of serious (and unanswered) concerns about the reliability

of the methodology Dr. Prince would use to arrive at the number of times the data for each class

member was sold, or "Q", without which he simply cannot calculate classwide market value

damages. First, the OECD study, on which Dr. Prince seems entirely to rely in determining the

quantity of sales of class member PII, clearly explains the drawbacks of each of the methods Dr.

Prince appears to accept (at face value) as "plausible" market valuation methods to calculate the

total number of data sales—summarized conveniently in a chart at p. 20 of the OECD paper. The

chart makes clear that the methods described by Dr. Prince may be used as measures of *value* of

personal data ("indicators based on market valuation"), not methods of determining the total

*number of sales* of personal data of any individual consumer. And Dr. Prince fails entirely to

explain how methodology designed to be used for one purpose (valuation of personal data) reliably

can be used for a completely different purpose (estimating the total quantity of sales of one

person's personal data).[29] This fails to comply with the requirement of Rule 702(d) that the

---

[29] The earlier exchange demonstrates the off-the-cuff nature of Dr. Prince's approach to his market
value damages methodology. He makes it quite clear in his deposition testimony and reports that
he relied heavily on the OECD paper in developing his methodology. Dr. Prince claims that the
multiple possible models for calculating the value of individual items of PII identified in the OECD
paper (each with its own drawbacks and potential for erroneous conclusions) would yield a
different quantity of PII sales for any or every class member and could account for different values

proponent of expert opinion testimony has "reliably *applied the principles and methods to the facts of the case.*" Fed. R. Evid. 702(d) (emphasis added).

Second, and importantly, the OECD paper prefaces its discussion of various means of estimating the value of personal data based on market valuation with a clear caveat:

> There are two important points that should be kept in mind in this context. Firstly, it must be highlighted that there is no single, perfect measure of value of personal data. Each of the presented measures might suffer from certain methodological biases and measurement errors. It should also be reemphasized that it is crucial not to isolate personal data from the underlying context of the business model in question.

OECD Paper at 19. Turning to the first method discussed in the OECD paper—"financial results per data record" (the one that Dr. Prince said he "probably would start with")—it is described as "[a]ggregated market cap (revenues, or net income) of a company divided by the total number of personal data records used by this company." OECD Paper at 20. Its benefits are described as "relatively easy to identify, reflects actual economic value added generated through personal data." *Id.* But its potential drawbacks are described as follows: "Likely to be inaccurate, as numerous other components impact market cap/revenues/income of a company; [p]ossible synergy effects could lead to overestimates for firms with larger datasets; [a]ppropriateness of this approach depends on what portion of turnover is directly tied to personal data." *Id.*[30] But nowhere in either

---

for each class member depending on the combination of comprised data for each class member. Prince Dep. 2 at 472:17–22. However, all financial valuation methods proposed in the OECD paper (market capitalization, revenue, profit) create equal value for each data record, no matter what the content, and all methods infer a common "Q" for each record. Dr. Prince has failed to identify how he would be able to formulaically calculate a separate "Q" for each individual record using the methods proposed. But even if Dr. Prince could justify this economic legerdemain, he failed to test it using the available NDS database for any bellwether plaintiff, which itself falls short of complying with Rule 702.

[30] The OECD paper provided more detail about the use of the "financial results per data record" method of calculating the value of personal data. It stated, relevantly: "The first method for estimating the value of personal data looks at the financial results of a company such as market capitalization, revenues, and net income on a per-user or per-record basis as a way to capture the

his initial report (where he mentioned the OECD paper in a footnote on the next to last page of his report), his rebuttal report, or either of his depositions, does he explain how he determined that this methodology's drawbacks did not outweigh its benefits, or that it would be appropriate for use in estimating "Q"—total sales of class member personal data for purposes of calculating market value damages. And just as concerning, he did not attempt to test this methodology using the NDS data of any bellwether plaintiff, despite the fact that he had this data and months in which to do so.

Similarly, Dr. Prince's testimony that the OECD paper also allows him to determine the market value of PII by "looking at revenues"[31] fails to account for the serious shortfalls of this methodology identified in the OECD paper itself. It states:

> There are several limitations related to the use of financial results (e.g., market cap, *revenues* or net income) divided by the number of users or records as a measure for value of personal data. There are numerous components other than personal data that impact financial results of a company, such as its human and physical capital stock, volume of other intangible assets and expertise. Consequently, this measure could significantly overestimate the value of personal data, particularly in industries where personal data are not the main input factor of production. . . . The measure of revenues per personal datum/user does have limitations because revenues only contribute to economic growth insofar as they generate added value (or surplus). . . . In addition, the relationship between the volume of personal data and financial outcomes may not be linear, even for companies that rely heavily on personal data. For example, it is likely that the use of personal data in an economic activity could include synergistic effects, i.e., when for a given company the economic value of a single isolated data record is smaller than the economic value of the same data record in

---

market values of the data in each record. This type of analysis only works for firms that either derive most, if not all, of their revenues from personal data or firms that separate out revenues for personal data activities. Many companies that work with personal data are not publicly traded or do not report information in sufficient detail to perform these analyses." OECD Paper at 20. Dr. Prince does not explain how he determined that this model—which he stated was the one he "probably" would start with, was appropriate for estimating the quantity of class member data sales, given its limitations as noted in the paper. Thus, he fails to meet the requirements of Rule 702(c) (expert testimony is the product of reliable principles and methods).

[31] Prince Dep. 2 at 471:20–472:6.

> a large, consistent dataset. Such synergies could in turn lead to significant estimation biases.

OECD Paper at 24–25 (emphasis added). Dr. Prince does not explain how he accounted for these shortfalls in his model, and, of course, he failed to test it with the NDS database information for any of the bellwether plaintiffs. This fails to comply with the requirements of Rule 702.

Another of the methods for estimating value of personal data based on market valuation discussed in the OECD paper (not specifically referenced by Dr. Prince, but presumably included in his reference to the OECD article as presenting "multiple ways" to determine quantity of class member data sales) is described as "market prices for data." *Id.* at 20. It is described as "price per personal data entry offered on the market by data brokers." *Id.* Its benefits are referenced as "relatively easy to identify, reflects market value of a given specific data entry," and its potential drawbacks as "[a]part from the data value, it includes the cost of data search and processing. It also neglects the context in which the data is sold, which has a large influence on the demand (and price) for data." *Id.* As with the "financial results per data record" method, Dr. Prince failed to explain how this method of estimating the *value* of personal data based on market data could be used to estimate the total number of *sales* of each class member's NDS data, a completely different purpose. And, as already noted, Dr. Prince did not feel the need to test this method using bellwether plaintiff NDS data and actual market prices for this data. Accordingly, he likewise fails to meet the requirements of Rule 702 with respect to its use.

The same may be said of the remaining valuation methods listed in the OECD paper, which Dr. Prince did not discuss in any detail. And whether considered individually or collectively, Dr. Prince has failed to identify and test with available bellwether NDS data *any* method of

determining "Q"—the number of sales of class member personal data, which is an essential component of his model to formulaically determine classwide damages for loss of market value of class member PII.[32] His failure to test his assumptions with the NDS data that he had for the bellwether plaintiffs (even though he repeatedly testified that it would be easy for him to do so) is in sharp contrast to the methodology he applied to his overpayment model—where he first tested his model with historical data (because he had not received NDS data) and later re-tested using NDS data for the bellwether plaintiffs, once it was made available. Rather, for his market value damages, Dr. Prince was content to just trust his assumptions that his model would work, and that his algorithm was equal to the task of performing the calculations that were needed. And his vagueness about how he would determine Q, the quantity of sales for each class member's PII—an essential component to his ability to calculate the revenue those sales would have produced (which is what the damages would be)—leaves half of his formula both unexplained as well as untested. Moreover, his failure to address the warnings in the OECD article about the shortcomings of each of the potential methods he said he could possibly use to calculate market revenue damages fails to demonstrate that any of these methods would produce reliable results. Thus, at *each* of the four steps of his market value damages model, Dr. Prince fails to meet the requirements of Rule 702. Failure at *any* of the four steps would be sufficient to disqualify the market value model. Therefore, I am GRANTING Defendants' motion to exclude this category of damages.[33]

---

[32] Neither did he explain how to overcome the substantial shortcomings of each of the valuation methods identified in the OECD article itself, and, of course, he failed to test his assumptions using bellwether plaintiff NDS data. Taken individually or collectively, these failures further demonstrate that Dr. Prince's market value model fails to meet the requirements of Rule 702.

[33] Dr. Tucker raises many other valid deficiencies in Dr. Prince's market value model in her rebuttal report, but I need not discuss them because the above discussion amply demonstrates why Dr. Prince's model does not pass muster under Rule 702. *See* Tucker Suppl. Rep.

## CONCLUSION

In conclusion, Defendants' motion to exclude Dr. Prince's opinions regarding the overpayment damages model is DENIED for purposes of ruling on the class certification motion. Further discovery will proceed, under the capable supervision of the Special Master, with the production of relevant NDS database information regarding the class members for which the court has granted class certification. A supplemental report will be prepared by Dr. Prince once he has had the opportunity to test his overpayment model with the forthcoming discovery. Dr. Prince may be deposed again regarding his supplemental report. Dr. Tucker may submit a supplemental rebuttal report to address the supplemental report by Dr. Prince, and Dr. Tucker may be deposed. Thereafter, if Defendants seek to renew their challenge to Dr. Prince's overpayment methodology, they may submit a three-page letter setting forth the anticipated grounds for doing so, and a scheduling conference will be held with respect to briefing the motion.

Defendants' motion to exclude Dr. Prince's opinions regarding the market value damages model is GRANTED. A separate order memorializing this opinion will follow.

_____May 3, 2022_____
Date

_____
Paul W. Grimm
United States District Judge

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

IN RE: MARRIOTT INTERNATIONAL
CUSTOMER DATA SECURITY BREACH
LITIGATION

MDL No. 19-md-2879

## MEMORANDUM ORDER AND OPINION

Pending before this Court is Plaintiffs' Motion for Class Certification [Doc. 858], which has generated rounds and rounds of briefing. For the reasons hereinafter stated, the Motion will be granted.

The facts of this case are well set out in the opinion of the United States Court of Appeals for the Fourth Circuit in *In re Marriott International, Inc.*, 78 F.4th 677 (4th Cir. 2023):

> In November 2018, Marriott International, Inc., disclosed that it had been subject to a massive data breach: From July 2014 to September 2018, hackers had access to the guest reservation database of a hotel chain, Starwood Hotels & Resorts Worldwide, that Marriott had purchased mid-breach in September 2016. Through the Starwood database, the hackers were able to view customers' personal information, including names, mailing addresses, birth dates, email addresses, phone numbers, and, in some cases, passport and payment card information. The compromised information was associated with both regular guests and those who were

1

members of the Starwood Preferred Guest Program. In total, the breach affected roughly 133.7 million guest records within the United States.

Consumer plaintiffs across the country began filing lawsuits against Marriott. The suits claimed, in collective effect, that Marriott failed to take reasonable steps to protect its customers' personal information against the foreseeable risk of a cyberattack, giving rise to tort liability. They also alleged that Marriott had breached contractual and statutory duties the company owed to its customers. Those actions were ultimately consolidated in multi-district litigation in the District of Maryland, where Marriott is headquartered. The plaintiffs added as a defendant Accenture LLP, a third-party provider of IT services to Starwood and then Marriott during the relevant period.

In their operative complaint, the plaintiffs asserted various state-law contract and statutory consumer-protection claims against Marriott, along with state-law tort claims for negligence against both Marriott and Accenture. Marriott and the plaintiffs then identified ten "bellwether" claims to test the sufficiency of the pleadings; each was keyed to the law of a particular state, with the named plaintiffs from the selected state serving as the bellwether plaintiffs. The plaintiffs and Accenture followed a similar process to identify test jurisdictions and named plaintiffs for the state-law negligence claims against that defendant. Marriott and Accenture then moved to dismiss the representative plaintiffs' claims.

2

The district court denied the defendants' motions in relevant part, allowing the plaintiffs' claims to proceed.  *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig. (Marriott I)*, 440 F.Supp.3d 447 (D. Md. 2020); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig. (Marriott II)*, 2020 WL 6290670 (D. Md. Oct. 27, 2020).  Most important here, the district court held that the named plaintiffs had adequately alleged "injury in fact" for purposes of Article III standing, and in so doing, it identified the theories of harm that would go on to guide the class certification litigation. *Marriott I*, 440 F. Supp. 3d at 456–66; *Marriott II*, 2020 WL 620670, at *4–5 (incorporating reasoning of *Marriott I*).  Everyone agreed that plaintiffs who had experienced actual "fraudulent misuse of their personal information" had suffered a cognizable injury. *Marriott I*, 440 F.Supp.3d at 456 n.4, 460 n.6.  But the district court also found, as relevant here, that the remaining plaintiffs had advanced three other forms of injury sufficient to establish standing: (1) that they had spent time and money mitigating a non-speculative threat of identity theft (the "mitigation" theory); (2) that the cyberattack had deprived them of the inherent market value of their personal identifying information (the "loss of market value" theory); and (3) that they had paid more for their hotel rooms than they would have had they known of Marriott's allegedly lax data-security practices (the "overpayment" theory). Id. at 460–66.

B.

The plaintiffs moved to certify various classes, and in the decision now before us, the district court granted that motion in part. *See **In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig. (Marriott III)***, 341 F.R.D. 128 (D. Md. 2022). On the plaintiffs' contract and consumer-protection claims against Marriott, the court certified three state-specific damages classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure. *Id*. at 172–73. And on the plaintiffs' negligence claims against Marriott and Accenture, the court certified four state-specific "issue" classes under Rule 23(c)(4), limited to the elements of duty and breach, with individualized proceedings on injury, causation, and the amount of damages to follow. *Id*. at 173. Our ruling today turns primarily on the import of a class-action waiver signed by members of the damages classes against Marriott. But that issue is intertwined with others in this complex proceeding, and the defendants' objections are wide-ranging, so we lay out much of the district court's comprehensive opinion below.

1.

The district court began by returning to the question of the class representatives' standing. *Id*. at 140–43. The court relied mostly on its prior analysis from the motion to dismiss stage, reasoning that the same evidentiary burden applied through class certification and until summary judgment, at which point the defendants could raise further standing

4

challenges. *Id*. at 141. The district court did, however, make one adjustment to the scope of the damages classes against Marriott in response to standing concerns. Those classes, the court explained, relied in critical part on an alleged "overpayment" injury: The class members paid more for their hotel rooms than they were worth, given Marriott's data-security deficiencies. But as defined by the plaintiffs, Marriott argued, the classes also included customers, like those traveling for work, who were reimbursed for their stays and thus did not themselves incur the hypothesized economic injury. *Id*. at 142. The district court agreed, and thus limited the classes proceeding on the overpayment theory of injury – the contract and consumer-protection classes against Marriott – to "persons who bore the economic burden for hotel room[s]" and were not reimbursed for their stays. *Id*. at 142–43.

That raised a second concern for Marriott: that the classes, so defined, were insufficiently "ascertainable" because there was no administratively feasible way of determining who was and was not a class member. *See* **EQT Prod. Co. v. Adair**, 764 F.3d 347, 358 (4th Cir. 2014) (discussing Rule 23's "implicit threshold requirement" that members of a proposed class be "readily identifiable" (internal quotation marks omitted)). Here, the district court disagreed, finding no reason to think – at least at present – that identifying class members who had paid their own way would call for any "exceptionally complicated administrative review." **Marriott III**, 341 F.R.D. at 144. But the court cautioned that it would continue to monitor

5

this process, redefining the classes or even decertifying them altogether if identifying members proved too unwieldy. *Id*. at 146.

2.

The court turned then to the issue implicating the class-action waivers at the heart of this appeal: Rule 23(a)'s "typicality" requirement, under which a class representative's claims and defenses must be typical of those of the class. *See* Fed. R. Civ. P. 23(a)(3); *Marriott III*, 341 F.R.D. at 149. The problem here, as Marriott saw it, was that the class representatives, all members of the Starwood Preferred Guest Program ("SPG"), had a contractual relationship with Marriott that differed critically from that of other class members. As SPG members, every class representative had signed a "Terms & Conditions" contract with a provision purporting to waive his or her right to pursue class litigation. *See* J.A. 727 ("Any disputes arising out of or related to the SPG Program or the[ ] SPG Program Terms will be handled individually without any class action ...."). But as the plaintiffs had defined them, the consumer-protection and negligence classes against Marriott included non-SPG members, who had not signed such waivers. And that, the district court concluded, did indeed "raise[ ] serious typicality concerns," because Marriott had indicated that it would rely on the waiver to argue that SPG members – like the class representatives, but unlike many class members – could not pursue class litigation at all. *Marriott III*, 341 F.R.D. at 149.

6

To address that concern, the district court redefined all classes against Marriott to include only SPG members, bringing the class representatives into alignment with class membership. *Id*.  The result, of course, was that now every proposed class member litigating against Marriott would be someone who had purportedly given up the right to engage in just such class litigation.  But the district court did not further consider the import of the class waiver on its certification decision.  Instead, in a footnote, it first observed that the plaintiffs had raised a "strong argument" that Marriott had waived its right to enforce the class-action waiver; though it was included as a "one-line, boilerplate affirmative defense" in Marriott's answer, Marriott had not otherwise pressed the issue as "part of the bellwether negotiation process" or in any separate motion. *Id*. at 149 n.26.  And in any event, the court concluded, it could address the class-action waiver, along with other affirmative defenses, after discovery and at the merits stage of the litigation. *Id*.

After addressing other threshold Rule 23(a) requirements not at issue on appeal, the court proceeded to certify several state-specific Rule 23(b)(3) damages classes against Marriott on the plaintiffs' contract and consumer-protection claims.  Here, the focus was on Rule 23(b)(3)'s predominance requirement, *see* Fed. R. Civ. P. 23(b)(3), which in this context meant that damages must be "capable of measurement on a classwide basis." *Marriott III*, 341 F.R.D. at 161 (quoting *Comcast Corp. v.*

7

*Behrend*, 569 U.S. 27, 34 (2013)). Though damages need not be calculated on a classwide basis, that is, the plaintiffs had to demonstrate that there was a "common, classwide method for determining individual damages." *Id*. (internal quotation marks omitted). And as the court explained, it had approved just such a common method for calculating the plaintiffs' alleged overpayment injuries in a companion Daubert opinion issued the same day. *Id*. at 161–62 & n.48 (citing *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig. (Marriott IV)*, 602 F. Supp. 3d 767 (D. Md. 2022))."

*In re Marriott International, Inc.*, 78 F.4th at 680–683.

After the district court entered its certification order, Marriott and Accenture timely petitioned the Fourth Circuit for permission to appeal under Rule 23(f) of the Federal Rules of Civil Procedure. The Fourth Circuit granted the petitions.

On appeal, the Fourth Circuit determined that the district court erred in not addressing the issue of whether the plaintiffs, by agreeing to the SPG Terms and Conditions, agreed to bar the certification of a class action. Accordingly, the Fourth Circuit vacated the class certification and remanded this case for consideration of the issue. The Court further found that, in the absence of a valid class certification against Marriott, the class certification against Accenture cannot stand. Accordingly, the class certification with regard to Accenture was vacated and remanded as well.

Since the major issue on remand is the effect of the "class action waiver," it would appear prudent to first examine the provision. On the last page of the Pre-August SPG

Program Terms, there is a "class waiver" provision found in the choice of law and the venue section, as follows:

> 13.21 Choice of Law and Venue. Any disputes arising out of or related to the SPG Program or these SPG Program Terms will be handled individually without any class action, and will be governed by, construed and enforced in accordance with the laws of the State of New York, United States, without regard to its conflicts of law rules. The exclusive jurisdiction for any claim or action arising out of or relating to these SPG Program Terms or the SPG Program may be filed only in the state or federal courts located in the State of New York, United States.

This Court makes the following observations with regard to the Choice of Law and Venue provision:

1. The entire provision contains only two sentences;

2. The heading of the provision makes no reference to individual handling of claims;

3. The provision is buried on the last page of the Terms;

4. While it has been described as a class action waiver, the provision is broader than that, mandating the handling of all claims on an individual basis;

5. The provision requires that New York law apply to any dispute;

6. The provision limits the jurisdiction to handle any claims to the state and federal courts of New York;

7. Rather than referencing the parties, this provision purports to control the court's management of the litigation, i.e. will be handled individually.

9

The plaintiff's contend that Marriott waived or forfeited the provision by its inaction and action. A court may find that a party has waived a contractual provision when the party takes actions that are inconsistent with the provision. Waiver of an argument precludes review, while mere forfeiture of an argument permits plain error review. "Forfeiture 'is the failure to make the timely assertion of a right,' while 'waiver is the "intentional relinquishment or abandonment of a known right."' *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))." *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 498–99 (7th Cir. 2018).

"There is no concrete test to determine whether a party has engaged in acts inconsistent with its right to arbitrate; rather, we consider the totality of the parties' actions." *Hill v. Xerox Bus. Servs.*, LLC, 59 F.4th 457, 471 (9th Cir. 2023).

"Outside the arbitration context, a federal court assessing waiver does not generally ask about prejudice. Waiver, we have said, 'is the intentional relinquishment or abandonment of a known right.' *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022).

In this case, this Court finds that Marriott waived the Choice of Law and Venue provision:

1. Marriott requested that all of the cases be consolidated into an MDL action. An MDL is the antithesis of handling each claim on an individual basis;

2.      When Marriott sought the MDL, it asked for "transfer and consolidation to eliminate duplicative discovery, avoid conflicting rulings, reduce litigation costs, and conserve the time and effort of the parties, attorneys, witnesses, and courts";

3.      In seeking the MDL, Marriott added that "separately litigating each of the 59 related actions, plus additional tag-alongs, offer no benefit and will inevitably heighten the duplication, complexity, and burdens of these matters for all stakeholders";

4.      Marriott requested that the MDL be assigned to the District of Maryland, which is wholly inconsistent with the Choice of Law and Venue provision's requirement that any case be filed in New York;

5.      Despite the Choice of Law and Venue provision, Marriott stated that venue was proper in the District of Maryland;

6.      At status conferences in April and May, 2019, the parties jointly suggested a bellwether approach using plaintiffs from several states and claims under those various states' laws.  For several of the states, Marriott nominated multiple representative plaintiffs. Again, this is wholly inconsistent with handling cases on an individual basis, in New York, applying only New York law.

In the bellwether process, Marriott noted that it was not waiving any arguments it may have regarding choice of law and that each party is recerving its rights as to the same. However, a reservation of rights is not an assertion of rights.  ***Hooper v. Advance America Cash Advance Centers of Missouri, Inc.***, 589 F.3d 917, 923 (8th Cir. 2009).

In its decision, the Fourth Circuit indicated that by citing the Choice of Law and Venue provision in its answer and only raising it in opposition to class certification, Marriott adequately preserved its individual claims provision.  This Court respectfully disagrees.

11

The provision prohibits any collective handling of the claims, including by class action.  It is not merely a class action waiver.

It appears that Marriott having not fared as well as it had hoped in the bellwether process is now attempting to invoke one half of one third of the Choice of Law and Venue provision.  It has clearly waived 5/6 of the provision.  It now seeks to enforce the words "class action" completely out of context.  Marriott should not be permitted to cherry-pick the rules from a provision, having waived every other term therein.  "In this case, the arbitration agreement also included a waiver of the right to bring a class action suit.  If GC Services waived any right to arbitrate, the company necessarily waived any right to oppose class certification premised on the agreement.  *See A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1065 n.17 (7th Cir. 2018)."  *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018).  "Individually without class action" is a single phrase - it is a single rule.  And it has been waived.

As the Supreme Court noted in *Stern v. Marshall*:

We have recognized "the value of waiver and forfeiture rules" in "complex" cases, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487–488, n. 6 (2008), and this case is no exception. In such cases, as here, the consequences of "a litigant ... 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor," *Puckett v. United States*, 556 U.S. 129, 134 (2009) (some internal quotation marks omitted)—can be particularly severe.  If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation,

12

then he should have said so—and said so promptly. *See United States v. Olano*, 507 U.S. 725, 731 (1993) ("'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited ... by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'" (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944))).  Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there.  We will not consider his claim to the contrary, now that he is sad.

*Stern v. Marshall*, 564 U.S. 462, 481–82 (2011).

This Court also has reservations as to the validity of the Choice of Law and Venue provision, even were it not waived.  In *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the United States Supreme Court held that a New York statute precluding a class action to recover a penalty such as statutory interest was invalid because it conflicted with Rule 23 of the Federal Rules of Civil Procedure.

The Fourth Circuit, relying on *Shady Grove*, held that a West Virginia state statute requiring a pre-filing expert report for a claim of medical malpractice conflicted with the Federal Rules of Civil Procedure and was invalid in Federal court.  *Pledger v. Lynch*, 5 F.4th 511 (4th Cir. 2021).

In *Johnson v. West Virginia Univ. Bd. of Govs.*, 2022 WL 908496, at *13 (S.D. W.Va. March 29, 2022) (Johnston, C.J.), the Court held that "[t]he applicability of the *Shady Grove* analysis is not limited to cases involving federal question jurisdiction—which was the case in *Pledger*—rather, cases involving diversity jurisdiction and supplemental

jurisdiction are also within *Shady Grove's* purview. *See* ***Doe #5 v. Raleigh General Hospital, LLC.***, 2021 WL 4496241, at *5 (S.D. W.Va. Sept. 30, 2021) [(Volk, J.)] ('Simply put, the conflict between the pre-suit notice and the Federal Rules of Civil Procedure does not dematerialize in diversity actions. *Pledger* applies just the same.')."  Chief Judge Johnston added that "*Pledger's* holding is categorical: 'state-law certification requirements like West Virginia's [MPLA] are inconsistent with the Federal Rules of Civil Procedure, and thus displaced by those rules in federal court.' *Pledger*, 5 F.4th at 514.  It was of no consequence that Pledger's claims were brought pursuant to the FTCA and invoked the court's federal question jurisdiction, as claims brought under the FTCA 'incorporate[ ] state-law rules of "substantive liability," [but] not procedure.' *Id.* at 523 (citing ***FDIC v. Meyer***, 510 U.S. 471, 478 (1994)).  Similarly, here, it is of no consequence that Plaintiff's claims were brought pursuant to the MPLA, thereby invoking this Court's supplemental jurisdiction.  *Pledger's* holding, and the *Shady Grove* analysis set forth therein, are applicable in this case because it is in federal court, notwithstanding this Court's jurisdiction over Plaintiff's claims." *Johnson*, 2022 WL 908496, at *13.

Marriott cites a number of cases which have found class action waivers to be enforceable.  Many of these case dealt with class action waivers in the arbitration context. ***American Express Co. v. Italian Colors Restaurant***, 570 U.S. 228 (2013); ***Viking River Cruises, Inc. v. Moriana***, 596 U.S. __, 142 S.Ct. 1906 (2022); ***In re Titanium Dioxide Antitrust Litigation***, 962 F.Supp.2d 840 (D. Md. 2013); ***County of Orange v. United States District Court***, 784 F.3d 520 (9th Cir. 2015).  Of course, where the parties agree to resolve their case in a non-judicial forum, the Federal Rules have limited applicability.

14

Marriott has, however, cited to some cases which have upheld class action waivers in a non-arbitral context. In *Crews v. Titlemax of Delaware, Inc.*, 2023 WL 2652242 (M.D. Pa. March 27, 2023), the District Court upheld a stand alone class waiver, finding that *Shady Grove* did not address whether the parties, through contract, can waive their right to bring claims as part of a class.

Similarly, in *Deluca v. Royal Caribbean Cruises, LTD*, 244 F.Supp.3d 1342 (S.D. Fla. 2017), the District Court upheld the validity of a waiver where the first paragraph of the ticket contract contains bolded language specifically directing passengers to important terms and conditions. The notice states:

**IMPORTANT NOTICE TO GUESTS**

**YOUR CRUISE/CRUISETOUR TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF PASSENGERS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS CONTRACT, PAYING PARTICULAR ATTENTION TO SECTION 3 AND SECTION 9 THROUGH 11, WHICH LIMIT OUR LIABILITY AND YOUR RIGHT TO SUE, AND RETAIN IT FOR FUTURE REFERENCE.**

Paragraph 9(b) contained a class action relief waiver printed in all caps.

This Court finds the above cases to be unpersuasive. In this case the Choice of Law and Venue provision does not state that SPG members will not bring or participate in class actions. Rather, it seeks to limit this Court's own authority by stating that "[a]ny disputes . . . will be handled individually." The parties cannot by agreement dictate that a district court must ignore the provisions of Rule 23 of the Federal Rules of Civil Procedure.

In ***Martrano v. Quizno's Franchise Co., L.L.C.***, 2009 WL 1704469 (W.D. Pa. June 15, 2009), Magistrate Judge Lenihan reviewed a defense request that the plaintiffs be barred from participating in a class action or consolidation based upon a contractual bar.

The Court analyzed the issue as follows:

> "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." ***Liberty Mut. Ins. Co. v. Treesdale, Inc.***, 419 F.3d 216 (3d Cir. 2005), quoting ***Gasperini v. Center for Humanities, Inc.***, 518 U.S. 415, 427 (1996).  Although classification of a law as 'substantive' or 'procedural' for this purpose is "sometimes a challenging endeavor", *id.*, "[c]oncerning matters covered by the Federal Rules of Civil Procedure, the characterization question is usually unproblematic: It is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." ***Gasperini***, 518 U.S. at 427 n. 7. Thus,

> > When a situation is covered by one of the Federal Rules ... the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

> ***Hanna v. Plumer***, 380 U.S. 460, 471 (1965), *quoted in* ***Stewart Organization, Inc. v. Ricoh Corp.***, 487 U.S. 22, 27(1988).

16

Consolidated and class-wide adjudication are clearly procedural devices governed by specific Federal Rules. *See* Fed.R.Civ.P. 23, 42. Accordingly, the question before the court is whether giving effect to a purported waiver of consolidated or class-wide adjudication would comport with the language and purpose of those Rules. For the reasons explained below, this Court concludes that it would not.

This Court has, after extensive review, located no case authorities addressing the proper role of contractual waivers by the parties in class action or consolidation determinations under Rules 23 or 42. Virtually all of the reported cases on contractual class action waivers involve mandatory arbitration clauses, a circumstance that renders them patently distinguishable from the present case. Simply stated, whether the parties may effectively agree, as a matter of State contract law, to constrain the procedures to be followed in a privately-contracted dispute resolution has little apparent bearing on whether such an agreement also constrains a federal court's application of its own rules, whose authority derives from a federal statute (and ultimately from the Constitution) rather than from a private contract.

The Court does find guidance, however, in cases considering the effect of contractual forum-selection agreements on federal venue. In **Stewart Organization**, the Supreme Court "rejected the ... contention that the effect ... of a forum selection clause should be a matter purely of contractual interpretation governed by state law", instead requiring the district

17

court to "determine whether to give the clause effect by transferring the case to ... the contractually specified forum" by applying on the standards laid out in .the federal change of venue statute, 28 U.S.C. § 1404(a).  *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir. 1995). The Court accordingly concluded that [t]he forum-selection clause, which represents the parties' agreement as to the most proper forum, should receive neither dispositive consideration ... nor no consideration ..., but rather the consideration for which Congress provided in § 1404(a)." *Stewart Organization*, 487 U.S. at 31.  Thus, rather than being treated as a binding agreement overriding otherwise applicable venue standards, "a forum selection clause is treated as a manifestation of the parties' preferences as to a convenient forum", which is a factor encompassed within the framework of § 1404. *Jumara*, 55 F.3d at 880.54

\*     \*     \*

More particularly, if the prerequisites of Rule 23(a) are satisfied, whether a class action may be maintained turns on whether injunctive or declaratory relief is warranted for the whole class by defendants' conduct on grounds that apply generally to the class, or whether common questions predominate over individual questions and a class action is superior to other methods of adjudication. *See* Fed.R.Civ.P. 23(b)(2),(3).  These controlling standards make no mention of whether a class action is preferred by the parties.  Likewise, as long as actions involve a common question of law or

18

fact, Rule 42(a) contemplates issuance of consolidation orders "to avoid unnecessary cost or delay"—a standard that also does not call for consideration of the parties' preferences.  Under both Rule 23 and Rule 42, the ultimate governing standard is furtherance of efficient judicial administration, which leaves no room for enforceability of private agreements among litigants to forego the efficiencies potentially afforded by consolidated or class adjudication.

This is not just an academic issue.  Defendants' invocation of the Agreement's class action / consolidation waiver could potentially force this and other courts to hold separate trials of dozens, or hundreds, or even thousands of cases involving extensively overlapping issues.  Such a result is flatly inconsistent with the governing Rules, which are to be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed.R.Civ.P. 1.

Because this Court finds that as a matter of federal law the parties' waivers are ineffective to override the court's discretion to certify a class under Rule 23 or consolidate proceedings under Rule 42, it is unnecessary to address Plaintiffs' contention that such waivers are void due to unconscionability under State law.

*Martrano v. Quizno's Franchise Co.*, 2009 WL 1704469, at *20–21 (W.D. Pa. June 15, 2009) (footnotes omitted).

For the above reasons, this Court finds that Marriott waived any benefit from its Choice of Law and Venue provision.  In addition, this Court finds the adhesive provision[1], buried on the last page of the Terms cannot direct this Court to ignore the provisions of Rule 23 of the Federal Rules of Civil Procedure.

This Court also finds that inasmuch as this Court will re-certify the classes with respect to Marriott in this case, the class certification with regard to Accenture will be reinstated again.

Accordingly, this Court will reinstate the classes as certified by Judge Grimm in *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128 (D. Md. 2022).

This Court notes that on November 27, 2023 [Doc. 1154] Marriott requested oral argument on the Choice of Law and Venue issues.  At the time that the undersigned received the Motion, the undersigned was approximately two-thirds of the way through preparing this Order.  Accordingly, Marriott's Unopposed Request for a Hearing to Address the Court's September 22, 2023, and November 7, 2023, Orders [**Doc. 1154**] is **DENIED AS MOOT**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

---

[1] This Court notes that in ***Atlantic Marine Const. Co. v. U.S. District Court***, 571 U.S. 49, 66 (2013), the Court stated "A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place."  This was hardly the case herein.

**DATED**: November 29, 2023.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE